1
2
3
4
5
6

*The Honorable Richard A. Jones*

7
8

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9
10
11
12
13
14
15
16
17
18
19
20
21
22

MICHAEL J. FLYNN; and DENNIS LEE
MONTGOMERY and BRENDA KATHLEEN
MONTGOMERY, husband and wife,

          Plaintiffs,

      v.

COUNTRYWIDE FINANCIAL
CORPORATION;

COUNTRYWIDE HOME LOANS, INC.;

COUNTRYWIDE BANK, FSB;

BANK OF AMERICA, N.A., successor to the
COUNTRYWIDE DEFENDANTS;

BAC HOME LOANS SERVICING, LP,
successor to the COUNTRYWIDE
DEFENDANTS, LP;

BANK OF AMERICA CORPORATION,
successor to the COUNTRYWIDE
DEFENDANTS; and

DOES 1-50,

          Defendants.

Case No. 2:13-cv-00360-RAJ

**SECOND AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

23
24

    COME NOW Plaintiffs, by and through their counsel, Paul E. Brain and the Brain Law Firm PLLC, and allege and complain as follows:

25

## I. INTRODUCTION AND OVERVIEW OF CLAIMS

26
27
28

    1.1    This is a civil action filed by Michael Flynn ("Flynn") and Dennis and Brenda Montgomery (the "Montgomerys"), collectively "Plaintiffs," against NV Mortgage Inc., Countrywide Financial Corporation, Countrywide Home Loans Inc., Countrywide Bank FSB,

Bank of America Corporation, Bank of America N.A. and BAC Home Loans Servicing L.P. (collectively for the sake of convenience only "Defendants"), for misconduct related to Defendants' origination and servicing of the Montgomerys' single-family residential mortgage for a home located at 3812 94th Avenue NE, Yarrow Point, King County, Washington (the "Subject Property").  The misconduct involving the Montgomerys' mortgage is part of a larger pattern of misconduct in connection with which Defendants have entered into a "Consent Judgment" for violation of, among other laws, the Unfair and Deceptive Practices Acts of multiple states including Washington and Nevada, the False Claims Act, the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), violations of the Uniform Standards of Professional Appraisal Practice ("USPAP"), and the Bankruptcy Code and Federal Rules of Bankruptcy Procedure.  Defendants have also entered into civil suit settlements paying billions of dollars in connection with the frauds recited herein, including a $375 million settlement to one of its insurers, Syncora Gaurantee Inc.  Thus, the frauds and schemes recited herein have become common public knowledge supported by overwhelming evidence, which Defendants herein have admitted.  Defendants have also been sued by the Unites States Government for many similar acts alleged herein.  *See* Complaint filed in *Ex rel Edward O'Donnell v. Bank of America Corporation*, Case No. 12-cv-1422 (S.D.N.Y.).

      1.2     Defendants violated all of the foregoing laws in connection with the Montgomerys' loan and mortgage.  Defendants also violated their own underwriting requirements in making the loan to the Montgomerys (the "Loan"); and the underwriting requirements imposed by multiple federal regulations, including regulations imposed on "Fannie Mae" loans.  Additionally, upon information and belief, Defendants may have already received payment on the Loan, or has made claims on the Loan from an insurer who insured the Loan for purpose of selling the Loan to investors as part of a "bundle" of thousands of loans for the purpose of issuing notes on the "bundled" loans – called "collateralized loan obligations" ("CLO's") or "Collateralized Debt Obligations" ("CDO's") – generically called "derivatives." Defendants also uniformly and systematically required its Loans to be subject to "Credit Default Swaps," a form of fraud wherein Defendants essentially insured payment on defaulted loans

SECOND AMENDED COMPLAINT – Page 2

from third-party insurers paid for by the borrowers, ***knowing that the loans violated their own underwriting requirements***. In effect, Defendants defrauded the Montgomerys and everybody in the "chain" of the "bundled" loans based on their failure to follow their own guidelines in originating the loans, their representations in the "chain" that their originating activities complied with applicable law including FIRREA, and that the Subject Property serving as collateral was appraised in conformity with the Fair Market Value standards imposed by FIRREA and USPAP. The systemic fraud in the U.S. real estate markets – which collapsed in 2008 from the weight of these fraudulent loans – was caused by Defendants and other banks based on the fraud and greed of their management, like Angelo Mozillo at Countrywide. Countrywide "originated" the Montgomerys Loan on a Fannie Mae application.

1.3     The causal result of Defendants' misconduct has left the Montgomerys in bankruptcy, and Mr. Montgomery with a brain aneurysm and limited life expectancy. Among the most egregious acts perpetrated against the Montgomerys by Bank of America and ultimately causing Mr. Montgomery his physical, emotional and mental breakdown was Bank of America's misconduct involving the "loan modification plans" mandated by various federal programs, which Bank of America presented to the Montgomerys, while deviating from federal regulations required by the loan modification programs, and attempting to foreclose on their home (the Subject Property). As recited in the Consent Judgment as one of their patterned frauds, Bank of America not only "dual track processed" the Montgomerys pretended "loan modification" while attempting to foreclose, ***Defendants violated the loan modification protocols they had agreed to implement under the federal programs and concealed their schemes from federal regulators***.

1.4     As described in the allegations below, and consented to by Bank of America in the Consent Judgment, its pattern of misconduct resulted in the issuance of thousands of improper mortgages, premature and unauthorized foreclosures, violation of service members' and other homeowners' rights and protections, the use of false and deceptive affidavits and other documents, and the waste and abuse of taxpayer funds. Bank of America knew that it was engaged in a systematic pattern of fraud, which it effectively admitted in the Consent Judgment,

SECOND AMENDED COMPLAINT – Page 3

BRAIN LAW FIRM PLLC
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON 98402
TEL: 253-327-1019 / FAX: 253-327-1021

since the loans to the Montgomerys and others were inconsistent with their own, then-current and applicable underwriting practices.   As disclosures by former employees, the Consent Judgment, numerous lawsuits, and the Montgomerys' own investigation have revealed, Defendants systematically ignored their lending guidelines in order to increase the volume of loan originations, and their own fees, at the expense of their borrowers and anyone in the "chain" of the market for "derivatives."   In connection with "jumbo," unconventional loans originated under Fannie Mae, like the Montgomerys' Loan, rather than reject them, they were referred to "senior underwriters" who approved them based on fraudulent, "compensating factors."

1.5     Specifically applicable to the Montgomerys' Loan which originated with Countrywide and its agent, Soma Financial Corporation, is the factually-based claim by the California Attorney General that Countrywide "set out to double Countrywide's share of the national mortgage market…through a deceptive scheme to mass produce loans for the secondary market…with little or no regard to borrower's long term ability to afford the loans" it made.   In 2002, Angelo Mozilo, Countrywide's former Chairman and CEO, publicly announced that Countrywide would double its market share of loan originations within four years.     The Montgomerys were swept up in Mozilo's schemes to reach his goal.   Mozilo pressured his underwriters to implement his schemes knowing that the enormous volume of loans Countrywide was originating would be securitized and sold on the secondary market. Countrywide amassed huge fees and points from borrowers like the Montgomerys based on Mozilo's automated "exception processing system" designed, as internal Countrywide documents reveal, to "approve virtually every borrower and loan profile, with pricing add on where necessary."   Countrywide intended that the resulting loans would be securitized and sold and that it would only retain a limited residual interest in the securitized loans.   The downside risk and cost would be borne first by the note holders, and ultimately by the homeowners, like the Montgomerys, who lost their homes.   If the various States' Attorneys General had not stepped in and exposed the entire scheme resulting in the Consent Judgment, there would have been no protection for homeowners like the Montgomerys.   Each of the allegations regarding Bank of America contained herein applies to instances in which one or more, and in some cases

BRAIN LAW FIRM PLLC
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON 98402
TEL: 253-327-1019 / FAX: 253-327-1021

all, of the Defendants engaged in the conduct alleged as part of a pattern of fraudulent activity in which the Montgomerys are but one example.  *See, also, <u>Ex rel Edward O'Donnell v. Bank of America Corporation</u>*, Case No. 12-cv-1422 (S.D.N.Y.) and Public Broadcasting Service, *The Untouchables*, http://www.pbs.org/wgbh/pages/frontline/untouchables/.

## II. PARTIES

2.1     Plaintiffs Dennis and Brenda Montgomery are husband and wife, and are residents of Yarrow Point, Washington.  At all times material hereto, the Montgomerys owned the Subject Property located in King County, Washington.  The Montgomerys filed a Petition for Relief under Chapter 7 of Title 11 of the United States Code on June 26, 2009.   The Montgomerys' claims herein are limited to claims for damages incurred as a result of the course of conduct alleged herein after the date of filing of the Petition for Relief.

2.2     Plaintiff Michael Flynn is a resident of the State of Massachusetts.  Pursuant to a Sale Agreement and Order from the U.S. Bankruptcy Court, Central District of California, Los Angeles Division, true and correct copies of which are attached hereto as Exhibits 1 and 2, respectively, Flynn acquired all of the Montgomerys' interest in the Subject Property together with any rights or claims for damages arising from the course of conduct alleged herein prior to the filing of the Montgomerys' Petition for Relief.

2.3     Defendant Bank of America Corporation is a diversified global financial services company and a bank holding company.  It is a Delaware corporation headquartered in Charlotte, North Carolina.   Defendant Bank of America N.A. is a national banking association headquartered in Charlotte, North Carolina, and is Bank of America Corporation's principal banking subsidiary.  For purposes of this Complaint, Plaintiff is informed and believes that Bank of America Corporation and Bank of America N.A. operate as a single business concern and will be referred to herein simply as "Bank of America."

2.4     Defendant BAC Home Loans Servicing L.P. (BAC) was a servicing company that had formerly been known as Countrywide Home Loans Servicing L.P.  Upon information and belief, it was, for a time, a wholly-owned subsidiary of Bank of America N.A.   Upon

BRAIN LAW FIRM PLLC
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON  98402
TEL: 253-327-1019 / FAX: 253-327-1021

1    information and belief in July 2011, it was merged into Bank of America N.A. but at all times

2    relevant BAC has acted as the agent and on behalf of Bank of America.

3        2.5    On or about July 1, 2008, Bank of America merged with the Countrywide

4    Defendants identified below and for purposes of this Complaint is the successor-in-interest to the

5    Countrywide Defendants and has thus assumed liability for the conduct of the Countrywide

6    Defendants alleged herein.

7        2.6    Defendant Countrywide Financial Corporation is a financial services company

8    previously headquartered in Calabasas, California, and a Delaware corporation, and also consists

9    of at least three of its subsidiaries, Countrywide Home Loans Inc., and Countrywide Bank FSB

10   (collectively with Countrywide Financial Corporation, "Countrywide").  On April 23, 2009, the

11   Office of the Comptroller of the Currency approved Countrywide Bank FSB's ("CWB")

12   requested to convert its charter back to that of a national bank and the request by Bank of

13   America N.A. to then immediately acquire CWB by merger.  These transactions were executed

14   on April 27, 2009, as a result of which CWB ceased to exist.  Bank of America N.A. was the

15   surviving institution resulting from this merger.  Thus, Bank of America N.A. is the successor in

16   interest to CWB.  The business of Defendants and their subsidiaries and affiliates includes

17   origination and servicing of mortgage loans.  Bank of America N.A. is the successor in interest

18   to the Montgomerys' Loan and its current servicer, and the administrator of the federal loan

19   administration program under the Consent Judgment.

20                    **III.  JURISDICTION AND VENUE**

21       3.1    This Court has personal jurisdiction over the Defendants because the Defendants

22   have transacted business in this District, and because the Defendants have committed acts

23   proscribed by FIRREA, multiple federal banking regulations, and the False Claims Act in this

24   District.

25       3.2    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because

26   the action arises under the laws of the United States.

27       3.3    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because

28   plaintiff and defendants, and each of them, have diversity of citizenship

SECOND AMENDED COMPLAINT – Page 6

3.4     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(1) and (2) and. The Subject Property is located in this District.

## IV.  BACKGROUND

**A.      Overview of Relevant Federal Programs.**

**(i)      The United States Trustee Program.**

4.1     The U.S. Trustee Program is a component of the Department of Justice that seeks to promote the efficiency and protect the integrity of the Federal bankruptcy system.  To further the public interest in the just, speedy and economical resolution of cases filed under the Bankruptcy Code, the U.S. Trustee Program monitors the conduct of bankruptcy parties and private estate trustees, oversees related administrative functions, and acts to ensure compliance with applicable laws and procedures.  It also identifies and helps investigate bankruptcy fraud and abuse in coordination with United States Attorneys, the Federal Bureau of Investigation, and other law enforcement agencies.

4.2     The primary role of the U.S. Trustee Program is to serve as the "watchdog" over the bankruptcy process.

4.3     U.S. Trustees supervise the administration of liquidation proceedings under Chapter 7 of the Bankruptcy Code, reorganization proceedings under Chapter 11, family farm and fisherman reorganization proceedings under Chapter 12, and "Wage-earner" reorganization proceedings under Chapter 13.

4.4     Specific responsibilities of the U.S. Trustees include appointing and supervising private trustees who administer Chapter 7, 12, and 13 bankruptcy estates (and serving as trustees in such cases where private trustees are unable or unwilling to serve); taking legal action to enforce the requirements of the Bankruptcy Code and to prevent fraud and abuse; referring matters for investigation and criminal prosecution when appropriate; ensuring that bankruptcy estates are administered promptly and efficiently, and that professional fees are reasonable; appointing and convening creditors' committees in Chapter 11 business reorganization cases; reviewing disclosure statements and applications for the retention of professionals; and advocating matters relating to the Bankruptcy Code and rules of procedure in court.

SECOND AMENDED COMPLAINT – Page 7

1

    **(ii)**   **The Single-Family Mortgage Industry.**

2

   4.5  The single-family mortgage industry consists of financial services and other firms

3

that originate, underwrite, securitize, and service mortgages for residential properties designed to

4

house one to four-family dwellings.

5

   4.6  Mortgage origination is the process whereby a lender loans money to a borrower

6

and receives a security interest in the subject real property, through a mortgage or comparable

7

device that secures the loan.  Origination generally includes all the steps from receiving a loan

8

application through disbursal of the loan proceeds.

9

   4.7  For more than thirty years, mortgages typically have been "bundled" or "pooled"

10

to create an investment vehicle, often denominated as a trust, and interests in the trusts have been

11

sold to investors as "notes" that own interests in payment streams generated by principal and

12

interest payments by the borrowers.

13

   4.8  After mortgages are originated, a "servicer" is responsible for mortgage

14

administration activities, known as servicing activities, which generally include collecting

15

payments from mortgagors; applying payments made in an agreed-upon order to the mortgagor's

16

indebtedness; distributing payments after allowable deductions to the investment trust entities

17

for distribution to investors; making advances to cover delinquent mortgage payments and other

18

costs, such as the costs of protecting and maintaining properties that collateralize mortgage loans

19

when mortgagors fail to do so; pursuing collections from delinquent mortgagors; and pursuing

20

either loss mitigation or foreclosure, as appropriate, to minimize the loss to investors and others

21

when mortgagors become delinquent on mortgage payments.

22

   4.9  The Federal National Mortgage Association (FNMA), colloquially known as

23

"Fannie Mae," was established in 1938 after the depression to provide local banks with federal

24

money to finance home mortgages.  Fannie Mae created a liquid secondary mortgage market

25

making it possible for banks and loan originators to issue more housing loans, primarily by

26

buying FHA insured mortgages.  Fannie Mae developed a monopoly in the secondary market.

27

In 1968, Fannie became a privately-held company in order to remove it from the federal budget.

28

In 1970, Congress authorized Fannie Mae to purchase private mortgages not federally insured,

SECOND AMENDED COMPLAINT – Page 8

BRAIN LAW FIRM PLLC
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON 98402
TEL: 253-327-1019 / FAX: 253-327-1021

and created the Federal Home Loan Mortgage Corporation, colloquially known as "Freddie Mac," to compete with Fannie Mae to create a more efficient secondary market.  During the 1990's, based on political pressures to expand its low and moderate income loans, Fannie Mae aggressively moved into the subprime market exposing it to risks and collapse similar to the Savings and Loan crisis in the 1980's.  In 2004, the Fannie Mae underwriting rules were again changed to allow sub-prime loans to fall within the rules for standard conforming mortgages, which had the effect of driving mortgage loans into the private mortgage industry.  This resulted in private industry ignoring both the Fannie Mae underwriting rules and the future consequences of a borrower's inability to pay.  Countrywide ignored both and wrote, what can only be called, regulatory violating, FIRREA violating, fraudulent loans to capture the secondary marketplace knowing it would securitize and sell the loans, reap the fees and deflect the risk.   The Montgomerys' Loan is the poster child for this systemic fraud.   In September 2006, Countrywide wrote a ten year, interest only, negative amortization, with payment options, low documentation, non-standard conforming loan under the pretense of a Fannie Mae underwritten loan.  The Loan was really a complete departure from underwriting standards using a Fannie Mae loan application process, with the intent to minimize risk through securitization.   It represented the peak of the fraudulent schemes implemented by Defendants.   In 2008, the scheme, along with the market collapsed, and in July 2010, the federal government was then compelled to allocate $360 billion to rescue Fannie Mae and Freddie Mac of which $150 billion of taxpayer money has already been paid.

          **(iii)**        **The United States' Stimulus/Rescue Efforts to Bailout Defendants.**

4.10    Beginning in fall 2008, the federal government instituted several measures to try to stabilize the housing and credit markets and assist troubled homeowners, like the Montgomerys, who have a federally-guaranteed "Fannie Mae" loan.  Bank of America, although incentivized to reduce principal and modify the Montgomerys' federally-guaranteed Loan, and while appearing to offer loan modification terms, was "dual track processing" the Montgomerys' Loan, and drove the Montgomerys into bankruptcy; and then attempted to foreclose on the Subject Property.

SECOND AMENDED COMPLAINT – Page 9

4.11     In October 2008, the Emergency Economic Stabilization Act of 2008 (EESA) was passed to promote stability and liquidity in the financial system.   Among other things, EESA authorized the Secretary of the Treasury to establish the Troubled Asset Relief Program (TARP).   TARP funds were used, in part, to promote various mortgage loan modification programs.

4.12     The Making Home Affordable (MHA) Program.   In March 2009, the United States launched the MHA Program.   The MHA Program included the Home Affordable Modification Program (HAMP), a Treasury program that uses TARP funds to provide incentives for mortgage servicers to modify eligible first-lien mortgages.

4.13     HAMP uses incentive payments to encourage loan servicers and owners of mortgage loans or bonds backed by mortgage loans to modify eligible first lien mortgages so that monthly payments of homeowners, like the Montgomerys who are in default or at imminent risk of default, will be reduced to affordable and sustainable levels.

4.14     The Home Price Decline Protection Incentives (HPDP) Initiative.   The HPDP initiative is designed to encourage modifications of loans in markets hardest hit by falling home prices.   The HPDP initiative provides investors with additional incentives for loan modifications on properties located in areas where home prices have recently declined and where investors are concerned that price declines may persist.

4.15     The Principal Reduction Alternative (PRA).   PRA is designed to encourage the use of principal reduction in modifications for eligible borrowers whose homes are worth significantly less than the remaining outstanding principal balances of their first-lien mortgage loans.   It provides investor incentives to offset a portion of the principal reduction.

4.16     The Home Affordable Unemployment Program (UP).   UP is designed to offer assistance to unemployed homeowners through temporary forbearance of a portion of their mortgage payments.

4.17     The Home Affordable Foreclosure Alternatives Program (HAFA).   HAFA is designed to provide incentives to servicers, investors and borrowers to utilize short sales and deeds-in-lieu of foreclosure for HAMP-eligible loans in cases in which the borrower, like the

SECOND AMENDED COMPLAINT – Page 10

Montgomerys, can no longer afford to stay in their home but want to avoid foreclosure.  Under this program, the servicer releases the lien against the property and the investor waives all rights to seek a deficiency judgment against a borrower who uses a short sale or deed-in-lieu when the property is worth less than the outstanding principal balance of the mortgage.

4.18   The Second Lien Modification Program (2MP).   2MP is designed to modify second lien mortgages when a corresponding first lien is modified under HAMP.

4.19   The FHA-HAMP Program.   The FHA-HAMP Program is designed to provide compensation to the holders and servicers of FHA-insured mortgages that are modified under FHA-HAMP, to reduce payments to more affordable levels.

4.20   The Treasury/FHA Second-Lien Program (FHA2LP).   FHA2LP is designed to facilitate refinancing under the FHA Short Refinance Program by reducing second liens.  Treasury provides incentives to participating servicers and investors who agree to partial or full extinguishment of second liens associated with an FHA refinance.

4.21   The FHA Refinance for Borrowers with Negative Equity (FHA Short Refinance) Program.  This program is partially supported by TARP funds and allows servicers and investors who write down a borrower's principal balance on a non-FHA-insured, existing, underwater, first-lien mortgage loan in connection with a refinancing to obtain FHA insurance on the newly refinanced mortgage.  Treasury has provided a TARP-funded letter of credit for up to $8 billion in loss coverage on these newly-refinanced FHA loans.

4.22   Housing Finance Agency Hardest Hit Fund (HHF).   HHF is a TARP-funded program designed to fund foreclosure prevention programs run by state housing finance agencies in states hit hardest by the decrease in home prices and in states with high unemployment rates.  Eighteen states and Washington D.C. have received approval for aid through this program.

4.23   The foregoing programs are financed by U.S. taxpayers to "bail out" Bank of America, amongst other "too big to fail" financial institutions and their borrowers, like the Montgomerys, for frauds deliberately perpetrated by Angelo Mozilo and Countrywide and Bank of America.  The $25 billion paid by the five banks involved in the Consent Judgment is a "drop in the bucket" of fraudulently procured revenues from the overall schemes recited herein which

BRAIN LAW FIRM PLLC
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON 98402
TEL: 253-327-1019 / FAX: 253-327-1021

1   involved hundreds of billions of dollars in damages.  In connection with the Montgomerys, Bank
2   of America then violated its own agreements with multiple federal and state agencies to
3   implement a "loan modification plan" conforming to the required protocols.  The plan Bank of
4   America presented to the Montgomerys, not only fails to comply with the principal reduction
5   amounts mandated by the loan modification program they agreed to as part of the Consent
6   Judgment and other programs, they also engaged in "dual track processing" as hereinafter
7   alleged.

8                                   **V.  FACTUAL ALLEGATIONS**

9          **A.      Defendants' Servicing Misconduct.**

10         5.1      Countrywide, then once acquired by Bank of America, serviced home mortgage
11  loans secured by residential properties owned by individual citizens, like the Montgomerys, and
12  is a party to the Consent Judgment through Bank of America.  Countrywide originated and
13  serviced the Montgomerys' mortgage until acquired by Bank of America, which is a party to the
14  Consent Judgment.

15         5.2      Each Defendant is or was engaged in trade or commerce in the State of
16  Washington and is subject to the consumer protection laws in the conduct of their debt servicing,
17  collection, loss mitigation and foreclosure activities as recited in the Consent Judgment.
18  Defendants were engaged in trade or commerce in the State of Washington where Defendants
19  originated and serviced the Montgomerys' Loan.  The Washington consumer protection laws
20  include laws specifically prohibiting the unfair or deceptive practices engaged in by Defendants.

21                 **(i)      Defendants' Unfair, Deceptive, and Unlawful Servicing Processes.**

22         5.3      Under the Washington consumer protection laws, Defendants are prohibited from
23  engaging in unfair or deceptive practices with respect to consumers.

24         5.4      In the course of their conduct, management and oversight of loan servicing in
25  Washington, as well as all additional states included in the Consent Judgment, Defendants have
26  engaged in a pattern of unfair and deceptive practices in connection with the Montgomerys'
27  Loan, which is typical of the unfair and deceptive trade practices recited in the Consent
28  Judgment.

SECOND AMENDED COMPLAINT – Page 12

5.5    Defendants' and specifically Bank of America as a going concern and as successor to Countrywide engaged in unfair and deceptive practices in the discharge of its loan servicing activities in connection with the Montgomerys' Loan include. Bank of America became servicer of the Loan because SOMA financial originated the Loan then "bundled" the Loan with other residential loans into a security and then sold the Loan to Countrywide. In turn, Countrywide financially imploded and was purchased by Bank of America in 2008. Bank of America through its subsidiary BAC and then ultimately just Bank of America became the "servicing agent" for the Loan but at some previous point in the aforementioned process, the actual Loan was held by "The Bank of New York Mellon, FKA the Bank of New York, as Trustee for the Certificate Holders CWMS, Inc., CHL Mortgage Pass-Through Trust 2006-17, Mortgage Pass-Through Certificates, Series 2006-17" ("Bank of New York Trustee"). Whether the Bank of New York Trustee is still the holder of the note and/or is just one of many such "holders" is unknown to Plaintiffs. Moreover, aside from the identity of the current "note" holder, Plaintiffs do not know who currently holds the "Deed of Trust" associated with the Loan. However, in all events, it appears that Bank of America is or was the servicing agent for the Loan with purported rights to enforce the Loan. In this regard, Bank of America's wrongful conduct as to the Montgomerys includes, but is not limited to, the following, which facts are similar to those recited in the Consent Judgment:

   a.    Defendant BAC Home Loan Servicing ("BAC") failed to timely and accurately apply numerous mortgage payments made by the Montgomerys to Countrywide after Bank of America purchased Countrywide and took over its operations and in this respect failed to maintain accurate account statements which resulted in the balance showed on the account statements being in excess of what the Montgomerys actually owed. In particular, the Montgomerys made at least two monthly mortgage payments totaling approximately $34,000 but Bank of America of BAC never applied those payments presumably as a result of its internal computer "glitches" associated with its acquisition of Countrywide. This failure to apply payments resulted in Bank of America charging not only excessive late fees and interest, but also reflected that the Montgomerys were in default of the Montgomery Loan even though they were not. In fact, in BAC's motion for relief filed in the Montgomerys bankruptcy case, BAC represented

BRAIN LAW FIRM PLLC
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON 98402
TEL: 253-327-1019 / FAX: 253-327-1021

that the Montgomerys had missed 3 mortgage payments prior to filing for bankruptcy when in fact the Montgomerys were not in default on the loan at all[1] ;

b.      Defendant Bank of America after taking over Countrywide charged excessive or improper fees for default-related services;

c.      failing to properly oversee third-party vendors involved in servicing activities on behalf of Bank of America;

d.      From 2009 through 2013, Defendant Bank of America imposed force-placed insurance in the amount of $5,000 in annual premiums without properly notifying the Montgomerys and when they already had adequate coverage, yet Bank of America included the forced placed insurance premiums in the charges owed to the Montgomerys under the loan, thereby unnecessarily increasing amounts due under the loan both in terms of additional fees, charges, interest and principal and in an amount that was grossly in excess of the insurance premiums the Montgomerys already had in place for the home.  Specifially, the insurance that the Montgomerys were paying for themselves to insure their property was only $1,700 in annual premiums;

e.      providing the Montgomerys false or misleading information concerning the scope of Bank of America's forced place insurance.   Specifically, after the Montgomerys filed for bankruptcy and were unable to pay for the homeowners' premiums, Bank of America's counsel represented to the Montgomerys that Bank of America would be imposing forced place insurance providing the same type of insurance coverage that the Montgomerys' had been paying for.   The Montgomery relied on this representation to their detriment.  Bank of American's representation ended being false because as it turned out, Bank of America's forced placed insurance did not cover liability and accident risks, but only casualty losses to the Subject Property itself.  On December 27, 2012 an accident occurred on the Property while the Montgomerys were residing there.   This accident resulted in physical harm to a non-resident of the Subject Property which resulted in a $40,000 liability to the Montgomerys.    When the Montgomerys attempted to make an insurance claim against Bank of America's forced placed insurance policy, the claim was denied because, contrary to the representations of Bank of America, the forced placed insurance policy did not cover the Montgomerys' liability.   Had Bank of America not made this false representation to the Montgomerys, they would have purchased their own liability insurance; for which the Montgomerys  a; and

   (ii)    **Defendants' Unfair, Deceptive, and Unlawful Loan Modification and Loss Mitigation Processes.**

5.6     Under the Washington consumer protection laws, Bank of America is prohibited from engaging in unfair or deceptive practices with respect to consumers.

---

[1]  BAC's motion for relief indicates that three mortgage payments were missed putting the Montgomerys in arrears by approximately $44,000

BRAIN LAW FIRM PLLC
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON 98402
TEL: 253-327-1019 / FAX: 253-327-1021

5.7     Pursuant to Fannie Mae regulations and FHA guidance, Fannie Mae approved mortgage lenders and their servicers are required to engage in loss-mitigation efforts to avoid the foreclosure of HUD-insured single-family residential mortgages.  *E.g.*, 24 C.F.R. § 203.500 *et seq.*; Mortgagee Letter 2008-07 ("Treble Damages for Failure to Engage in Loss Mitigation") (Sept. 26, 2008); Mortgagee Letter 1996-25 ("Existing Alternatives to Foreclosure – Loss Mitigation") (May 8, 1996).  Thus, when acting as a servicer, Bank of America was required to refrain from foreclosing on any Fannie Mae mortgage where a default could be addressed by modifying the terms of the mortgage or other less-costly alternatives to foreclosure were available.  Federally-guaranteed loans in the "Fannie Mae" program made by Bank of America as successor to Countrywide required compliance with the loan modification and loss mitigation process.   Defendant Bank of America violated these requirements repeatedly and then compounded the violations in the Montgomerys' case by:

    a.     Beginning in June and September of 2008 through 2013, the Montgomerys attempted to contact Bank of America or BAC as their loan servicer to for purposes of attempting to modify the terms of their loan on multiple occasions and at least 15 (upon information and belief, Bank of America contains the logs and recordings of each phone conversation).  However, at the beginning of this process, the Montgomerys inquired if Bank of America actually held the promissory note and security documents associated with the Loan so that Montgomerys and Bank of America could be assured that Bank of America had adequate authority to modify the terms of the Loan and to assure themselves that the Montgomerys were eligible for loan modifications under applicable loan modification programs.   Originally, Bank of America's customer service representatives represented that the original loan documents were "lost" and continuing to inform to the Montgomerys and their lawyers for almost two years that their loan documents were "lost" and therefore no one was sure who had authority to modify the Loan and whether the Loan qualified for modification.  As a result of the loan documents being "lost", Bank of America dragged its feet in working with the Montgomerys to modify the Loan.  In fact the documents were electronically stored in Bank of America's computers and available through the push of a button as discovered in late 2012 when the Montgomerys' appointed loan workout agent met with a representative of Bank of America in Seattle and learned that copies of the loan documents were available at a push of a button.  It appears that Bank of America falsely gave the Montgomerys the "run-around" about their loan document being "lost" because either: (1) Bank of America did not actually possess the promissory note and mortgage and therefore had no authority to enforce or modify the Loan; or (2) the actual holders of the promissory note and mortgage changed hands so many times that Bank of

BRAIN LAW FIRM PLLC
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON  98402
TEL: 253-327-1019 / FAX: 253-327-1021

America could not properly service the Loan vis-à-vis its obligations to the Montgomerys. In either event, Bank of America appears to have been simply stringing along the Montgomerys so that the Montgomerys would not challenge Bank of America's authority to modify or enforce the Loan or otherwise seek remedies against Bank of America, meanwhile the Montgomerys were harmed by the excessive interest they were being charged by not being able to modify the loan. Even under a "best case" scenario, Bank of America grossly mishandled the modification process because the Montgomerys contacted Bank of America at least 15 times over the span of several years to modify the Loan but never made any progress because the Montgomerys rarely, if ever, talked to the same customer service representative, was promised return phone calls from a person who could actually help them modify the Loan, never received return phone calls and generally got the run-around and conflicting stories about their eligibility for modification. In other words, even under a best case scenario, the Montgomerys got the "run around" with an institution that was too large to actually service its customers and

b.   in conjunction with the Montgomerys numerous attempts to communicate with Bank the Montgomerys contacted Bank of America as successor to Countrywide to modify the loan to reduce the interest rate from 6.75% to current market rates which at all relevant times was closer to 3% or 4% and which the Montgomerys were entitled to modify under the aforementioned loan modification programs. Upon Bank of America's request, the Montgomerys provided all documents to Bank of America to prove their eligibility for modification. Weeks would go-by with no word from Bank of America until eventually a Bank of America representative would respond saying that they would modify the loan because the Montgomerys were qualified under applicable loan modification programs but that Bank of America would do it later. But "later" never happened because, as represented to the Montgomerys by Bank of America's representatives, as a result of high internal employee turnover and inadequate training in Bank of America, internal restructuring and general incompetence, no person at Bank of America actually worked on the Montgomerys' file. This caused the Montgomerys to incur debt and interest charges far in excess of what they were entitled to under the government's programs, all while relying on Bank of America's representations that the pending modifications would cure any default and reduce the principal and interest owed by them. In addition to inducing the Montgomerys into believing that their Loan would be modified to cure any default, Bank of America continued to charge interest against the Loan, and began to "dual-track" the foreclosure process whereby Bank of America would purportedly work toward foreclosing the mortgage while also modifying the Loan. This only served to increase the physical and emotional suffered by the Montgomerys as described below.

c.   in further conjunction with the Montgomerys' attempts to modify the Loan, the Montgomerys communicated with Bank of America in June and September of 2008 prior to the Montgomerys missing any payments on their Loan but because of the soured economy and numerous missed paychecks due to Mr. Montgomery

BRAIN LAW FIRM PLLC
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON 98402
TEL: 253-327-1019 / FAX: 253-327-1021

from his employers, the Montgomerys' could foresee economic trouble in the future for them and therefore sought modification of their Loan. Incredibly, Bank of America's customer service representatives in 2008 encouraged and induced the Montgomerys to default on their Loan because, according to Bank of America, only if the Montgomerys defaulted, could they be eligible for Loan modification. Then, having induced the Montgomerys to default, Bank of America then delayed indefinitely in modifying the Loan and ultimately sought to foreclose on the Deed of Trust as a result of the default that Bank of America induced.

5.8     Under the Treasury's various rescue and stimulus programs, Bank of America received monetary incentives from the federal government in exchange for the commitment to make efforts to modify defaulting borrowers' single-family residential mortgages. *See, e.g.*, Making Home Affordable Handbook v.1.0, ch. 13 ("Incentive Compensation") (Aug. 19, 2010). Under the programs, Bank of America agreed to fulfill requirements set forth in program guidelines and servicer participation agreements. In connection with the Montgomerys, and in addition to the above, Bank of America falsely presented an inapplicable loan modification program it claimed would only remove interest and penalties when the Montgomerys in fact and in law were entitled to a full reduction of all principal and interest because of the systemic frauds involved in their Loan. In order to implement this fraud, Bank of America falsely represented that the Montgomerys Loan documents were "lost."

5.9     Bank of America regularly conducted or managed loan modifications on behalf of the entities that hold the loans and mortgages.

5.10     In the course of its servicing and oversight of mortgage loans, including the Montgomerys, Bank of America violated federal laws, program requirements and contractual requirements governing loss mitigation in connection with the Montgomerys' Loan including, but not limited to, lying to the Montgomerys about which loan modification plan applied to them, that their loan documents were lost, giving the Montgomerys the "run-around", inducing the Montgomerys' reliance by representing that the Montgomerys were eligible for loan modification only if the Montgomerys' defaulted but then delaying indefinitely any actual modification, all while dual track processing of Loan, and robosigning in connection with its bankruptcy filings and foreclosure attempts.

BRAIN LAW FIRM PLLC
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON 98402
TEL: 253-327-1019 / FAX: 253-327-1021

1     5.11    In the course of their conduct, management and oversight of loan modifications,

2  Bank of America has engaged in a pattern of unfair and deceptive practices.

3     5.12    Bank of America's failure to discharge its required loan modification obligations,

4  and related unfair and deceptive practices in the Montgomerys' Loan, particularly in the context

5  of its public relations efforts on its website, and other media outlets to promote its "home loan

6  assistance programs" and "National Mortgage Settlement" initiatives, all of which the

7  Montgomerys relied upon and placed hope in, include, but are not limited to, the allegations

8  alleged in the subparagraphs above, which also encompass the following:

9        a.     failing to perform proper loan modification underwriting based on applicable

10               loan modification programs as described above;

11       b.     failing to gather or losing loan modification application documentation and other
              paper work as described above and lying to the Montgomerys about their loan

12               documents as "lost;"

13       c.     failing to provide adequate staffing to implement programs as described above;

14       d.     failing to adequately train staff responsible for loan modifications as described;

15       e.     failing to establish adequate processes for loan modifications;

16       f.      inducing the Montgomerys to default on the Loan so that they could then be
              eligible for a modification but then not actually modifying the Loan; g.

17               wrongfully denying the Montgomerys modification applications for a full
       principal reduction;

18
       h.     failing to respond to the Montgomerys inquiries;
19
       i.     providing false or misleading information to the Montgomerys while referring
20              their loan to foreclosure during the loan modification application process;

21       j.     providing false or misleading information to the Montgomerys while initiating

22              foreclosure where the Montgomerys were in good faith actively pursuing a loss
              mitigation alternative offered by Defendants;

23       k.     providing false or misleading information to the Montgomerys while scheduling

24              and conducting proceedings before and in bankruptcy during the loan application
              process and during trial loan modification periods including lying to them about

25              what loan modification plans applied to them including full principal reduction;

26       l.     misrepresenting to the Montgomerys that loss mitigation programs would provide
              relief from the initiation of foreclosure or further foreclosure efforts;

27

28

SECOND AMENDED COMPLAINT – Page 18

m.    failing to provide accurate and timely information to the Montgomerys who are in need of, and eligible for, loss mitigation services, including loan modifications of full principal and interest;

n.    falsely advising the Montgomerys that they must be at least 60 days delinquent in loan payments to qualify for a loan modification;

o.    miscalculating the Montgomerys' eligibility for loan modification programs and improperly denying full loan modification relief to them;

p.    misleading the Montgomerys by representing that loan modification applications will be handled promptly when Bank of America failed to act on loan modifications in a timely manner; and have delayed loan modification for over three years causing the Montgomerys to file bankruptcy and resulting in physical disabilities to Mr. Montgomery;

q.    failing to properly process the Montgomerys' applications for loan modifications, including failing to account for documents submitted by them and failing to respond to their reasonable requests for information and assistance including production of their loan documents;

r.    failing to assign adequate staff resources with sufficient training to handle the demand from the Montgomerys and other distressed borrowers; and

s.    misleading the Montgomerys by providing false or deceptive reasons for denial of loan modifications and full principal reduction.

5.13   In connection with the Montgomerys' Loan and mortgage, Bank of America committed each of the foregoing violations in connection with the origination and servicing of the Montgomerys' Loan.  Moreover, during said process, Bank of America not only lied to the Montgomerys by suggesting that they were only entitled to interest modification when in fact they were entitled also to principal reduction, Bank of America internally "dual tracked" the foreclosure processes.  Inducing the Montgomerys to default of the Loan so that they could be eligible for a loan modification, then lying about which loan modification plan applied to the Montgomerys, then indefinitely delaying modification through the beauracratic "run-around" it gave the Montgomerys while "dual tracking" to foreclose as a result of the default Bank of America induced in the first place constitutes an unfair and deceptive trade practice which led, in part, the Montgomerys into bankruptcy, which then led to Bank of America "robosigning" documents in to obtain relief from the automatic stay to foreclose the Deed of Trust encumbering the Subject Property even though the Montgomerys were entitled to a loan

BRAIN LAW FIRM PLLC
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON  98402
TEL: 253-327-1019 / FAX: 253-327-1021

modification that would cure any default and eliminate the ability of Bank of America to foreclose.  In particular, Bank of America's agent Elsa Bolanos signed a declaration under penalty of perjury in the Montgomerys' bankruptcy case on April 7, 2010 in which she testified that she had personally reviewed and "personally work on books, records and files" which were "available for inspection and copies" related to the Montgomerys Loan documents and found that the Montgomerys' were in default, that they failed to make 3 required payments before filing for bankruptcy and that their pre-petition arrearage was $44,900.91.  Ms. Bolanos' declaration was patently robosigned because Bank of America had previously informed the Montgomerys on numerous occassions that their Loan documents were "lost" and could not be provided to them and was one of the purported reasons why the Montgomerys' Loan could not be modified prior to their bankruptcy.  Moreover, the representation that the Montgomerys had missed three mortgage payments prior to default could only have been the result of being "robosigned" because in fact the books and records of Bank of America should have reflected that the Montgomerys, at most, had only missed one payment pre-petition, and even that payment was not due in June of 2009 until the date after which the Montgomerys filed their bankruptcy petition.  Additionally, because the Montgomerys had not missed three payments pre-petition, Ms. Belanos' claim that the Montgomerys' pre-petition arrearage was $44,000 was also false.  Thus, all indicia are that Ms. Belanos' declaration signed under penalty of perjury was in fact "robosigned".  Without that "robosigned" declaration, Bank of America would not have obtained relief from the automatic stay to foreclose and would not have therefore suffered upon the Montgomerys the physical and emotional distress of losing their home to foreclosure that should not otherwise be allowed to move forward.  As established in the Consent Judgment, and by the claims filed by various States' Attorneys General, "Robosigning is massive, systematic, fraudulent, criminal conduct.  Alternatively, it may be labeled "lying, cheating, and stealing."  The Consent Judgment involves fundamental and systemic breaches of the rule of law – perjury and fraud on an economy-wide scale.  Among the abuses regulators found and recited in the Consent Judgment are "dual track processing" a process wherein a bank would work with a homeowner, like the Montgomerys, to modify a mortgage, while at the same time

BRAIN LAW FIRM PLLC
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON 98402
TEL: 253-327-1019 / FAX: 253-327-1021

1   the bank would continue with legal proceedings to foreclose.  This process is exactly what Bank

2   of America did in connection with the Montgomerys' bankruptcy proceedings.  The issue that

3   now arises is that if the loan documents were in fact electronically stored while lying about them

4   being "lost," *why* did Bank of America perpetrate *this* fraud?  Only after securing a lift of the

5   bankruptcy stay in order to foreclose, and only after forcing the Montgomerys from their home

6   (the Subject Project), and only after being threatened by the Department of Justice on a

7   nationwide scale, did Bank of America cease foreclosure proceedings.  But the damage was

8   done.  The Montgomerys' home (the Subject Project was abandoned and physically damaged in

9   the process and Mr. Montgomery as the sole family wage earner had developed a brain

10  aneurysm, diagnosed following the filing of the bankruptcy and inability to modify the Loan,

11  now rendering him disabled and unable to pay any part of the defaulted mortgage; or even

12  participate in a loan modification program.

(iii)       **Wrongful Conduct Related to Foreclosures.**

13

14       5.14    Under the Washington consumer protection laws, Bank of America is prohibited

15  from engaging in unfair or deceptive practices with respect to consumers.

16       5.15    Fannie Mae regulations and guidance and HAMP and other MHA servicer

17  participation agreements establish requirements to be followed in the foreclosure of single-

18  family residential mortgages that are Fannie Mae regulated, or where the servicer conducting the

19  foreclosure is an MHA participant, or where the loan is federally regulated, as in the

20  Montgomerys' "Fannie Mae" Loan.

21       5.16    Bank of America regularly conducted or managed foreclosures on behalf of

22  entities that hold mortgage loans and have contracted with them to service such loans.

23       5.17    In the course of their conduct, management, and oversight of foreclosures, Bank

24  of America violated Fannie Mae regulations and, as part of a larger pattern of fraudulent

25  conduct, regularly violated MHA foreclosure requirements.

26       5.18    In the course of its conduct, management, and oversight of foreclosures, Bank of

27  America has engaged in a pattern of unfair and deceptive practices against the Montgomerys and

28  others similarly situated.

SECOND AMENDED COMPLAINT – Page 21

5.19    Bank of America's failure to follow appropriate foreclosure procedures and related unfair and deceptive practices involving the Montgomerys include, but are not limited to, the following:

   a.    attempting to foreclosure on the Deed of Trust after having induced the Montgomerys to default on the Loan in the first place because, according to Bank of America, only if there was a default could there be a Loan modification, but then failing to actually modify the Loan;

   b.    preparing, executing, or presenting false, perjured, and misleading documents, filing false and misleading documents s as part of its the Motion to Lift the Stay in the Montgomery bankruptcy as described above as part of the foreclosure process (including, but not limited to, affidavits, declarations, certifications, substitutions of trustees, and assignments) [see Paragraph 5.13 *supra*];

   c.    inappropriately dual-tracking foreclosure and loan modification activities, and failing to communicate with the Montgomerys with respect to foreclosure activities while lying to them about applicable loan modification plans and programs as described above.

   d.    attempting to foreclose at all as a result of the Montgomerys' eligibility for loan modification in light of Bank of America's gross mishandling of their modification efforts as described above.

5.20    Bank of America committed each of the foregoing violations in connection with its efforts to foreclose as recited above.  More specifically, paragraph 7 of the declaration of Bank of America's records custodian, Elsa Bolanos, filed in the Montgomery bankruptcy states that it holds the Deed of Trust.  Yet the Montgomerys were told for over three years that their loan documents were "lost."  If the documents were "lost", Defendants' declaration cannot be true since Defendants cannot find the Deed of Trust!  Thus, Defendants have committed bankruptcy fraud and/or committed perjury.  Paragraph 1 of the declaration also states that the Bank of New York is the current holder of the debt but if the loan documents are "lost," Defendants cannot find the note, thereby committing bankruptcy fraud.  The truth is likely that the Montgomerys' Loan documents are probably electronically stored and have been concealed because they expose other frauds in the origination and underwriting process.

   **B.    Defendants' Bankruptcy-Related Misconduct.**

5.21    In the ordinary course of their businesses, Bank of America regularly appear as a creditor, or on behalf of creditors, in bankruptcy cases, including bankruptcy cases commenced

SECOND AMENDED COMPLAINT – Page 22

in this district and over which this Court has original jurisdiction under 28 U.S.C. § 1334, seeking the payment of money from bankruptcy estates and/or prosecuting motions seeking relief from the automatic stay to foreclose on consumer mortgages.  Bank of America sought relief from stay in the Montgomerys' bankruptcy in the Central District of California based upon the multiple frauds recited herein.

5.22    Bank of America has bankruptcy procedures that are utilized or relied upon by its employees, attorneys, contractors, and other agents when it files documents, including proofs of claim and motions seeking relief from the automatic stay in bankruptcy cases.  Use of these bankruptcy procedures has resulted in an insufficient level of oversight and safeguards regarding pleadings and documents filed by Bank of America or its agents in bankruptcy cases and their conduct during the bankruptcy cases.

5.23    Use of these bankruptcy procedures has resulted in the filing of signed pleadings and documents in bankruptcy cases as to which the signatory has not conducted a reasonable inquiry into the factual contentions or allegations, as required by applicable law, including Fed. R. Civ. P. 11 and Fed. R. Bankr. P. 9011.  Bank of America violated these specific laws in the filing of the Motion to Lift the Stay in the Montgomerys' bankruptcy by representing to the Montgomerys that their Loan documents were "lost," by dual track processing foreclosure and loan modifications and by robosigning bankruptcy pleadings, in particular the Declaration of Elsa Bolanos (discussed above).

5.24    Use of these bankruptcy procedures has also resulted in a failure to exercise adequate supervision over Defendants' attorneys, contractors, and other agents in bankruptcy proceedings.  As a result of having been discovered that Bank of America's attorneys and agents in the Montgomerys' bankruptcy violated said laws, Bank of America instructed them to cease foreclosure proceedings involving the Montgomerys, but the damage had already been done.

5.25    As a result of the use of inadequate bankruptcy procedures, the conduct of Bank of America or its agents has resulted in, among other things, some or all of the following:

a.    making representations involving the Montgomerys as part of a nationwide pattern of misconduct that were inaccurate, misleading, false, or for which Defendants, at the time, did not have a reasonable basis to make, including

BRAIN LAW FIRM PLLC
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON 98402
TEL: 253-327-1019 / FAX: 253-327-1021

without limitation representations contained motions for relief from the automatic stay under 11 U.S.C. § 362 and related documents as alleged above; other documents;

b.   Bank of America implemented and relied upon inadequate bankruptcy procedures despite having actual or constructive notice that such procedures could, and did, lead to the errors described above.

5.26   Use of these bankruptcy procedures has also resulted in Bank of America seeking inappropriate relief from debtors, like the Montgomerys, under the Bankruptcy Code, including under 11 U.S.C. §§ 362.

## VI.  COUNT I – UNFAIR AND DECEPTIVE CONSUMER PRACTICES WITH RESPECT TO LOAN SERVICING

6.1   The allegations in paragraphs above are incorporated herein by reference.

6.2   The loan servicing conduct of Bank of America, as described above, constitutes unfair or deceptive practices in the conduct of a trade or business in violation of the Washington consumer protection laws, including penalties of not more than $2,000 for each violation under RCW 19.86.020.

6.3   Bank of America's unlawful conduct is part of a nationwide pattern as recited in the Consent Judgment that has resulted in injury to the Montgomerys and others similarly situated who have had home loans serviced by Bank of America, thereby impacting the public interest.  As described above, the harm sustained by the Montgomerys and others includes not applying at least two loan payments made by the Montgomerys, inducing the Montgomerys to default on the Loan, charging improper , interest as a result of not properly applying loan payments and charging interest on defaulted payments when Bank of America induced the default , unreasonable delays and expenses to obtain loss mitigation relief, improper denial of loss mitigation relief, and incurring excessive debt.  The harm to the Montgomerys and others includes the subversion of their legal process and the sustained violations of their laws.  The Montgomerys have had to incur substantial expenses in the investigations and attempts to obtain remedies for Defendants' unlawful conduct.

## VII.  COUNT II – UNFAIR AND DECEPTIVE CONSUMER PRACTICES WITH RESPECT TO FORECLOSURE PROCESSING

7.1   The allegations in paragraphs above are incorporated herein by reference.

BRAIN LAW FIRM PLLC
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON 98402
TEL: 253-327-1019 / FAX: 253-327-1021

7.2     The foreclosure processing conduct of Bank of America, as described above, constitutes unfair or deceptive practices in violation of the Washington consumer protection laws.

7.3     Bank of America's unlawful conduct has resulted in injury to the Montgomerys and others similarly situated who have had home loans serviced by Bank of America. The harm sustained by the Montgomerys includes unwarranted debt liability for excessive interest that was charged as a result of Bank of America's inducement to the Montgomerys to default in the first palce and improper fees and charges, unreasonable delays and expenses to obtain loss mitigation relief, improper denial of loss mitigation relief, due to improper improper foreclosure proceedings resulting from Bank of America's inducement of the Montgomerys to default in the first place under the guise of default being a condition precedent for Loan modification. The harm to the Montgomerys includes the subversion of their legal process and the sustained violations of laws intended to protect them. The Montgomerys have had to incur substantial expenses in the investigations and attempts to obtain remedies for Bank of America's unlawful conduct.

## VIII.  COUNT III – RICO – 18 U.S.C. § 1962(c)

8.1     The allegations in paragraphs above are incorporated herein by reference.

8.2     The Defendant Bank of America is associated with and engaged in a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

8.3     Defendant Bank of America as alleged herein has engaged in a pattern of racketeering activity.

8.4     Defendant Bank of America committed at least two predicate acts as defined in 18 U.S.C. § 1961(1)(D) when it filed a knowingly false declaration under penalty of perjury in the Montgomerys' bankruptcy case in connection with its Motion for Relief from Stay filed on April 27, 2010 at Docket No. 115 in the Montgomery bankruptcy case supported by a knowingly false declaration as alleged above. This bankruptcy fraud was a defined predicate act under 18 U.S.C. § 1961(D). Bank of America further committed the predicate act of wire fraud when it communicated on at least 15 occasions between 2008 and 2012 with the Montgomerys

BRAIN LAW FIRM PLLC
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON 98402
TEL: 253-327-1019 / FAX: 253-327-1021

concerning their loan modification attempts and eligibility while falsely representing to the Montgomerys that they were only eligible for an interest modification when in fact they were eligible for principal reduction as well and falsely represented to the Montgomerys that their loan documents were "lost", which thereby complicated, delayed, and ultimately frustrated entirely any loan modification for the Montgomerys.  The wire fraud additionally furthered in context of Bank of America advertising to consumers, including the Montgomerys, the virtues of its homeowners assistance programs on its website and other media outlets.  This wire fraud constituted predicate acts under 18 U.S.C. § 1961(B).

8.5    The Montgomerys were the direct victims of Defendant Bank of America's predicate acts.  However, the Montgomerys were not the only victims.  As reflected in the Complaint giving rise to the Consent Judgment, the bankruptcy fraud engaged in by Bank of America and the other banks identified in the Consent Judgment was rampant all over the nation.  The Banks, including Bank of America, knowingly allowed and directed its "robo-signer" agents and employees to submit sworn statements and proofs of claims on their behalf in bankruptcy proceedings knowing that their robo-signers: (1) did not have personal knowledge of the facts attested to: (2) and/or that the robo-signers and the Banks did not actually have the notes and security interests that they claimed to have or that such notes were "lost" when in fact the Banks, including Bank of America, knew that they were not lost; (3) and/or testified that the debtors owed a certain amount when in fact the robo-signers did not know the exact amount owed or that the Banks provided the robo-signers with false figures in the first place concerning the amount owed by the debtors.  Thus, the pattern of racketeering activity was not limited to the Montgomerys but was expanded to all borrowers who found themselves in bankruptcy only to find the Banks filing knowingly false proofs of claims and stay relief motions.  Indeed, the sad irony of all this is that many bankrupt borrowers, like the Montgomerys, found themselves seeking bankruptcy protection in the first place because the Banks had created a self-perpetuating and self-inflating borrowing frenzy as a result of their fraudulent "easy money" policies.

BRAIN LAW FIRM PLLC
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON  98402
TEL: 253-327-1019 / FAX: 253-327-1021

8.6     Also evidencing the pattern of racketeering activity are the innumerable instances of wire fraud and bankruptcy fraud set forth in the Complaint which gave rise to the Consent Judgment.

8.7     The Enterprise consisted of Bank of America associated with its various affiliates such as BAC Home Loans Servicing, Countrywide and and their robo-signing third party vendors and attorneys for the purpose of obtaining collateral out of the Montgomerys' bankruptcy estate as well as the bankruptcy estates of innumerable bankrupt debtors through fraudulent means.

8.8     As a result of Defendant Bank of America's RICO conduct, the Montgomery's have been injured in their business and property as alleged herein and seek treble damages in an amount to be proven at trial.

8.9     In short, however, the harm sustained by the Montgomerys include payment of improper fees and charges, unreasonable delays and expenses in their bankruptcy cases, and loss of homes due to improper, unlawful, or undocumented foreclosures.

## IX.  COUNT IV – DAMAGES FOR NEGLIGENT OR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

9.1     The allegations in paragraphs above are incorporated herein by reference.

9.2     While under a duty not to do so, Bank of America engaged in extreme and outrageous conduct, intentionally, recklessly or negligently causing severe emotional distress to the Montgomerys including, but not limited to, physical injury to Mr. Montgomery susceptible to medical diagnosis and provable through medical evidence resulting in substantial damages to the Montgomerys.

9.3     As alleged above, Bank of America strung along the Montgomerys for years beginning in 2008 with promises to modify the terms of their Loan if they defaulted and cure any default so that the Montgomerys would not lose their home through foreclosure, particularly when the Montgomerys were eligible for the loan modification programs described above and in the context of Bank of America's advertising to consumers, including the Montgomerys, that it was participating in such programs and that loan modification for struggling borrowers like the

BRAIN LAW FIRM PLLC
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON  98402
TEL: 253-327-1019 / FAX: 253-327-1021

Montgomerys was a priority.  Yet, despite Bank of America's repeated promises to modify the Montgomerys' Loan within this context, Bank of America indefinitely and forever delayed and ultimately did not modify the Loan through subterfuges and intentional misconduct and false statements such as representing to the Montgomerys that their loan documents were "lost" when in fact they appear to have not been lost, misapplying or not applying at least two payments, inducing the Montgomerys to go into default because, according to Bank of America, it could not modify the Montgomerys' loan unless and until the Montgomerys started missing payments. Then once the Montgomerys did in fact default per Bank of America's inducement, Bank of America failed to modify the Loan, then attempted to foreclose on the Deed of Trust and in doing so used perjured declarations.  Certainly inducing the Montgomerys to default on their loan obligations so that Bank of America could then modify the loan, but then once in default, Bank of America failed to act to modify the loan despite the Montgomerys attempts to do so, and not only failed to act, but then attempted to foreclosure as a result of the default it induced, Bank of America acted outrageously, intentionally, recklessly or at a minimum negligently which caused severe emotional distress for the Montgomerys, which ultimately physically manifested itself in Mr. Montgomery's diagnosed brain aneurysm.

## X.  PRAYER FOR RELIEF

WHEREFORE, the Montgomerys and Flynn respectfully request that Judgment be entered in their favor and against Defendants, jointly and severally, as follows:

1.     On Count I, Judgment against Defendants, jointly and severally, injunctive relief to restrain Defendants from further unlawful conduct; an order requiring disgorgement of unlawful gains obtained by Defendants as a result of their unlawful conduct; restitution or other remedial relief to compensate individual victims of Defendants' unlawful conduct, including the Montgomerys, together with civil penalties; and attorneys' fees and costs of investigation.

2.     On Count II, Judgment against Defendants, jointly and severally, injunctive relief to restrain Defendants from further unlawful conduct; an order requiring disgorgement of unlawful gains obtained by Defendants as a result of their unlawful conduct; restitution or other

SECOND AMENDED COMPLAINT – Page 28

BRAIN LAW FIRM PLLC
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON 98402
TEL: 253-327-1019 / FAX: 253-327-1021

remedial relief to compensate individual victims of Defendants' unlawful conduct, including the Montgomerys, together with civil penalties; and attorneys' fees and costs of investigation.

3.      On Counts III, Judgment in favor of the Montgomerys against Defendants for compensatory damages, treble damages, attorneys fees and costs in an amount to be determined at trial for RICO violations;

8.      On Count IV, Judgment against Defendants, jointly and severally, for damages to the Montgomerys for emotional and physical distress; and

9.      For all other and further relief as the Court may deem just proper and equitable.

DATED this 7th day of November, 2013.

BRAIN LAW FIRM PLLC

By:_____
        Paul E. Brain, WSBA #13438
        Counsel for Plaintiffs

BRAIN LAW FIRM PLLC
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON  98402
TEL: 253-327-1019 / FAX: 253-327-1021

**CERTIFICATE OF SERVICE**

I hereby certify that I am a citizen of the United States of America and a resident of the State of Washington, am over the age of twenty-one years, am not a party to this action, and am competent to be a witness herein.

Pursuant to Fed. R. Civ. P. 5(b) and RCW 9A.72.085, I hereby certify that on the 7th day of November, 2013, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following

**Counsel for Defendants Bank of America N.A. as successor by merger to Countrywide Bank FSB and BAC Home Loans Servicing LP; Countrywide Home Loans Inc.; and Bank of America Corporation for itself and as successor by merger to Countrywide Financial Corporation**

Jody M. McCormick (jmm@witherspoonkelley.com, katel@witherspoonkelley.com)
Steven J. Dixson (sjd@witherspoonkelley.com, aliciaa@witherspoonkelley.com)

and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants:

[none]

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

DATED this 7th day of November, 2013, at Tacoma, Washington.

Paul E. Brain, WSBA #13438
Brain Law Firm PLLC
1119 Pacific Avenue, Suite 1200
Tacoma, WA 98402
Tel: 253-327-1019 / Fax: 253-327-1021
Email: pbrain@paulbrainlaw.com

PLAINTIFFS' STATEMENT REGARDING JOINT STATUS REPORT
AND DISCOVERY PLAN (Case No. 2:13-cv-00360-RAJ) – Page 30

BRAIN LAW FIRM PLLC
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON  98402
TEL: 253-327-1019 / FAX: 253-327-1021



**Exhibit 1**

## ASSET PURCHASE AGREEMENT

This Sale Agreement (the AAgreement@) is between Michael Flynn as purchaser (ABuyer@), on the one hand, and Jason Rund, the duly appointed Trustee (ATrustee@) for the bankruptcy estate of Dennis Lee Montgomery and Brenda Kathleen Montgomery (ADebtors@) as seller on the other hand (together AParties@).  This Agreement is entered into based upon the following facts:

## FACTS

1.      The Debtors filed a voluntary petition under Chapter 7 of the Bankruptcy Code on June 26, 2009 (APetition Date@).

2.      Jason M. Rund is the duly appointed trustee of the bankruptcy estate of Dennis Lee Montgomery and Brenda Kathleen Montgomery (ABankruptcy Estate@).

3.      The proposed Buyer, Michael Flynn, filed a claim in the bankruptcy estate in the amount of $833,223.15.

4.      Listed assets of the Bankruptcy Estate on the Debtors= Schedules include the following real property: real property located at 6 Toscana Way, Rancho Mirage, California valued at $952,000; real property located at 3812 94th Ave NE, Yarrow Point, Washington, valued at $2,150,000; and real property located at 12720 Buckthorn Lane, Reno, Nevada, valued at $605,000 (collectively, AReal Properties@).

5.      The Debtors= Schedules also include the following personal property assets: certain bank accounts valued at a total of $10,036.89; household goods and furnishings valued at $8,000; books and pictures, including a CD Juke Box, valued at $1,100; wearing apparel valued at $4,540; jewelry valued at $98,902.80; a term life insurance policy valued at $0.00; an IRA valued

1

at $26,402; 1,000 shares of Nevada Security Bank Stock valued at $859; Accounts Receivable valued at $526,204; certain patents valued at $10,000,000; three automobiles - a 2006 Silverado valued at $9,845; a 2005 Cadillac CTS valued at $13,850; and a 2003 Tahoe valued at $8,915; office equipment valued at $875; other personal property listed as Aper Court Order entered in this proceeding in the US Federal Court, Reno, NV - Case #306-cv-00056-PMP-VPC valued at $2,104,600.12; and claims against various parties valued at $38,809,011.12, scheduled as follows: (a) the Claims against the Liner Firm, Teri Pham, and Deborah Klar for indemnification regarding sanction order in Federal Court Reno, NV Case No. 306-cv-0056-PMP-VPC valued at $204,411.00; (b) Claims for legal malpractice against Liner firm, Terri Pham, Deborah Klar, Tuneen Chisolm, Shannon Anderson, Robert Oliver, Richard Mooney, Ryan Lapine, Robert Shore, Stuart A. Liner, Peter Bransten, Ellen Garofalo, and Randal Sunshine in Federal Court Reno, NV Case No. 306-cv-0056-PMP-VPC valued at $10,000,000.00; and (c) Claims for misrepresentations against Edra Blixseth and the Liner Law Firm for settlement agreement with Warren Trepp and Etreppid Technologies on 09/08 valued at $26,500,000.00 (collectively, APersonal Property Assets@).

6.     The Debtors have claimed fully exempt the following Personal Property Assets: household goods and furnishings in the amount of $21,065 per Section 703.140(b)(3) and (b)(6); books and pictures in the amount of $3,188 per Section 703.140(b)(3); wearing apparel in the amount of $4,540 under Section 703.140(b)(3); and the Debtors= IRA in the amount of $26,402 per Section 703.140(b)(10)(E).

7.     The Debtors have claimed partially exempt the following Personal Property Assets: jewelry in the amount of $19,900 per Section 703.140(b)(4), (1) and (5); and 2006 Chevy

2

Silverado in the amount of $2,975 per Section 703.140(b)(2).

8.      The following Personal Property Assets were sold to the Debtors per Court Order entered June 11, 2010: CD Juke Box; Jewelry; 1,000 shares of Nevada Security Bank Stock; and three automobiles - a 2006 Silverado; a 2005 Cadillac CTS; and a 2003 Tahoe valued at $8,915.

9.      The following unscheduled Personal Property Asset was abandoned by the Trustee pursuant to Court Order entered March 24, 2010: Complaint for violation of the False Claims Act 31 U.S.C. Section 3129, et seq. and conspiracy to violate the False Claims Act filed by the Debtor on behalf of himself and the United States Government in camera and under seal in the District Court of Nevada.

10.     The following scheduled Personal Property Assets were abandoned by the Trustee pursuant to Court Order entered November 10, 2010: (a) the Claims against the Liner Firm, Teri Pham, and Deborah Klar for indemnification regarding sanction order in Federal Court Reno, NV Case No. 306-cv-0056-PMP-VPC valued at $204,411.00; (b) Claims for legal malpractice against Liner firm, Terri Pham, Deborah Klar, Tuneen Chisolm, Shannon Anderson, Robert Oliver, Richard Mooney, Ryan Lapine, Robert Shore, Stuart A. Liner, Peter Bransten, Ellen Garofalo, and Randal Sunshine in Federal Court Reno, NV Case No. 306-cv-0056-PMP-VPC valued at $10,000,000.00; and (c) Claims for misrepresentations against Edra Blixseth and the Liner Law Firm for settlement agreement with Warren Trepp and Etreppid Technologies on 09/08 valued at $26,500,000.00.

11.     The Trustee is currently holding a large number of documents at All Aboard Mini Storage,   1705 S. State College Boulevard, Unit #19, Anaheim, California, (ADocuments In Storage@),   including but not limited to, documents delivered from the Liner Firm obtained in

3

their representation of the Debtor and from discovery documents received by the Liner Firm in connection with litigation in which they represented the Debtor; and documents relating to litigation in Nevada, wherein upon the request of the United States Department of Justice (ADOJ@), the Nevada District Court entered several protective orders including an Order entered on August 29, 2007 (ADOJ Protective Order@. The Nevada District Court also entered a protective order regarding discovery matters between the Debtor and eTreppid on September 11, 2007 (AeTreppid Protective Order@).

12. The DOJ reviewed and redacted all of the Documents In Storage prior to their receipt by the Trustee so as to comply with the Protective Order. The Trustee has caused the review of the Documents In Storage and has verified that all of the documents appear to have been reviewed by the DOJ. The Documents In Storage, since they are fully redacted, are no longer subject to the DOJ Protective Order.

13. With regards to the eTreppid Protective Order and the Documents In Storage marked by eTreppid as AConfidential@or ARestricted Confidential@, the Trustee entered into an additional stipulation with eTreppid, which was approved by the Bankruptcy Court on August 30, 2010. Pursuant to this additional stipulation with eTreppid, the Trustee may seek and obtain an order from the Bankruptcy Court allowing the release of these documents, after providing eTreppid with the opportunity to collect the documents. The Trustee has requested direction from eTreppid as to their desire to collect the documents and has not received a response. As part of the motion to approve this Agreement, the Trustee will also seek confirmation that the documents marked by eTreppid as AConfidential@or ARestricted Confidential@ may be released to the Buyer.

14. The Buyer, Michael Flynn, wishes to purchase the Bankruptcy Estate=s interest, if

4

any, the remaining assets not claimed exempt, purchased by the Debtors or previously abandoned by the Trustee, for the purchase price of $20,000 (AOffer@) as follows:

a. All assets identified on the Debtors= Schedules not claimed exempt, purchased by the Debtors or previously abandoned by the Trustee, including, without limitation, that certain real property located at 3812 9th Ave. NE, Yarrow Point, WA, 98004, and legally described as:

THE SOUTH 25 FEET OF LOT 21, AND ALL OF LOT 22, BLOCK 1, REPLAT OF PORTIONS OF YARROW, ACCORDING TO THE PLAT THEREOF, RECORDED IN VOLUME 21 OF PLATS, PAGE 11, IN KING COUNTY, WASHINGTON

(herein after referred to as the AYarrow Point Property@). A Relief from Stay Order was entered by the Bankruptcy Court on May 26, 2010. In addition, the Debtors= Schedules indicate that Warren Trepp may have a judgment lien encumbering this property.

b. Certain real property located at 6 Toscana Way, Rancho Mirage, California. A Relief from Stay Order was entered by the Bankruptcy Court on October 27, 2009. In addition, the Debtors= Schedules indicate that Warren Trepp may have a judgment lien encumbering this property.

c. Certain real property located at 12720 Buckthorn Lane, Reno, Nevada. A Relief from Stay Order was entered by the Bankruptcy Court on October 28, 2009 and November 18, 2009. In addition, the Debtors= Schedules indicate that Warren Trepp may have a judgment lien encumbering this property.

d. Certain bank accounts scheduled by the Debtors. The evidence indicates that on the Petition Date, the Debtors had no funds in their scheduled bank accounts.

e. Accounts Receivable - Blxware Payroll in the scheduled amount of

5

$526,204.00;

        f.      Patents as provided on Debtor=s Schedule B valued at $10,000,000;

        e.      Any and all claims and/or causes of action derived from or arising out of assets identified on the Debtors= Schedules not claimed exempt, purchased by the Debtors or previously abandoned by the Trustee;

        f.      Any and all proceeds derived from or arising out of assets identified on the Debtors= Schedules which are not claimed exempt, purchased by the Debtors or previously abandoned by the Trustee;

        g.      Any and all claims and/or causes of action against Edra D. Blixseth;

        h.      Any and all claims and/or causes of action against the original lender, mortgage broker, subsequent loan holder, loan assignee, loan related certificate holder, loan servicer, mortgage servicer, or similar lender or loan entity associated with the purported loan and purported security instruments which encumber or use as security for repayment, the Yarrow Point Property.  Such entities may include, but are not limited to, Bank of New York Mellon, Bank of America, N.A., Countrywide Home Loans, Inc., NV Mortgage, Inc. dba SOMA Financial, Fannie Mae, Freddie Mac, Mortgage Electronic Registration Systems, Inc., Certificateholders CWMBS, Inc., CHL Mortgage Pass-Through Trust 2006-17, Mortgage Pass-Through Certificates, 2006-17, and all successors and assigns thereto (hereinafter referred to as AYarrow Point Claims@);

        i.      Documents In Storage; and

        j.      Any and all claims against Blxware, LLC; Opspring, LLC; Blxware, Inc.; and Opspring, Inc.

Collectively, the above described assets are hereinafter referred to as the ASaleable Assets@.

15.     All assets to be sold include only those assets which existed on the Debtors=
bankruptcy Petition Date.

## SALE AGREEMENT

16.     The Trustee will move the Bankruptcy Court for approval of this Sale Agreement.

17.     This Sale Agreement shall become final upon entry of an order of the United States
Bankruptcy Court authorizing the Trustee to enter into it and approving the terms set forth herein.
Absent entry of a final order of the United States Bankruptcy Court approving this Sale
Agreement, this Sale Agreement shall be null and void.

18.     Should any dispute arise regarding this Sale Agreement, the United States
Bankruptcy Court for the Central District of California, Los Angeles Division shall have
jurisdiction to determine the dispute.

19.     Upon execution of the Sale Agreement, the Buyer hereby agrees to remit the sum of
$20,000 for the purchase of the Bankruptcy Estate=s interest, if any, in the Saleable Assets.

20.     The Trustee=s Motion for approval of this Agreement shall include a request for
approval of an overbid procedure for the purchase of the Saleable Assets as follows:

        a.      Only Qualified Bidders may submit an overbid.  A AQualified Bidder@ is
one who provides a financial statement and such business and banking references as are required in
Trustee=s reasonable discretion, sufficient to assure Trustee of the bidder=s ability (based on
availability of financing, experience or other conditions) to consummate the purchase of the
Personal Property, AND one who can consummate the purchase of the Saleable Assets on the
same terms and conditions, other than price, as those proposed in the Offer.

        b.      Each bid must be <u>received</u> by the Trustee and the Trustee=s counsel no

7

later than three (3) business days prior to the hearing on the Motion.

        c.     The initial overbid must exceed the Purchase Price by a minimum of Five Hundred U.S. dollars ($500.00).   For instance, the first bid must be at least Twenty Thousand Five Hundred U.S. dollars ($20,500.00).   Each subsequent bid must then be in increments of Five Hundred U.S. dollars ($500.00).   For instance, the first subsequent bid must be at least Twenty One Thousand U.S. dollars ($21,000.00).

        d.     Each bid must be all cash, non-contingent, and on the same terms and conditions, other than price, as those proposed in the Offer.

        e.     Each bidder must match all terms and conditions of the original bid. Thus, the payment of the full Purchase Price must be made.   Said payment must be received by the Trustee by no later than three (3) business days prior to the hearing on this Motion.   Said Payment must be in cash, cashier=s check, certified check or irrevocable letter of credit, and must be deposited with the Trustee so that the Trustee will have access to said funds no later than three (3) business days prior to the hearing on the Motion.

      21.     Promptly following the executed of the Sale Agreement, the Trustee will file a motion before the Bankruptcy Court seeking approval of the Sale Agreement with a finding that the Buyer is a good faith purchaser within the meaning of Section 363(m) of the Bankruptcy Code and a waiver of the 14-day stay set forth in Bankruptcy Rule 6004(h).

      22.     In the event that there is a successful overbidder who is not the proposed Buyer, or if the Bankruptcy Court fails to approve a sale of the Saleable Assets, the bankruptcy estate will promptly refund the $20,000 remitted to the estate by the Buyer.

      23.     Limitations of Sale: The Parties acknowledge that the operation of the law has placed the Bankruptcy Trustee in a unique role as the Seller of the Saleable Assets, which are the

8

subject of this Agreement.   Due to the nature of the Trustee's role in administering the bankruptcy estate, there are limitations as to the extent, type and character of the agreement under which the Trustee can convey the Saleable Assets.   The Trustee proposes to sell these assets subject to certain limitations.   The Parties hereby acknowledge that they understand the terms under which the Saleable Assets are to be conveyed may vary substantially from the normal customs and trade within the real estate industry.   Except where expressly mandated by operation of law, the Buyer consents to any such modifications and amendments.

24.   Buyer acknowledges that Buyer is purchasing the Saleable Assets from the bankruptcy estate subject to any and all liens, secured interests and encumbrances of any kind.

25.   Buyer further acknowledges that immediately upon entry of an Order approving a sale of the Estate=s interest in the Saleable Assets, the costs to store the Documents In Storage immediately becomes the responsibility of the Buyer.

26.   Purchase without Warranties: Buyer acknowledges that he is purchasing the Saleable Assets from the Bankruptcy Estate AAS IS@ without warranties of any kind, expressed or implied, being given by the Trustee, concerning the condition of the property or the quality of the title thereto, or any other matters relating to the Saleable Assets.   Buyer represents and warrants that he is purchasing the Saleable Assets as a result of his own investigation and is not buying the Saleable Assets pursuant to any representation made by any Broker, Agent, Accountant, Attorney or Employee acting at the direction, or on the behalf of the Trustee.   Buyer acknowledges that Buyer has inspected the Saleable Assets, and Buyer forever waives, for himself, his heirs, successors and assigns, any and all claims against the Debtors, their attorneys, agents and employees, the bankruptcy estate of Dennis L. Montgomery and Brenda Kathleen Montgomery,

9

Case No. 2:10-bk18510-BB, Jason M. Rund, as Bankruptcy Trustee and individually, and his

Attorneys, Agents and Employees, arising or which might otherwise arise in the future concerning

the Saleable Assets.

27.     Trustee's Liability: Buyer acknowledges that the Trustee is acting in his official

capacity only.   No personal liability shall be sought or enforced against the Trustee with regard to

this Agreement, the sale of the Saleable Assets, or the physical condition of the Saleable Assets.

In the event that the Trustee fails or refuses to complete the transaction for any reason, then the

limit of the Trustee's liability is only to return any money paid to the Trustee by the Buyer, without

deduction.

28.     Hold Harmless: Buyer understands the terms and conditions of this entire Sale

Agreement and holds the Estate, its agents, the Law Office of Thomas H. Casey, Inc., attorneys,

agents and employees harmless from any liabilities arising from this contract.

29.     Attorneys Fees and Costs.    In the event that any action, suit or other proceeding is

hereafter instituted to remedy, prevent or obtain relief from a breach of this Agreement, arising out

of a breach of this Agreement, the prevailing party shall recover all of such reasonable attorneys'

fees and costs incurred in each and every such action, suit or other proceedings, including any and

all appeals, writs or petitions therefrom.

30.     Buyer is aware that this offer is contingent upon Chapter 7 Bankruptcy Trustee

approval, Bankruptcy Court confirmation and overbid procedures.

DATED:   November ___, 2012          _____
                                                          Michael Flynn

DATED:   November ____, 2012         _____
                                                          Jason Rund, in his capacity as Chapter 7 Trustee for
                                                          the estate of Dennis Lee and Brenda Kathleen

10

Montgomery

Approved as to form and content:

CONANT LAW LLC

DATED:  November 12, 2012

_____
Christopher J. Conant, counsel for Michael Flynn

DATED:  November ____, 2012

LAW OFFICE OF THOMAS H. CASEY, INC.,
A PROFESSIONAL CORPORATION

By:      _____
Thomas H. Casey, Attorney for Jason M. Rund, in
his capacity as Chapter 7 Trustee for the estate of
Dennis Lee and Brenda Kathleen Montgomery

11



**Exhibit 2**

1  Thomas H. Casey - Bar No. 138264
2  Kathleen M. Goldberg - Bar No. 132637
   LAW OFFICE OF THOMAS H. CASEY, INC.
3  A PROFESSIONAL CORPORATION
   22342 Avenida Empresa, Suite 200
4  Rancho Santa Margarita, CA  92688
   Telephone:    (949) 766-8787
5  Facsimile:     (949) 766-9896
   Email:        TomCasey@tomcaseylaw.com
6  Email:        KGoldberg@tomcaseylaw.com

7  Attorney for Jason M. Rund,
   Chapter 7 Bankruptcy Trustee

**FILED & ENTERED**

JAN 09 2013

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY beauchan DEPUTY CLERK

8                    UNITED STATES BANKRUPTCY COURT

9           CENTRAL DISTRICT OF CALIFORNIA / LOS ANGELES DIVISION

10  In re                                    )   Case No.: 2:10-bk-18510-BB
                                             )
11  MONTGOMERY, DENNIS LEE,                   )   Chapter 7
    MONTGOMERY, BRENDA KATHLEEN,              )
12                                            )   **ORDER GRANTING CHAPTER 7
                                             )   TRUSTEE'S MOTION FOR ORDER:
13                                            )   (1) APPROVING SALE AGREEMENT
                  Debtors.                    )   WITH MICHAEL FLYNN REGARDING
14                                            )   THE SALE AND PURCHASE OF THE
                                             )   ESTATE'S INTEREST IN CERTAIN
15                                            )   PROPERTY; (2) DEEMING BUYER TO
                                             )   BE A GOOD FAITH PURCHASER
16                                            )   PURSUANT TO 11 U.S.C. §363(m);(3)
                                             )   WAIVING 14 DAY STAY IMPOSED BY
17                                            )   FEDERAL RULE OF BANKRUPTCY
                                             )   PROCEDURE 6004(h)**
18                                            )
                                             )
19                                            )
                                             )   Date:   January 2, 2013
20                                            )   Time:   10:00 a.m.
                                             )   Ctrm:   1475
21                                            )
                                             )
22  _____  )

23        Chapter 7 Trustee Jason M. Rund's Motion For Order Approving (1) Sale Agreement

24  With Michael Flynn Regarding The Sale And Purchase Of The Estate's Interest In Certain

25  Property; (2) Deeming Buyer To Be A Good Faith Purchaser Pursuant To 11 U.S.C. Section

26  363(m); And (3) Waiving 14 Day Stay Imposed By Federal Rule Of Bankruptcy Procedure

27  6004(h) ("Motion") came on for hearing on January 2, 2013, the Honorable Sheri Bluebond,

28  United States Bankruptcy Judge presiding.

                                             1

Thomas H. Casey of the Law Office of Thomas H. Casey, Inc. appeared telephonically on behalf of Chapter 7 Trustee, Jason Rund and Christopher J. Conant of Conant Law, LLC appeared on behalf of proposed buyer, Michael Flynn.  No overbidders were present.

Having considered the Motion, the record before the Court, and good cause appearing,

**IT IS HEREBY ORDERED** that the Trustee's Motion is granted;

**IT IS FURTHER ORDERED** that the Trustee is authorized to enter into the Sale Agreement;

**IT IS FURTHER ORDERED** that the Trustee's sale of the Saleable Assets to the Buyer, Michael Flynn ("Buyer"), pursuant to *11 U.S.C. Section 363* as provided for in the Sale Agreement for the purchase price of $20,000 is approved;

**IT IS FURTHER ORDERED** that the sale and purchase of the Saleable Assets, including the eTreppid Documents In Storage, per the Sale Agreement, is approved;

**IT IS FURTHER ORDERED** that the Saleable Assets do not include the sale of any potential causes of action against the United States Government, or the Potential Claim Against the U.S. Government as defined in the Trustee's Motion;

**IT IS FURTHER ORDERED** that the Trustee is authorized to release the Documents In Storage marked by eTreppid as "Confidential" or "Restricted Confidential" to the Buyer;

**IT IS FURTHER ORDERED** that the Buyer is a "good faith purchaser" under 11 U.S.C. Section 363(m);

**IT IS FURTHER ORDERED** that the stay of this order provided by Bankruptcy Rule 6004(h) is hereby waived; and,

///
///
///

    **IT IS FURTHER ORDERED** that the Trustee is authorized to sign any and all documents necessary, and to undertake any non-material amendments and modifications necessary, to complete the sale without further notice, hearing or Court order.

###

Date: January 9, 2013

Sheri Bluebond
United States Bankruptcy Judge

# NOTICE OF ENTERED ORDER AND SERVICE LIST

Notice is given by the court that a judgment or order entitled (*specify*): **Order Granting Chapter 7 Trustee's Motion for Order: (1) Approving Sale Agreement with Michael Flynn Regarding the Sale and Purchase of the Estate's Interest in Certain Property; (2) Approving Overbid Procedure; (3) Deeming Buyer to be a Good Faith Purchaser Pursuant to 11 US.C. Section 363(m); (4) Waiving 14 Day Stay Imposed by Federal Rule of Bankruptcy Procedure 6004(h)** was entered on the date indicated as "Entered" on the first page of this judgment or order and will be served in the manner stated below:

**1.   SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)** – Pursuant to controlling General Orders and LBRs, the foregoing document was served on the following persons by the court via NEF and hyperlink to the judgment or order. As of (*date*) **January 8, 2013**, the following persons are currently on the Electronic Mail Notice List for this bankruptcy case or adversary proceeding to receive NEF transmission at the email addresses stated below.

- Robert Aisenstein    aisenstein@msn.com
- Robert W Beck    robert.beck@beckandbrowning.com
- Thomas H Casey    lmiller@tomcaseylaw.com, msilva@tomcaseylaw.com
- Arturo M Cisneros    arturo@mclaw.org
- Christopher Conant    cconant@conantlawyers.com
- Joseph A Eisenberg    jae@jmbm.com
- Angela M Fontanini    ecfcacb@piteduncan.com
- Ellyn S Garofalo    egarofalo@linerlaw.com, mwilcox@linerlaw.com
- Thomas M Geher    tmg@jmbm.com, we1@jmbm.com;fc3@jmbm.com
- Kathleen M Goldberg    msilva@tomcaseylaw.com
- John H Kim    jkim@cookseylaw.com
- Elmer D Martin    elmermartin@gmail.com
- Roshni V Patel    bknotice@mccarthyholthus.com
- Vy Pham    vpham@mileslegal.com
- Jason M Rund (TR)    trustee@srlawyers.com, jrund@ecf.epiqsystems.com
- Ramesh Singh    claims@recoverycorp.com
- Steven R Skirvin    srs@dkclaw.com
- Richard C Spencer    rspencer@rspencerlaw.com
- Craig S Sternberg    craig@stoslaw.com, scher@schernet.com
- Balpreet Thiara    ecfcacb@piteduncan.com
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
- Kristin A Zilberstein    bknotice@mccarthyholthus.com, kzilberstein@mccarthyholthus.com

☐Service information continued on attached page

**2.   SERVED BY THE COURT VIA UNITED STATES MAIL:** A copy of this notice and a true copy of this judgment or order was sent by United States mail, first class, postage prepaid, to the following persons and/or entities at the addresses indicated below:

Dennis Lee Montgomery
6 Toscana Way
Rancho Mirage, CA 92270

Brenda Kathleen Montgomery
6 Toscana Way
Rancho Mirage, CA 92270

4

1

2

**3.    TO BE SERVED BY THE LODGING PARTY**: Within 72 hours after receipt of a copy of this judgment
or order which bears an "Entered" stamp, the party lodging the judgment or order will serve a complete
copy bearing an "Entered" stamp by United States mail, overnight mail, facsimile transmission or email
and file a proof of service of the entered order on the following persons and/or entities at the addresses,
facsimile transmission numbers, and/or email addresses stated below:

3

4

5

**TO BE SERVED BY THE LODGING PARTY**:

6

| **Interested Parties** | **Counsel for Scott D. Hill** |
|---|---|
| Raphael O. Gomez | Craig S. Sternberg |
| Carlotta P. Wells | Sternberg Thomson Okrent & Scher, PLLC |
| Senior Trial counsel | 600 University Street, Suite 2401 |
| Federal Programs Branch | One Union Square |
| US Department of Justice | Seattle, WA  98101 |
| Civil Division – Room 6114 | |
| 20 Massachusetts Ave., N.W. | Scott D. Hill |
| P.O. Box 883 | 3760 Carillon Point |
| Washington, DC 20044 | Kirkland, WA  98033 |

7

8

9

10

**Counsel for Michael Joseph Flynn**          eTreppid Technologies, LLC
Christopher J. Conant                                      755 Trademark Drive
Conant Law LLC                                              Reno, NV  89521-5920
730 17th Street, Suite 200
Denver, CO  80202                                         **Counsel for eTreppid Technologies, LLC**
                                                                        Timothy A. Lukas, Esq.
Michael Joseph Flynn                                     Holland & Hart LLP
P.O. Box 690                                                  5441 Kietzke Lane, 2nd Floor
Rancho Santa Fe, CA 92067                         Reno, NV  89511-2094

11

12

13

14

15

**Counsel for Scott D. Hill**                            **Counsel for eTreppid Technologies, LLC**
Craig S. Sternberg                                           Reid H. Weingarten, Esq.
Sternberg Thomson Okrent & Scher, PLLC     Brian M. Heberlig, Esq.
500 Union Street, Suite 500                            Robert A. Ayers, Esq.
Seattle, WA  98101                                          Steptoe & Johnson LLP
                                                                        1330 Connecticut Avenue, N.W.
                                                                        Washington, D.C. 20036-1795

16

17

18

19

20

21

22

23

24

25

26

27

28

5