DOWNS DECL - EXHIBIT A

**From:** Michael Flynn [mailto:mike@mjfesq.com]
**Sent:** Monday, July 21, 2014 3:44 PM
**To:** Wollin, Debi
**Cc:** pbrain@paulbrainlaw.com; sjd@witherspoonkelley.com; jmm@witherspoonkelley.com; Downs, Jake; Devlin, John; Hutchings, Danna; Burrus, Leah
**Subject:** Re: Flynn, et al. v. NV Mortgage Inc., et al.

**Jake:   Among other things, I note that you have not identified any Bank of America employees or agents as you indicated that you would.   Am I correct in understanding that you do not intend to call any Bank of America or Country Wide employees.   Your response may be the subject of a motion to compel compliance unless you affirm your intention not to call them.   Also, we agreed that you would further supplement the data bases and location of categories of documents.   Please provide a timetable for that response.**

**Michael Flynn**


On Mon, Jul 21, 2014 at 3:14 PM, Wollin, Debi <WollinD@lanepowell.com> wrote:
Counsel,

Attached please find Defendants' Supplemental FRCP 26(A)(1) Initial Disclosures in the above-referenced matter.



Debi Wollin
Legal Assistant
Lane Powell PC
1420 Fifth Avenue, Suite 4200
P.O. Box 91302
Seattle, WA 98111-9402
Direct: 206.223.7409
http://www.lanepowell.com



_____
This message is private or privileged. If you are not the person for whom this message is intended, please delete it and notify me immediately, and please do not copy or send this message to anyone else.

Please be advised that, if this communication includes federal tax advice, it cannot be used for the purpose of avoiding tax penalties unless you have expressly engaged us to provide written advice in a form that satisfies IRS standards for "covered opinions" or we have informed you that those standards do not apply to this communication.

DOWNS DECL - EXHIBIT B

**From:** Michael Flynn <mike@mjfesq.com>
**Date:** July 30, 2014 at 10:09:28 AM PDT
**To:** "Downs, Jake" <DownsJ@lanepowell.com>
**Cc:** "pbrain@paulbrainlaw.com" <pbrain@paulbrainlaw.com>, "Devlin, John" <DevlinJ@lanepowell.com>,
"Jody M. McCormick (JMM@witherspoonkelley.com)" <JMM@witherspoonkelley.com>,
"sjd@witherspoonkelley.com" <sjd@witherspoonkelley.com>
**Subject: Re: Montgomery: meet and confer**

Dear Jake:


I am responding to your most recent email, attached in this chain.


Notwithstanding our second meet and confer on Monday, July 28, 2014, and the
extensive discussion of the core issues relating to BOA's Rule 26 violations, your
email misstates some of the key points we discussed and the sanctions we seek for
over 12 months of continuous violations.


1.  First, as I said on the phone this Rule 26 motion  originates in facts occurring
over a year ago arising out of BOA's first filing of its mandatory Rule 26
disclosures on May 13, 2013 and the statements therein which directly contradict
BOA's now suddenly shifted position as now recited in your last two emails.  In
BOA's initial disclosures, it stated:


> "Any of BANA's employees or representatives who may have
>
> communicated with Dennis Montgomery, and
> Brenda                                           Montgomery ("Borrowers") or otherwise
>
> worked on the loan account (4 ending 1408) of Borrowers."


In our meet and confer you stated that BOA is now going to only call its custodian
of the records.   In your email, it appears there is now yet another shift to one BOA
employee and the custodian of the records.  Certainly, it appears that BOA is

p. 8

shifting its positions with the wind in order to avoid its original obligations admitted in its first disclosures and thereby avoid sanctions.  But as I have repeatedly stated the sanctions motion is being filed because the case law is directly on point, BOA has violated its obligations, and given the posture of the case, BOA has failed to meet its burden of harmlessness, and plaintiffs have been severely prejudiced.  In sum, the shift in BOA's position is plainly contradictory and designed to evade the sanctions.

2.  Secondly, there is also an apparent misunderstanding of the issues involving the BOA whistleblowers.  Our Motion is not based as you said on the failure to disclose all BOA whistleblower employees, of which there appear to be many.  It is based on the fact that BOA continues to conceal the identity, as mandated by case law, (which duty it  acknowledged in its  in its first disclosures on May 13, 2013), of its employees who "worked on the loan account (4 ending 1408) of the Borrowers." BOA continues to obstruct and violate the Rule and applicable case law.

3.  Finally,  I made it repeatedly clear in our discussion on Monday, that plaintiffs are not filing this Motion to "extort" as you put it in one email a "settlement."  This Motion has been in the pipeline for many months, originates from the violations in the original disclosures now continued and repeated with BOA's shifted positions.  I sincerely expressed to you plaintiffs intent to seek early mediation and alternative dispute resolution with zero desire to carry on a protracted litigation battle with BOA.   But if BOA does not wish to seek resolution – contrary to the stated intentions of Witherspoon Kelley – we are left with no choice but to pursue the litigation remedies afforded our clients.  The Rule 26 issues are very serious ones given the two years of protracted litigation involving the Motions to Dismiss, and given the dismissal of the consumer protection claims and the going forward with the emotional distress and RICO claims.  Because of our desire to settle this case, I sent you the requested demand yesterday.  I don't know how strongly to emphasize to you we are not using the Motion to threaten or force BOA into settlement.  It is part of the litigation process.   Please convey to your clients our desire to resolve this case without further litigation.  In order to deflect yours or their concerns about the purpose of the Motion, we will defer filing until Friday and give your client the opportunity to express its intent re early resolution.

Michael

p. 9

On Tue, Jul 29, 2014 at 12:40 PM, Downs, Jake <DownsJ@lanepowell.com> wrote:

Mike and Paul,

Please consider this email as a follow up to my call with Mike yesterday regarding Defendants'
Rule 26 disclosures and his perceived deficiencies therewith. I understand from Mike that he will
not be deterred from filing a motion related to the Rule 26 disclosures absent a settlement.
However, I would like to reiterate what I stated during our call and make one last attempt to
explain Defendants' position in the hopes that a motion can be avoided.

First, I continue to respectfully disagree with your interpretation of Rule 26, and in particular,
your belief that Rule 26 requires Defendants to identify all persons that may have information
that you deem relevant to your lawsuit.  In fact, following the 2000 amendments, the rule only
requires that my clients disclose witnesses or documents that my clients intend to use.  It does
not require my clients to disclose witnesses or documents, whether favorable or unfavorable, that
they do not intend to use.  We believe this was done with our initial disclosures.  But in a further
effort to avoid unnecessary motion practice, I informed Mike that we will provide a
supplemental disclosure with supplemental witness identification along with the list of databases
where the documents we intend on using can be found.  We will provide this by August 4, 2014,
the same date our responses to your Requests for Production are due.

Specifically, since the exchange of initial disclosures, we have uncovered quite a bit about Mr.
Montgomery that we believe is relevant to the remaining claims (and that the Montgomerys'
disclosures certainly did not reveal).   In particular, we are now aware that a bank employee may
have attended a pre-litigation, pre-foreclosure mediation that was requested by Mr. Montgomery,
but attended by a third party, Tim Blixseth (I understand he is also a client of each of yours),
during which mediation Mr. Blixseth presented a draft version of the complaint that was filed in
this case.   Our supplemental disclosures will include the identity of this bank employee.

That being said, if it is your desire to obtain a list of people that may have information relevant to
your claims, you can seek such information using the discovery mechanisms available to you
under the federal rules. Again, Rule 26 does not obligate my clients to conduct your
investigation. To date, my clients have only received requests for production.  If additional
discovery requests are received,  my clients will respond to those accordingly.

With respect to your threatened sanctions motion, I understand the crux of it to be your belief
that my clients or their then counsel "withheld" publically available information, including the

3

p. 10

identity of witnesses, related to a lawsuit pending in Massachusetts regarding my client's implementation of the Home Affordable Modification Program (HAMP). But as Mike and I have discussed, that program limits eligibility on various factors that would certainly preclude the Montgomerys from participation. The most obvious precluding factor being that HAMP sets a loan limit of $729,750, while the Montgomerys' loan exceeds $2 million. Thus, not only were my clients under no obligation to reference the Massachusetts lawsuit as a related case, that lawsuit has zero relevance in this litigation and we believe that the Court will agree should you proceed with your motion.

Finally, I would like to note that my client has not been uncooperative on issues of discovery. Despite just recently receiving a physician's note from you that sheds some additional light on Mr. Montgomery's medical condition, we have agreed to accelerate the scheduling of his deposition at your insistence, assuming of course, his competency can be verified. We have also provided the Montgomerys with an extension to respond to our discovery requests.

In summary, I believe the threatened motion is both legally and factually baseless and a complete misuse of the resources of both the parties and the Court. Mike, you have not been ambiguous about your intent to file the motion in the absence of an excessive and unwarranted settlement in this case. I understand you claim that you are not using the motion to extort my clients, but the timing of your threats and demands lead us to the opposite conclusion. While we certainly hope that you opt not to burden the Court and our clients with your threatened motion, and will supplement our disclosures in a last ditch effort to avoid the same, we will vigorously oppose the motion should you move forward with it.

**Jacob M. Downs**

Shareholder, Bio | vCard
Lane Powell PC
1420 Fifth Avenue, Suite 4200
P.O. Box 91302
Seattle, WA 98111-9402
Direct: 206.223.7397
Cell: 206.683.6266
www.lanepowell.com

This message is private or privileged. If you are not the person for whom this message is intended, please delete it and notify me immediately, and please do not copy or send this message to anyone else.

Please be advised that, if this communication includes federal tax advice, it cannot be used for the purpose of avoiding tax penalties unless you have expressly engaged us to provide written

4

p. 11

advice in a form that satisfies IRS standards for "covered opinions" or we have informed you that those standards do not apply to this communication.

p. 12

DOWNS DECL - EXHIBIT C

Theoharis v. Rongen, CASE NO. C13-1345 RAJ, 2014 BL 199478 (W.D. Wash. July 18, 2014), Court Opinion

Pagination
    *   BL

United States District Court, W.D. Washington

---

DUSTIN T. THEOHARIS, Plaintiff, v. KRISTOPHER RONGEN, Defendant.

---

CASE NO. C13-1345 RAJ
July 18, 2014.

ORDER

Richard A. Jones, District Judge

## I. INTRODUCTION

This matter comes before the court on the motion of Plaintiff Dustin Theoharis to strike eight of Defendant's "rebuttal" expert witness reports, to prohibit those experts from offering any evidence, and to award him attorney fees and costs. For the reasons stated below, the court GRANTS the motion in part and DENIES it in part. Dkt. # 39.

## II. BACKGROUND

The court reluctantly slogs once again into the quagmire that has been the parties' disclosures of expert witnesses. The court has done so once before, in a June 16 order that described Defendant's counsel's failure to diligently complete discovery necessary for Defendant's experts to provide complete reports. At that time, the parties had made only their initial disclosures of expert witnesses in compliance (or in alleged compliance) with Federal Rule of Civil Procedure 26(a)(2). Plaintiff noted that many of Defendant's expert reports were explicitly incomplete, in that the experts admitted that they had not reviewed critical medical records, evidence from Plaintiff himself describing the shooting incident at the core of the case, and other evidence necessary to form complete opinions. Plaintiff asked the court to strike the reports on that basis. The court declined to do so, but cautioned Defendant's counsel that it would consider sanctions if counsel attempted to remedy the defects in the experts' reports by providing "rebuttal" or "supplemental" reports beyond the scope of permissible rebuttal or supplementation under Rule 26(a)(2).

Since then, Defendant disclosed new expert reports on June 20, 30 days after the court's May 21 deadline for expert reports. No one contends that the new reports are supplemental reports within the scope of Rule 26(a)(2)(E), so they are timely only if they are proper rebuttal reports within the meaning of Rule 26(a)(2)(D)(ii), which permits expert disclosures "intended solely to contradict or rebut evidence on the same subject matter" from an opposing party's expert. Plaintiff points to 8 reports out of the 11 that Defendant disclosed on June 20 that are neither rebuttal nor supplementation. He asks the court not only to strike the new reports, but to preclude the experts who offered the reports from testifying at all, even for those experts who also submitted reports by the May 21 deadline. He also asks for attorney fees and costs.

Before considering Plaintiff's request as to 8 of the new expert reports, the court considers the parties' expert disclosures in the broader context of this case. Defendant, Officer Kristopher Rongen of the Washington Department of Corrections, along with a King County Sheriff's deputy, shot Mr. Theoharis at least a dozen times after they found him in his bed after they arrested another person in a home. There is no dispute that in the more than two years since the February 2012 shooting, Mr. Theoharis [*2] has incurred hundreds of thousands of dollars in medical expenses, and that his medical expenses will continue to grow. There are disputes as to whether those expenses are reasonable, his future medical and rehabilitative needs, and the extent to which he will be able to work in the future. The parties also have sharp disputes about whether the shooting was lawful. All of these disputes are set for a 7-

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Theoharis v. Rongen, CASE NO. C13-1345 RAJ, 2014 BL 199478 (W.D. Wash. July 18, 2014), Court Opinion

to-10-day jury trial on November 17.

The parties propose to have at least 25 expert witnesses testify during those 7 to 10 days. Plaintiff provided 14 reports from 13 experts in May; Defendant provided at least 8 reports from 8 experts in May. Defendant disclosed at least 4 (and perhaps as many as 6) new experts in June, and it is not clear if Plaintiff designated any new experts at that time. A trial day before the undersigned judge consists of 5.5 hours of jury time, excluding breaks. If the parties could somehow avoid selecting a jury, making opening statements, presenting any fact witnesses at all, and making closing arguments, they would have about 1.5 hours to devote to each expert witness (including direct and cross examination) for a 7-day trial, and about 2.25 hours for each expert witness in a 10-day trial. In other words, the parties ought to rethink their expert designations.

The parties have yet to reveal to the court the subject matter of each expert's testimony, but the disclosures the court has examined so far do not suggest a model for efficient use of the jury's time. Defendant has designated at least 5 witnesses to opine as to whether Ofc. Rongen acted reasonably; Plaintiff designated at least 3 experts for the same topic. No party has acknowledged that this District's local rules prohibit a party from calling more than one expert witness on any topic, without leave of court. Local Rules W.D. Wash. LCR 43(j). Even setting aside the parties' over-designation of experts to address the reasonableness of the officers' actions (an issue the jury is capable of deciding with no assistance from experts), the court suspects that there is much overlap in the expected testimony of the parties' experts. The motion before the court is the fourth in a month arising from the parties' expert disclosures, and the court has yet to consider whether the experts offer proper opinion testimony (many of them, particularly the "experts" on police conduct, seem to wish to instruct the jury on how to interpret basic evidence, like eyewitness testimony). The court also has yet to consider whether the parties' disclosures are cumulative, such that presenting each expert witness would be a waste of the jury's time.

With these comments in mind, the court considers Plaintiff's motion to strike.


## III. ANALYSIS

### A. Federal Rule of Civil Procedure 26(a)(2) Delineates the Scope of Rebuttal Expert Testimony.

Rule 26(a)(2), which governs a party's obligation in disclosing expert testimony, first entered the Federal Rules of Civil Procedure in 1993. Experts specially engaged to provide expert testimony must furnish written reports that include a "complete statement of all **[*3]** opinions the witness will express and the basis and reasons for them," all "facts or data considered by the witness," and various disclosures related to the expert's qualifications, compensation, and prior expert testimony. Fed.R.Civ. P. 26(b)(2)(B)(i)-(vi). Absent a court order to the contrary, the parties must disclose expert testimony "at least 90 days before the date set for trial." Fed.R.Civ. P. 26(b)(2)(D)(i). A party may also, however, offer rebuttal expert testimony — testimony "intended solely to contradict or rebut evidence on the same subject matter" as another party's expert disclosure — within 30 days after the other party's disclosure. Fed.R.Civ. P. 26(b)(2)(D)(ii). In this case, the court's scheduling order set a May 21 deadline for both parties' expert disclosures, two months before the close of discovery on July 21. The court set no deadline for rebuttal experts, meaning that they were due 30 days after the disclosure of the initial report. Because neither Plaintiff nor Defendant suggest that they exchanged any initial expert report prior to May 21, the court (like the parties) treats June 20 as the deadline for rebuttal expert reports.

There is scarce appellate authority explaining the difference between an expert's Rule 26(a)(2) initial disclosures and her rebuttal disclosures, and the district courts have articulated a wide range of standards. This court's interpretation begins with the text of Rule 26(b)(2)(D)(ii), which declares that rebuttal reports are those "intended *solely* to contradict or rebut evidence" in an opposing party's expert disclosure. The court has emphasized "solely." At a bare minimum, a rebuttal expert cannot offer testimony unless the expert whom she rebuts has offered testimony. In addition, a rebuttal expert cannot offer evidence that does not contradict or rebut another expert's disclosure merely because she has also offered some proper rebuttal.

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
**// PAGE 2**

Theoharis v. Rongen, CASE NO. C13-1345 RAJ, 2014 BL 199478 (W.D. Wash. July 18, 2014), Court Opinion

Because neither Rule 26(a)(2) nor any other binding authority imposes additional restrictions on rebuttal expert testimony, the court declines to do so. The court acknowledges that district courts have taken various approaches in drawing the line between rebuttal expert testimony and non-rebuttal testimony. One that closely comports with this court's view is from another of this District's judges. In *Daly v. Far Eastern Shipping Co.*, 238 F.Supp.2d 1231, 1239 (W.D. Wash. 2003) (Coughenour, J.), the court considered two expert witnesses who addressed the conclusions of a Navy report on a maritime incident. Plaintiff disclosed an expert who attacked the report, Defendant disclosed one who largely agreed with it. *Id.* Plaintiff's expert disclosed that he was conducting an experiment to undermine the report, but had not yet completed it. *Id.* Plaintiff then disclosed a "rebuttal report" in which he announced the results of the completed experiment, but contended that it was a rebuttal to the defendant's expert.  Id. at 1240. The court found the experiment to be beyond the scope of proper rebuttal, because it "did not address any particular opinion in [defendant's expert]'s report," but was "a new means to support [plaintiff's **[*4]** expert]'s original opinion that the [Navy] report was flawed."  Id. at 1240-41. The court noted, among other things, that plaintiff's expert had begun the experiment before he had any expert testimony to rebut.  Id. at 1241. The court excluded the tardy disclosure.  *Id.*

Other courts have taken looser views, concluding that as long as an expert contradicts or rebuts the same "subject matter" as an opposing party's expert, she has offered rebuttal evidence. *Lindner v. Meadow Gold Dairies, Inc.*, 249 F.R.D. 625, 637 (D. Haw. 2008). A modified version of that viewpoint permits rebuttal testimony that "question[s] the assumptions and methods" of an opposing expert, without presenting "new facts" or "novel argument." *LaFlamme v. Safeway, Inc.*, *3:09-cv-514-ECR-VPC*, [2010 BL 205151], 2010 U.S. Dist. LEXIS 98815, at *8 (D. Nev. Sept. 2, 2010).

Other courts suggest a stricter view — that expert testimony is not rebuttal testimony where it addresses an anticipated (or reasonably anticipatable) portion of the other party's case. *E.g., Downs v. River City Group, LLC*, *3:11-cv-885-LRH-WCG*, [2014 BL 55909], 2014 U.S. Dist. LEXIS 26056, at *6-7 (D. Nev. Feb. 28, 2014) (citing cases); *Gerawan Farming, Inc. v. Prima Bella Produce, Inc.*, No. *1:10-cv-148 LJO JLT*, [2011 BL 130363], 2011 U.S. Dist. LEXIS 52792, at *12-13 (E.D. Cal. May 17, 2011). The court disagrees. This standard comports more closely to the standard for evaluating rebuttal testimony (expert or percipient) *at trial*, where rebuttal witnesses typically need not be disclosed at all. In that context, a rebuttal witness for the plaintiff is one who testifies during the rebuttal phase of trial, and who may only "meet new facts brought out in her opponent's case in chief." *Morgan v. Commercial Union Assur. Cos.*, 606 F.2d 554, 555 (6th Cir. 1979) (cited in *Downs*, [2014 BL 55909], 2014 U.S. Dist. LEXIS 26056, at *7). And although the defendant typically enjoys no rebuttal phase at trial, a "defense witness whose purpose is to contradict an expected and anticipated portion of the plaintiff's case in chief can never be considered a 'rebuttal witness,' or anything close to one."  Id. at 556. These distinctions matter at trial because rebuttal witnesses, whether expert or percipient, generally need not be disclosed in advance of trial. To ensure that a party does not suffer prejudice from a surprise witness disclosed near the end of trial, a court may exclude improper rebuttal witnesses, as was the case in *Morgan.* Id. at 556 (excluding purported "rebuttal" witness who defendant called to testify that the plaintiff had a pre-existing back condition, because defendant knew since the outset of the case that plaintiff would testify he had no pre-existing condition).

By contrast, rebuttal expert disclosures are expected, by default, to come at least 60 days before trial. A party who does not bear the burden of proof on an issue may be keenly interested in avoiding the expense of designating an expert witness on that issue. If, however, the party with the burden of proof offers a compelling expert disclosure, the opposing party can still designate a rebuttal expert in compliance with the rules. For that reason, the court declines to adopt the rule that expert testimony on an anticipated portion of an opposing party's case cannot be rebuttal expert testimony. *See Pakootas v. Teck Cominco Metals, Ltd.*, No. *CV-04-256-LRS*, [2012 BL 83030], 2012 U.S. Dist. LEXIS 72137, at *6 (E.D. Wash. **[*5]** Apr. 4, 2012) (explaining that Rule 26 "does not automatically exclude anything an expert could have included in his or her original report") (quoting *Crowley v. Chait*, 322 F.Supp.2d 530, 551 (D. N.J. 2004)). Rule 26(a)(2) provides more flexibility for rebuttal expert testimony than traditional notions of rebuttal testimony at trial. Where a *plaintiff* attempts to introduce rebuttal expert testimony, the concerns about unfair surprise from rebuttal experts more closely resemble those applicable to rebuttal witnesses at trial. But in a case like this one, where it is the defendant offering rebuttal testimony, the context is markedly different. Waiting until the rebuttal deadline carries risk. If an opposing party offers no expert disclosures, or only narrow disclosures, there will be little or nothing

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

to rebut. But Rule 26(a)(2) does not prohibit a party from assuming the risk inherent in relying on a rebuttal expert disclosure.

## B. Defendants' New Expert Reports Consist of Some Proper Rebuttal and Some Untimely Non-Rebuttal.

With these basic principles in mind, the court turns to the 8 "rebuttal" reports that are the subject of Plaintiff's motion. The court first considers the 4 reports from experts who were not previously disclosed, then the 4 reports from experts who previously submitted a non-rebuttal expert report.

## 1. Reports From Newly-Disclosed Rebuttal Experts

The court begins with the report of Thomas Wickizer, who offers opinions about whether approximately $950,000 of Plaintiff's medical bills are comprised of reasonable charges. Defendants did not disclose Mr. Wickizer as a witness until June 20. By itself, that presents no concern, because Rule 26(a)(2) does not require a rebuttal expert to be disclosed before the deadline for rebuttal disclosures. *E.g.*, *Johnson v. Grays Harbor Comm. Hosp.*, No. *C06-5502BHS*, [2007 BL 251332], 2007 U.S. Dist. LEXIS 95725, at *4 (W.D. Wash. Dec. 18, 2007). But his report is timely only to the extent it rebuts or contradicts one of Plaintiff's experts. *See id.* at *6 ("Plaintiff is cautioned that his experts will be permitted only to offer rebuttal testimony at trial."). Plaintiff suggests that Mr. Wickizer is no rebuttal expert because he does not so much as mention any of Plaintiff's experts or their reports. But that is also not determinative. *Lindner*, 249 F.R.D. at 636 (reviewing case law declining to strike rebuttal reports that "did not state . . . that they reviewed the reports of the [opposing party's] experts"). Karina Vega, one of the experts who provided a report on Plaintiff's behalf in May, also offered opinions about whether the cost of Plaintiff's medical care was reasonable. In some ways, Mr. Wickizer squarely rebuts her conclusions. She concluded, for example, that over $18,000 in airlift and ambulance costs were reasonable, whereas Mr. Wickizer opined that the reasonable value of those services was about $4,700. That is a rebuttal opinion. That Mr. Wickizer announced his own methodology for reaching his opinion is not improper, it is a requirement of valid expert testimony. On the other hand, Mr. Wickizer offered conclusions that go beyond the scope of Ms. Vega's report. She considered bills totaling **[*6]** about $913,000, whereas Mr. Wickizer considered bills totaling about $946,000. Among the additional bills were about $7,000 from St. Francis hospital. Mr. Wickizer's opinion that only about $3,500 of those bills were reasonable is not rebuttal to Ms. Vega, and thus Defendant did not timely disclose it. Mr. Wickizer's report is proper expert rebuttal testimony to the extent it contradicts Ms. Vega's conclusions, and untimely expert testimony to the extent it offers opinions on bills and other matters about which Ms. Vega offered no opinion.

Dr. James Vandenbelt, a psychiatrist, purports to address the reports of Plaintiff's expert psychiatrist, Dr. Andrew Saxon. He concurs with Dr. Saxon's assessment that Plaintiff suffers from post-traumatic stress disorder ("PTSD"). He also addressed the possibility that medication would lessen Plaintiff's PTSD symptoms over time, although it is not clear whether he has any disagreement with Dr. Saxon's views on that topic. Dr. Vandenbelt also addressed the conclusions of Plaintiff's expert Kathryn Reid, a rehabilitation counselor who wrote a report that included a "life plan" addressing Plaintiff's future medical needs, including home care needs, as well as his need for vocational rehabilitation. Ms. Reid, in consultation with Dr. Saxon, recommended ongoing counseling with a pain psychologist. Dr. Vandenbelt agreed, but believed that fewer sessions might be necessary. That is proper rebuttal testimony. Some of Dr. Vandenbelt's report is not rebuttal. First, to the extent that he intends to testify about his review of Plaintiff's medical records except as necessary to support a proper rebuttal opinion, he may not do so. Also beyond the scope of rebuttal is his opinion that if Plaintiff were to continue to use illicit drugs (as he admittedly did prior to the shooting), it would adversely impact his mental health. That opinion goes beyond the scope of Dr. Saxon's report. He also opined that Dr. Saxon did not account for anxiety problems for which Plaintiff obtained treatment *before* the shooting, and for the possibility of depression unrelated to the shooting. Dr. Saxon offered no opinion on any pre-existing or unrelated mental health conditions, and Dr. Vandenbelt's attempt to do so is not proper rebuttal.

Dr. Clifford Nelson purports to rebut the report of Plaintiff's forensic pathologist, Dr. Eric Keisel. Dr. Keisel examined the medical records to determine whether Plaintiff's gunshot wounds were consistent with Defendant's account of Plaintiff's actions when he (and the Sheriff's deputy) shot him. Dr. Keisel's opinion, boiled down, is straightforward:

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

**Bloomberg Law**®

Theoharis v. Rongen, CASE NO. C13-1345 RAJ, 2014 BL 199478 (W.D. Wash. July 18, 2014), Court Opinion

Plaintiff had no gunshot wounds to his back, which to Dr. Keisel's mind discredits the officers' accounts that they began shooting when Plaintiff was rolled onto his stomach and reaching between the mattress and box spring. Dr. Nelson's view is that several of the wounds could have been incurred while Plaintiff was in a twisted position, which is consistent with the officers' accounts that Plaintiff stopped reaching under the mattress and rolled onto [*7] his back as the shooting happened. It appears that Dr. Nelson and Dr. Keisel have relatively little dispute in the area of their medical expertise they do not disagree about the location of the gunshot wounds. They appear to disagree about what the officers actually said about when the shooting began. In any event, the court finds nothing in Dr. Nelson's report that exceeds the scope of proper rebuttal, even if his disagreement with Dr. Nelson as to what the officers actually said about the shooting is beyond the scope of expert testimony.

Dr. Carl Wigren also examined Plaintiff's medical records to respond to Dr. Keisel's report. He believes that there is evidence of at least one shot to Plaintiff's back, in contradiction to Dr. Keisel's opinion. That is proper rebuttal testimony. Also proper (assuming it falls within the scope of his expertise), is his review of literature to estimate how long it might have taken Mr. Theoharis to roll from his stomach to his back. Dr. Wigren also reviews the evidence to dispute Dr. Keisel's conclusion that the mattress contained no bullet holes that suggested that the officers might have missed with one or more shots. The court queries whether either expert is qualified to opine about bullet holes in mattresses (as opposed to bullet holes in people), but to the extent the witnesses are qualified, Dr. Wigren's opinion contradicts Dr. Keisel.

Concluding its review of Defendant's disclosures from the four rebuttal experts who he did not previously disclose, the court concludes that Dr. Nelson and Dr. Wigren offered reports that are entirely rebuttal testimony. Dr. Vandenbelt and Mr. Wickizer offered reports consisting in part of proper rebuttal testimony, and in part of testimony that rebuts none of Plaintiff's expert disclosures.

## 2. New Reports From Experts Who Also Offered Initial Reports

Dr. James Russo is Defendant's expert orthopedic physician. When he submitted his May report, he admitted that he had medical records only through January 2013, and he admitted that his lack of more recent records hampered his ability to offer opinions. By June, he had reviewed the report of two of Plaintiff's experts: Dr. Theodore Becker, who opined about Plaintiff's physical limitations with respect to his ability to work;[fn1] and Dr. Jennifer James, a physician who offered comprehensive opinions on Plaintiff's medical status. Dr. Russo's new report offers little more than a summary of Plaintiff's expert reports. He states that he would not change any of his opinions in the May report, except in two areas where Dr. James's review of more recent medical records suggest that he was wrong. This is not rebuttal, it is an acknowledgement of the weaknesses of his own report. He cannot correct his own errors by borrowing from another physician who had better records. And a statement that his own opinions have not changed is not rebuttal, it is unnecessary reiteration. As to Dr. Becker, he merely opines that his assessment of Plaintiff's physical capacities is not inaccurate, but that his capacities are likely to improve if [*8] he continues in physical therapy. That is proper rebuttal testimony.

James Gracey is a rehabilitation consultant who nominally addresses Ms. Reid's report and "life plan." His attempt to modify his previous report by considering Dr. Russo's review of medical records after May 21 is not a proper subject of rebuttal testimony. Indeed, he claims to have reviewed Dr. Russo's June 16 report, a report that Defendant's counsel decided not to submit after concluding that it violated this court's prior order. Much like Dr. Russo, Mr. Gracey uses his new report to state that he would not change any of the conclusions of his May report, except for a few conclusions he would change in light of Dr. Russo's review of more recent medical records. Just as those opinions were beyond the scope of rebuttal in Dr. Russo's new report, they are beyond the scope of rebuttal in Mr. Gracey's new report. His only rebuttal to Ms. Reid's report is to disagree with her regarding Plaintiff's need for a wheelchair and wheelchair-accessible vehicle and to disagree with her recommendations as to limited case manager support. Those opinions are proper rebuttal.

David Staskiewicz, who filed a May report opining on the officers' use of force, filed a new report consisting not of rebuttal, but of attacks on the qualifications of Plaintiff's experts. He concluded that Plaintiff experts Robert Thornton

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Theoharis v. Rongen, CASE NO. C13-1345 RAJ, 2014 BL 199478 (W.D. Wash. July 18, 2014), Court Opinion

and Leo Poort were not qualified to offer opinions, and thus declined to rebut them. He concluded that Plaintiff expert Michael Brasfield was largely unqualified (because he has not worked in the field as a law enforcement officer for almost 40 years). He addressed a few of Mr. Brasfield's opinions, but his disagreements consist mostly of disagreements over the interpretation of the evidence. The jury, not any of the party's experts, will decide what happened on the day of the shooting. The experts' disagreements over what happened are irrelevant. He offers a few disagreements with Mr. Brasfield's conclusions about the reasonableness of certain actions. To the extent that Mr. Brasfield is permitted to testify, Mr. Staskiewicz may offer those few rebuttal opinions. Mr. Staskiewicz's opinions about the qualifications of other officers are not proper rebuttal testimony.

Finally, another of Defendant's use-of-force experts, Craig Allen, also provided a second report. He purports to rebut a host of Plaintiff's experts. He contends that Dr. Keisel failed to consider the officers' reaction time both in beginning to shoot and in ceasing to shoot, that Dr. Jan Zemplenyi (a plastic surgeon) made errors in assessing Plaintiff's body position, as did Mr. Brasfield, Mr. Poort, and Mr. Thornton. To support his assertions, he conducted what he calls a "movement analysis" in which he used an actor about Plaintiff's size and attempted to recreate the circumstances of the shooting. To do so, he had to rely on some evidence that Defendant did not provide him with prior to his May report, including Plaintiff's recent deposition transcript. The court's review of Mr. Allen's new report suggests that he has [*9] attempted to rebut the opinions of Plaintiff's experts. The court suggests no opinion on whether Mr. Allen's report is proper expert testimony, but if it is, it is rebuttal expert testimony.

Before considering remedies that both address Defendant's improper rebuttal disclosures and ensure that he does not improperly use his proper rebuttal disclosures, the court notes that it does not purport to have exhaustively identified every bit of non-rebuttal disclosure within these 8 reports. This is in part because the court does not have all of the parties' expert reports and cannot make a complete comparison, and in part because some of the reports are simply too lengthy. The court expects the parties to work cooperatively to address any other non-rebuttal disclosures in accordance with this order. The court will impose sanctions on any party not adhering to the principles expressed in this order if additional motion practice is necessary.

## C. The Court Imposes Remedies to Address Defendants' Proper and Improper Expert Rebuttal Disclosures.

The court now considers the remedy for those portions of Defendant's experts' reports that exceed the scope of rebuttal. Rule 37(c)(1) provides a sanction for failure to make a disclosure required under Rule 26(a) — "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." Fed.R.Civ. P. 37(c)(1). This exclusion sanction, which the Federal Rules advisory committee deemed "self-executing" and "automatic," is designed to provide a strong inducement to make required disclosures of expert evidence and fact evidence. *Yeti by Molly Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001). The party who failed to make the disclosure bears the burden of proving that its untimely disclosure was substantially justified or harmless. Id. at 1107. A court has "particularly wide latitude" in its decision to impose sanctions via Rule 37(c)(1). Id. at 1106. In addition to (or instead of) the "automatic" exclusion sanction, the court may award attorney fees and reasonable expenses, may inform the jury of the party's untimely disclosure, and may fashion other sanctions, including the evidentiary sanctions listed in Rule 37(b)(2)(A)(i)-(vi). Fed.R.Civ. P. 37(c)(1)(A)-(C).

Defendant has not proven that his untimely disclosures of non-rebuttal expert testimony were substantially justified or harmless. At best, Defendant's lack of diligence (which the court detailed in its June 16 order) left him in the position of having to exceed the scope of proper rebuttal testimony to make up for shortcomings in his initial expert disclosures. Lack of diligence is not substantial justification, and the court explained in its June 16 order why his late expert disclosures are not harmless. *See also Wong v. Regents of the Univ. of Cal.*, 410 F.3d 1052, 1062 (9th Cir. 2005) (excluding untimely disclosed witness "even though the ultimate trial date was still some months away," noting that "[d]isruption to the schedule of the court and the other parties . . . is not harmless").

Plaintiff overreaches [*10] in its request that the court prevent these eight expert witnesses from testifying at all. The court disagrees with Plaintiff's assertion that it is impossible to segregate the experts' untimely non-rebuttal evidence

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

from their proper rebuttal evidence. The court has already done so, at least in part, and the court is confident that Plaintiff will be able to identify any other testimony beyond the scope of proper rebuttal.

The court will order a small attorney fee award. The majority of this motion was based on Plaintiff's belief that if Defendant *could* have disclosed expert testimony before the rebuttal deadline, he was *required* to do so. That belief does not comport with the Rule 26(a)(2), as the court has explained in Part III.A. Nonetheless, there were significant aspects of Defendant's rebuttal reports that went beyond the scope of rebuttal, and the court already warned Defendant that it would award attorney fees if it chose that path. Accordingly, the court orders the parties to meet and confer to discuss an appropriate attorney fee award based on the reasonable fees Plaintiff's counsel would have incurred if counsel had focused solely on the portion of the reports that were not proper rebuttal. If the parties agree on the award, they need not inform the court. If they disagree, Plaintiff may file a motion for attorney fees no later than August 22. The court will require any party who takes an unreasonable position in that motion to pay additional attorney fees.

The court declines, at this time, to impose additional sanctions arising from Defendant's untimely expert disclosures. The court does, however, emphasize the consequences of Defendant's decision to offer certain expert testimony solely as rebuttal. First, Defendant may not use any of that evidence *except to rebut Plaintiff's experts.* Among other things, Defendant may not use that evidence to support his own summary judgment motion or any other pretrial motion. He may use it in opposition to one of Plaintiff's motions only if Plaintiff relies on the opinion that prompted the rebuttal testimony. Similarly, Defendant may not use a rebuttal disclosure at trial unless one of Plaintiff's experts testifies as to the opinion that prompted the rebuttal testimony (or Plaintiff relies on such an opinion in one of his own pretrial motions). At trial, the court may impose additional sanctions if Defendant's experts attempt to make up for the shortcomings of their initial reports without staying within the scope of rebuttal testimony, or if the experts do not follow this court's rulings. The court might, for example, not merely instruct the jury to disregard such testimony, it might inform the jury that the witness is prohibited from addressing certain matters because Defendant did not timely provide his experts with underlying evidence.

### D. The Parties Must Meet and Confer to Reduce their Reliance on Expert Testimony.

Finally, the court returns to the quagmire it described at the outset of this motion. Discovery will close on July 21. The declarations of **[*11]** counsel for both parties suggest that there will be discovery yet to complete, and in particular that Plaintiff's counsel declined to depose at least some of Defendant's rebuttal experts pending the outcome of this motion. The next significant deadline in this case is the deadline for filing dispositive motions on August 19. The court will permit the parties to conduct additional depositions of expert witnesses, if necessary, until August 13. Before doing so, however, the court requires the parties to meet and confer *in person* to discuss reducing the number of experts on which each party will rely. After completing that discussion, the parties should attempt to agree on a schedule for completing expert depositions. Although the parties must discuss these two topics, they should also discuss any others that will save the jury from the quagmire the parties have created with their expert disclosures. If there is ever a case that requires 25 expert witnesses or more, the court is confident that this is not one of them. The court is also confident that everyone — the parties, the jury, and the court — will benefit from a more streamlined approach to this case. Putting that aside, the court will hold the parties to their 7-10 day trial estimate, and will ultimately put the parties on a "clock" that apportions time evenly between them based on the court's ultimate conclusion as to the length of trial. They cannot reasonably expect to present testimony from 25 or more expert witnesses in that time. The court urges the parties to reach their own solution to the problem they have created; the alternative is to risk a solution from the court enforcing LCR 43(j), and prohibiting testimony that is cumulative or of marginal value to the jury.

### IV. CONCLUSION

For the reasons stated above, the court GRANTS in part and DENIES in part Plaintiff's motion to exclude evidence. Dkt. # 39. The court strikes the portions of Defendant's rebuttal expert reports that exclude the scope of proper rebuttal, and prohibits Defendant from relying on those portions. Defendant may use the proper rebuttal testimony solely as rebuttal. The parties shall attempt to agree on an attorney fee award to Plaintiff in accordance with this order,

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Theoharis v. Rongen, CASE NO. C13-1345 RAJ, 2014 BL 199478 (W.D. Wash. July 18, 2014), Court Opinion

and Plaintiff shall file a motion if necessary no later than August 22. The court will permit the parties to complete any expert depositions until August 13.

[fn1] Dr. Becker's report is not part of the record before the court.

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

DOWNS DECL - EXHIBIT D

1  Michael J. Flynn
2  PO Box 690
   6125 El Tordo
3  Rancho Santa Fe, CA 92067

4  Suite 240
   One Center Plaza,
5  Boston MA 02108

6
   Tel: 858 775 7624
7  Fax: 858 759 0711
   E-Mail: mike@mjfesq.com
8
9  Creditor *in pro per*,

10
11
                **UNITED STATES BANKRUPTCY COURT**
12              **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
13                          **RIVERSIDE BRANCH**

14
15  IN RE:                              )   CASE NO.: 09-24322-BB
                                        )
16                                      )   Adversary Proc. No._____
                                        )
17  DENNIS MONTGOMERY and BRENDA        )
    MONTGOMERY                          )   **COMPLAINT TO:**
18                                      )   **1. DENY DEBTORS' DISCHARGE**
                                        )   **PURSUANT TO 11 U.S.C. § 727(A)(2);**
19              Debtors.                )   **2. DENY DEBTOR'S DISCHARGE**
                                        )   **PURSUANT TO 11 U.S.C. § 727(A)(3)-(5);**
20  _____       )   **3. DETERMINE NONDISCHARGEABILITY OF**
                                        )   **DEBT FOR ACTUAL FRAUD PURSUANT TO**
21  MICHAEL J. FLYNN, an individual,    )   **11 U.S.C. § 523(A)(2);**
                                        )   **4. DETERMINE NONDISCHARGEABILITY OF**
22              Plaintiff,              )   **DEBT PURSUANT TO 11 U.S.C. § 523(A)(6)**
    v.                                  )
23                                      )
                                        )
24  DENNIS MONTGOMERY, BRENDA           )
    MONTGOMERY                          )
25                                      )
                Defendants.             )
26  _____       )
27
28

p. 23

1

2      CREDITOR MICHAEL J. FLYNN (hereinafter "Flynn") *in propria persona*, hereby files this

3

4  Complaint to Determine Non-Dischargeability of Debtors and their Debts on behalf of himself and all

5  creditors, and for other claims, and in support thereof alleges as follows:

6                                          **I.**

7                          **JURISDICTION AND VENUE**

8      1.      On or about June 26, 2009 (the "Petition Date") the defendants Dennis Montgomery

9  and Brenda Montgomery filed a voluntary petition for relief (the "Chapter 7 Case") under Chapter 7,

10

11  Title 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States

12  Bankruptcy Court for the Central District of California, Riverside Branch.

13      2.      This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334, and 28

14  U.S.C. § 157 (a).

15      3.      This adversary proceeding is a core proceeding under pursuant to 28 U.S.C. 157

16  (b)(2)(I).

17      4.      Venue of the Chapter 7 Case and of this adversary proceeding is proper in this district

18

19  pursuant to 28 U.S.C. §§ 1408 and 1409.

20      5.      This adversary proceeding is commenced pursuant to Fed. R. Bank. P. 7001 (6) to

21  determine the dischargeability of Debtors and of debts owed to Flynn and other creditors.

22                                         **II.**

23                                     **PARTIES**

24      6.      Michael J. Flynn is an individual and judgement creditor of the defendants with a

25  California address of PO Box 690, 6125 El Tordo, Rancho Santa Fe, CA 92067.

26

27      7.      Defendant Debtors are natural persons residing at 6 Toscana Way, Rancho Mirage,

28  CA 92270.

p. 24

III.

**FACTUAL BACKGROUND**

8.      Michael Flynn is an attorney licensed in Massachusetts and a judgment creditor of the debtors by virtue of the breach of the Debtors' contractual obligation to pay attorney's fees in excess of $628,000 due pre-petition, as well as over $200,000 in sanctions imposed on Dennis Montgomery and his lawyers  for willful and malicious misconduct in Nevada litigation in which Mr. Flynn had previously represented the Debtors Dennis Montgomery and Brenda Montgomery. See *Montgomery v eTreppid Technologies*, 2009 U.S. Dist. LEXIS 35543, (D.Nev. 2009,  the "Sanctions Order").

9.      Pursuant to said Sanctions Order, Montgomery has been referred to the U. S. Attorney in Nevada for perjury. The Sanctions Order is now under appeal to the District Judge. Montgomery perjured himself in connection with multiple false statements under oath in the Nevada cases, including but not limited to the matters recited in the Sanctions Order. Mr. Flynn withdrew from the Nevada cases in June - August, 2007 when he discovered Montgomery's multiple perjuries and frauds.

10.      Thereafter,  the Los Angeles law firm of Liner, Yankelevitz, Sunshine & Regenstreif, also then representing Edra Blixseth, Montgomery's partner replaced Flynn.  The Liner law firm took over the representation of Montgomery *knowing* and in full possession of conclusive evidence that Montgomery was an habitual perjurer. *Id. Montgomery* continued his pattern of lying under oath throughout his two years of representation by the Liner firm; and again at his recent § 341(a) Meeting of Creditors on September 16, 2009.

11.      The instant Chapter 7 petition  was filed on June 26,2009, the day on which Dennis Montgomery was ordered to appear in the Nevada Federal District Court for his Debtor's Examination in connection with the above stated case,  *Montgomery v eTreppid Technologies,*

United States District Court for the District of Nevada, Case No. 06-cv-00056 (PMP, VPC).

12.    On that date, a Motion for Contempt and to Compel Production of previously ordered

documents was pending before the Nevada Federal Court (See Doc. # 's 1061,1075 and 1076 ) for

Montgomery's failure to comply with previous court orders requiring the production of his financial

records. Montgomery had intentionally and willfully concealed his financial records by, among other

things, intentionally deleting specific pages of specific bank records reflecting cancelled checks,

which would establish where millions of dollars of money paid to him by Edra Blixseth had been

hidden, including payments to his children. *Id.* The incomplete records Montgomery did produce

were contained on an electronic disc consisting of approximately 900 pages in his possession at that

time and at the present time. In his § 341(a) Meeting of Creditors, Montgomery denied possession of

his financial records.

13.    The records produced in the Nevada cases, coupled with Flynn's experiences with

Montgomery as his former attorney establish an intent to hide or conceal assets. The records reveal

that Montgomery purchased millions of dollars in bank checks between April and December, 2006

from monies paid to him by Edra Blixseth, his partner in a scheme to defraud the U.S. government

based on Montgomery's fraudulent software technology, while Montgomery was the subject of a

federal criminal investigation, and also a defendant in the eTreppid Nevada litigation in which he

subsequently confessed a $26.5 million dollar judgments.   The concealed cancelled checks and

other court ordered documents would have established where the said millions of dollars have been

hidden.

14.    To date, Montgomery has not produced said records, and a Rule 2004 exam motion is

now pending. At his § 341(a) Meeting of Creditors on September 16, 2009, Montgomery falsely

stated that he did not have possession of his records.  This is false. The emails sent to Flynn by

Montgomery's lawyers in June, 2009 relating to the Motion for Contempt plainly reveal that

p. 26

Montgomery was in possession of his financial records and had prepared the electronic disc that was produced. Montgomery later claimed on his schedules that he had $36.5 million in claims against the same lawyers, who he now claims have all of his records which prevented him from testifying at his § 341(a) Meeting of Creditors hearing. That testimony is part of a pattern of Montgomery lying under oath. Additionally, based upon Flynn's experience with Montgomery, Montgomery's *modus operandi* is to conceal documents and money.

15.    The Nevada Motion for Contempt and to Compel, and for the Debtor Examination was stayed on the morning of June 26, 2009 as a result of Montgomery's filing his Chapter 7 Case. The filing of said Chapter 7 petition constituted an intentional fraud to conceal assets and avoid production of the concealed financial records in violation of 11 U.S.C. § 727. It was also designed to stay the pending Sanctions Order appeal as to Montgomery. In addition, Montgomery's claims against his attorney, Deborah Klar and the Liner firm and the location of his assets are intermingled and interrelated in connection with his relationship with Edra Blixseth who purchased his copyrights, financed his defense by the Liner law firm in multiple cases including the Nevada litigation, and paid Montgomery approximately $5.7 million between April, 2006 and the present. Montgomery now claims that said copyrights belong to him and not to Blixseth and constitute a $10 million asset in his estate. Blixseth claims she owns the disputed technology. The Liner law firm has had throughout the dual representation of Montgomery and Blixseth an irreconcilable conflict between them. That conflict was conclusively adjudicated when the Liner firm suborned, induced, and /or aided and abetted Montgomery's perjury. See Sanctions Order, *supra*.

16.    The ownership of Montgomery's copyright assets that he contends are valued at $10 million, as well as his claims against the United States are riddled with fraud. Edra Blixseth purportedly purchased all of Montgomery's copyrights in April, 2006, in consideration of the payment to him of $3.3 million and a salary of $100,000 per month. This sale was later confirmed by the

p. 27

Liner firm again in 2007 when Flynn withdrew from the representation of Montgomery; and while the Liner firm was representing both Montgomery and Blixseth.  U

17.     pon information and belief, Edra Blixseth has aided and abetted Montgomery in the evasion of federal taxes, in an attempted fraud on the United States government, and in the potential concealment of assets in this bankruptcy. Montgomery is currently under indictment in Nevada for criminal fraud in connection with obtaining credit from casinos and cashing bad checks.  As recited herein, Montgomery's schemes of fraud include a three year pattern of obtaining cash by various fraudulent means and concealing it.

18.     Montgomery fraudulently procured the services of Flynn and other lawyers by means of the following misrepresentations in the specific context of the following facts.

19.     On or about September, 2005  - March, 2006,  Edra Blixseth, Michael Sandoval and Dennis Montgomery discussed and then agreed to take software technology that then belonged to eTreppid Technologies in Reno, Nevada, where Montgomery then worked.  Montgomery claimed that the  technology purported to intercept al-Qaeda communications.

20.     The evidence reported by the FBI and unsealed on September, 17 2007 by the Nevada District Court strongly suggests fraud by Montgomery in his implementation of fake testing procedures for his purported technology in an attempt to validate fraudulently represented technology to the U.S. government. Montgomery and Sandoval then sold the fraudulently represented technology to Edra Blixseth.

21.     Although Ms. Blixseth had knowledge of the fraud by January - April, 2007, she continued to try to sell it to the government after knowing that the technology itself was fraudulent and that Montgomery had a long history of fraud and perjury.

22.     As of September - December, 2005,   Montgomery was a part owner and employee of eTreppid; but was then in the process of being investigated and exposed by eTreppid

p. 28

employees, software engineers, and the FBI in connection with the creation of fraudulent

software, and the potential defrauding of the U.S. Government. These facts are contained in FBI

reports prepared in connection with a search and seizure of Montgomery's house and storage

units on file in the Nevada District Court. See United States District Court for the District of

Nevada, search and seizure proceedings in the case of *In Re Buckthorn*, 3:06-cv-263 (PMP,

VPC).

23.    Between September, 2005 and January 18, 2006, Montgomery was then planning

and actively engaged in taking eTreppid's technology with him to sell it to Sandoval and Edra

Blixseth. Having been exposed in November, 2005 for fraudulent conduct involving fake testing

procedures at eTreppid in a scheme to defraud the U.S. government, on or about January 18,

2006, Montgomery departed eTreppid. Montgomery and Sandoval convinced Ms. Blixseth that

the technology was legitimate, and that the Government had appropriated $100 Million Dollars in

a "black budget" to buy it. During the same time frame, Sandoval's chief scientist had advised

Sandoval that Montgomery was misrepresenting his technology; and that it didn't exist.

Etrepped's software creators had developed some media compression software which

Montgomery had taken; but the purported al-Qaeda intercepts were, in fact, fraudulent.

24.    While knowing that Montgomery and Sandoval were scheming to take whatever

technology eTreppid then possessed which would result in the purported payment of $100 Million

Dollars, Ms. Blixseth agreed with Montgomery and Sandoval to finance new companies, first

Azimyth, LLC, and X-Patterns LLC, then -Opspring, LLC, later Blxware. Ms. Blixseth

represented to Montgomery, Sandoval and others that her "connections" to the Bush

Administration would result in the payment of the $100 Million Dollars to them. Sandoval falsely

represented to the government during the search proceedings and later to plaintiff, that he had

"90% of the technology" before Montgomery became an employee of Opsprings in early April,

p. 29

2006. Ms. Blixseth confirmed these false facts to the Bush administration.

25.    On January 18, 2006, Montgomery departed eTreppid and took the software with him.

26.    On January 18, 2006, eTreppid sued Montgomery in the Reno Superior Court claiming Montgomery stole the technology, deleted or destroyed it off all eTreppid computers, and requested a preliminary injunction to prevent Montgomery from using, conveying, borrowing against, or even discussing the technology. On January 23, 2006, plaintiff met and spoke with Montgomery for the first time. Shortly thereafter, Montgomery retained plaintiff. For the ensuing 18 months, Montgomery spun the same web of lies and fraud to plaintiff that he spun to the United States government and to the courts.

27.    On February 7, 2006, the Reno Superior Court conducted a 12 hour evidentiary hearing in which Montgomery testified under oath that he didn't take any technology with him when he left; that the technology self-destructed pursuant to government requested security protocols; that the technology derived from his copyrights which had never been conveyed to eTreppid;; and that it was used in "top-secret" government programs.

28.    Virtually everything Montgomery said under oath was false. Montgomery made the same false representations to Flynn and his other four lawyers. The case was removed to the Nevada Federal Court. The technology now claimed on his schedules having a value of $10 million dollars, and the purported "source codes" for the technology is the subject of the foregoing false testimony; and was the subject of intensive litigation in the Nevada cases. Montgomery conveyed the fake technology to Blxware in April, 2006, in consideration of over $3.3 million dollars which he immediately turned into cash.

29.    The Nevada Federal Court entered multiple orders for Montgomery to produce the "source codes." He and Blixseth defied the orders. Montgomery defied the orders because the

p. 30

"source codes" would demonstrate his fraud. After months of evidentiary hearings for contempt, the Nevada District Court imposed sanctions against Montgomery, Blixseth, and Blxware at the rate of $2500 per day in July, 2008 until Montgomery produced the "source codes." He never did.

30.    Montgomery and Edra Blixseth then confessed $26.5 million in judgments to the Trepp parties in order to circumvent the contempt sanctions and to conceal the fraud. Montgomery had in fact taken from eTreppid whatever technology did exist.   In a September 5, 2008 hearing involving Montgomery's false accusations against the FBI, the Liner firm was compelled to admit that Montgomery made false statements under oath - they used the term "mistaken."  In the subsequent settlement with eTreppid on or about September 17, 2008, Montgomery admitted  to other falsehoods, including his fabrication of emails implicating Trepp and the Governor of Nevada in a  bribery scheme to obtain government contracts.  Montgomery made numerous perjured statements in false declarations in order to defeat the search by the FBI and  to obstruct discovery in the Nevada cases.   The FBI involvement arose out of Montgomery's alleged theft of the software from eTreppid.

31.    On March 1, 2006, the FBI raided Montgomery's home seeking the software taken from eTreppid, including the "source codes;" and "classified information" Montgomery took with him.  They seized his computers and other materials. On March 3, 2006, the FBI raided Montgomery's storage facilities seizing extensive electronic media, including hard drives, dvd's and cd's. But the bulk of the technology and other material taken from eTreppid Montgomery had concealed with a friend of his daughter and future (now present) son-in-law, Istvan Burgyan. Burgyan and his wife are  critical witnesses in these bankruptcy proceedings.

32.    Throughout the remainder of March, 2006, Sandoval negotiated and concluded a deal with Montgomery and Edra Blixseth, resulting in the creation of Opspring; and Montgomery's

p. 31

agreement to convey all of his technology to Opspring for $3.3 Million in "loans" and $100,000 per month in salary. As Montgomery received the purported "loan" monies he purchased bank checks for the purpose of breaking the chain of bank transfers and checks which would reveal where he ultimately deposited the money. Montgomery then cashed the bank checks in various casinos and purchased chips later converted to cash with "street brokers", all as part of his scheme to conceal assets.

33.    Between January, 2006 and April, 2007, when Sandoval, Montgomery and Blixseth *attempted to obtain* the $100 million "black budget", Flynn was representing Montgomery but did NOT know that the technology was fraudulent, that Montgomery was a pathological liar, that Montgomery had in fact taken the technology from eTreppid, that both Montgomery and Sandoval had a history of trying to market and sell fraudulent software technology, and that Montgomery was lying about how much money he had received from Blixseth and what he was doing with it. These facts became exposed in June, 2007 when Mr. Flynn withdrew. Just as Montgomery had continuously lied to various agencies of the federal government and convinced them of the legitimacy of his technology, he similarly convinced his lawyers. But the representations were fraudulent.

34.    Between January, 2006 and June, 2007, Montgomery continuously requested Flynn and other lawyers to provide him with legal services based on the fraudulent representations involving the purported software; and fraudulent representations regarding his ability to pay for the services; and Montgomery repeatedly made fraudulent representations relating to his concealment of monies he received from Edra Blixseth.

35.    Between April, 2006 and December, 2006 in Rancho Mirage, California, in Reno, Nevada, in person, in documents, in declarations and emails, Montgomery vigorously represented, claimed, and stated to Flynn the following facts: that the "Black Budget" al Qaeda

p. 32

technology was exclusively created, developed, owned and used solely by him at eTreppid; that

the al Qaeda intercepts and decoding were vital to national security; that the source codes for it

had never been on the premises of eTreppid; that he had never taken any of the eTreppid source

code from its premises; and that as a co-owner of eTreppid his possession of certain hard drives

containing emails and other materials involving the bribery of Governor Gibbons copied "over the

years" belonged to him.  Montgomery made these representations and others to the Nevada

Federal Court in order to defeat the FBI search and seizure and to defeat the claims of eTreppid.

These representations were all false.

36.    These constituted  critical representations relied upon by Flynn and other lawyers

working for the debtors  throughout 2006 until June, 2007, when they withdrew.

37.    The  representations above were placed in sworn declarations executed by

Montgomery under the penalties of perjury; and many of them were first testified to under oath by

Montgomery on or about February 7, 2006 in Reno, Nevada in a preliminary injunction hearing,

which was then issued against Montgomery.  Montgomery made these misrepresentations under

oath, and in sworn declarations, and to numerous individuals, including Flynn, for the purpose of

inducing him and lawyers working for him  to provide legal services.

38.    In truth, although Montgomery had conveyed whatever technology he did possess

to Opspring and Blixseth, including his copyrights, he never conveyed any "noise filtering" al

Qaeda   intercepting technology because it doesn't exist. As of October-November, 2005,

Sandoval knew from his chief scientist that  it didn't exist,  but "made a nice story for investors."

As of January, 2007, when Ms. Blixseth met with Sandoval's scientist; who told her  that the

technology  didn't exist and was not as represented, and that Montgomery did not appear to have

any software development skills,   Montgomery and Blixseth continued to deceive Flynn and the

other lawyers.

p. 33

# FIRST CLAIM FOR RELIEF

. ## (Objection to Discharge pursuant to 11 U.S.C. § 727 (a)(2) and (3))

39.     Plaintiff restates all previous allegations contained herein.

40.     The debtors with intent to hinder, delay, conceal and or defraud plaintiff and other creditors, have transferred or concealed or have permitted to be transferred or concealed, property of one or more of the  joint debtors within one year before the date of the filing of this petition.

41.     The debtors have concealed and falsified recorded information regarding the property from which the debtor's financial condition and business transactions might be ascertained.

42.     The discharge of the debtors should be denied pursuant to 11 U.S.C. § 727 (a)(2) and (3).

43.     Wherefore, plaintiff demands judgment denying the debtor's discharge and for such other relief as this Court deems just, including an award of costs and reasonable attorney's fees.

# SECOND CLAIM FOR RELIEF

## (Objection to Discharge pursuant to § 727(a)(3), (4) and (5))

44.     Plaintiff restates all previous allegations contained herein.

45.     The debtors have knowingly and fraudulently made a false oath in connection with this case. In particular, the debtors certified under penalty of  perjury that the schedules herein were true and correct, when in truth and fact, as the debtors knew, the schedules were false in material matters, including the fact that debtors have pursued a scheme to conceal assets by purchasing bank checks and cashing them in casinos to obtain cash which they have hidden; and a scheme to transfer assets without disclosure on their schedules.

46.     The debtors have concealed, destroyed, or failed to keep or preserve recorded information from which the debtors' financial condition or business transactions might be ascertained.

p. 34

47.     The debtors have knowingly and fraudulently failed to explain satisfactorily, before determination of denial of discharge under 11 U.S.C. § 727(a)(5) the loss of millions of dollars in assets or deficiency in assets to meet the debtors' liabilities while receiving millions of dollars from Edra Blixseth while at the same time procuring second mortgages on their real properties, all evidencing a scheme to conceal assets. Upon information and belief, Montgomery secured the second mortgages after concealing money received from Blixseth, for the purpose of obtaining additional cash, concealing it, and defrauding the lenders.

48.     The discharge of the debtors should be denied pursuant to 11 U.S.C. § 727(a)(3), (4) and (5).

49.     Wherefore, plaintiff demands judgment denying the debtors' discharge and for such further relief as this Court deems just, including an award of reasonable attorney's fees.

### THIRD CLAIM FOR RELIEF

**(Objection to Discharge pursuant to § 523(a)(2): Non-Dischargeable Debt Obtained by False Pretense, A False representation or Actual Fraud)**

50.     Plaintiff restates all previous allegations contained herein.

51.     Plaintiff is the holder of a $628,000 judgment, and a $200,000 Sanctions award entered in the Nevada Federal District Court. The judgment and the Sanctions award are for work and services performed by plaintiff which were procured by debtors or arising out of the debtors' fraud, misrepresentation and false pretenses. The misrepresentations were continuously made by debtors as part of a scheme to commit actual fraud against plaintiff and others.

52.     Both debts should be determined to be non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

53.     Wherefore, plaintiff demands judgment determining debtor's debts to be non-dischargeable and for such other relief as this Court deems just, including an award of attorneys

-13-

p. 35

fees.

## FOURTH CLAIM FOR RELIEF

## (11 U.S.C. § 523 (a)(6) - For Willful and Malicious Injury)

54.     Plaintiff restates all prior allegations contained herein.

55.     As recited in the Sanctions Order, debtors engaged in a comprehensive scheme and pattern of outrageous conduct, including perjury, to "crush Mr. Flynn into submission" by fabricating and filing false accusations and claims in venues from Massachusetts to Nevada and to California in order to defeat the payment of $628,000 in attorneys fees. The various proceedings were entirely fabricated, based on debtor's perjured statements and declaration all designed to willfully and maliciously harass, injure and cause harm to plaintiff.

56.     The judgment and the Sanctions award should be determined to be non-dischargeable pursuant to 11 U.S.C. § 523(a)(6).

57.     Wherefore, plaintiff demands judgment determining debtors' debts for the judgment and Sanctions award to be non-dischargeable, and for such other relief as this Court deems just, including attorney's fees.

## PRAYER FOR RELIEF

**WHEREFORE,** plaintiff on behalf of  himself and all creditors, requests that the Bankruptcy Court enter an Order providing for the following relief:

(i)     Determination that the debts of all creditors are non-dischargeable under  § 727 of the Bankruptcy Code; and / or

(ii)    Determination that the debts owed to plaintiff are non-dischargeable under § 523 of the Bankruptcy Code; and /or

(iii)    For all costs incurred herein, including attorneys fees and costs;

p. 36

1    (iv)    For such other and equitable relief as this Court deems just and equitable.

2  Dated this 25th day of September, 2009              MICHAEL J. FLYNN

3

4                                                      /s/ *Michael J. Flynn*
                                                  By: _____
5                                                        Michael J. Flynn, *In Pro Per*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

p. 37

FORM B104  (08/07)                                                                                    2007 USBC, Central District of California

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Page 2) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS | DEFENDANTS |
|---|---|
| | |

| ATTORNEYS (Firm Name, Address, and Telephone No.) | ATTORNEYS (If Known) |
|---|---|
| | |

| PARTY (Check One Box Only) | PARTY (Check One Box Only) |
|---|---|
| ☐ Debtor          ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor       ☐ Other<br>☐ Trustee | ☐ Debtor          ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor       ☐ Other<br>☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

---

### NATURE OF SUIT
(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
- ☐ 11-Recovery of money/property - §542 turnover of property
- ☐ 12-Recovery of money/property - §547 preference
- ☐ 13-Recovery of money/property - §548 fraudulent transfer
- ☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
- ☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
- ☐ 31-Approval of sale of property of estate and of a co-owner - § 363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
- ☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
- ☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
- ☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
- ☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
- ☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
- ☐ 61-Dischargeability - §523(a)(5), domestic support
- ☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
- ☐ 63-Dischargeability - §523(a)(8), student loan
- ☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
- ☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
- ☐ 71-Injunctive relief – imposition of stay
- ☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
- ☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
- ☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
- ☐ 01-Determination of removed claim or cause

**Other**
- ☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
- ☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☐  Check if this case involves a substantive issue of state law | ☐  Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐  Check if a jury trial is demanded in complaint | Demand  $ |

Other Relief Sought

**FORM B104 (08/07), page 2**                    **2007 USBC, Central District of California**

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | |
|---|---|
| NAME OF DEBTOR | BANKRUPTCY CASE NO. |
| DISTRICT IN WHICH CASE IS PENDING | DIVISIONAL OFFICE / NAME OF JUDGE |

| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
|---|---|---|
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISIONAL OFFICE | NAME OF JUDGE |

| SIGNATURE OF ATTORNEY (OR PLAINTIFF) |
|---|
| /s/ Michael J. Flynn, Esq. |

| DATE | PRINT NAME OF ATTORNEY (OR PLAINTIFF) |
|---|---|

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located.  Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate.  There also may be lawsuits concerning the debtor's discharge.  If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 104, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF).  (CM/ECF captures the information on Form 104 as part of the filing process.)  When completed, the cover sheet summarizes basic information on the adversary proceeding.  The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court.  The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney).  A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendents.**  Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.**  Give the names and addresses of the attorneys, if known.

**Party.**  Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.**  Enter the dollar amount being demanded in the complaint.

**Signature.**  This cover sheet must be signed by the attorney of record in the box on the second page of the form.  If the plaintiff is represented by a law firm, a member of the firm must sign.  If the plaintiff is pro se, that is, not presented by an attorney, the plaintiff must sign.

Attorney or Party Name, Address, Telephone & FAX Numbers, and California State Bar Number

FOR COURT USE ONLY

*Attorney for Plaintiff*

### UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF CALIFORNIA

| In re: | CHAPTER _____ |
| --- | --- |
| | CASE NUMBER |
| Debtor. | ADVERSARY NUMBER |

| | *(The Boxes and Blank Lines below are for the Court's Use Only) (Do Not Fill Them In)* |
| --- | --- |
| Plaintiff(s), | |
| vs. | **SUMMONS AND NOTICE OF STATUS CONFERENCE** |
| Defendant(s). | |

TO THE DEFENDANT:  A Complaint has been filed by the Plaintiff against you.  If you wish to defend yourself, you must file with the Court a written pleading, in duplicate, in response to the Complaint.  You must also send a copy of your written response to the party shown in the upper left-hand corner of this page.  Unless you have filed in duplicate and served a responsive pleading by _____, the Court may enter a judgment by default against you for the relief demanded in the Complaint.

A Status Conference on the proceeding commenced by the Complaint has been set for:

| Hearing Date: | Time: | Courtroom: | Floor: |
| --- | --- | --- | --- |

❑  **255 East Temple Street, Los Angeles**   ❑  **411 West Fourth Street, Santa Ana**

❑  **21041 Burbank Boulevard, Woodland Hills**   ❑  **1415 State Street, Santa Barbara**

❑  **3420 Twelfth Street, Riverside**

PLEASE TAKE NOTICE that if the trial of the proceeding is anticipated to take less than two (2) hours, the parties may stipulate to conduct the trial of the case on the date specified, instead of holding a Status Conference.  Such a stipulation must be lodged with the Court at least two (2) Court days before the date set forth above and is subject to Court approval.  The Court may continue the trial to another date if necessary to accommodate the anticipated length of the trial.

Date of Issuance: _____

**JON D. CERETTO**
**Clerk of the Bankruptcy Court**

By:  _____
       *Deputy Clerk*

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009 (COA-SA)*

**F 7004-1**

Summons and Notice of Status Conference - Page 2

**F 7004-1**

| In re | (SHORT TITLE) | CASE NO.: |
|---|---|---|
| | Debtor(s). | |

**NOTE**: When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on a CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

A true and correct copy of the foregoing document described as _____ _____ will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d), and **(b)** in the manner indicated below:

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** - Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On _____ I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email addressed indicated below:

☐ Service information continued on attached page

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL** (indicate method for each person or entity served): On _____ I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follow. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____ I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method) by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| _____ | _____ | _____ |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009 (COA-SA)*

**F 7004-1**

p. 41

**F 7004-1**

| In re | (SHORT TITLE) | CASE NO.: |
|-------|---------------|-----------|
| | Debtor(s). | |

**ADDITIONAL SERVICE INFORMATION** (if needed):

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 7004-1**

DOWNS DECL - EXHIBIT E

**The Man Who Conned the Pentagon**

Playboy Magazine    Jan./Feb. 2010

By AramRoston


**T**he weeks before Christmas brought no hint of terror. But by the afternoon of December 21, 2003, police stood guard in heavy assault gear on the streets of Manhattan. Fighter jets patrolled the skies. When a gift box was left on Fifth Avenue, it was labeled a suspicious package and 5,000 people in the Metropolitan Museum of Art were herded into the cold.

It was Code Orange. Americans first heard of it at a Sunday press conference inWashington, D.C.Weekend assignment editors sent their crews up Nebraska Avenue to the new Homeland Security offices, where DHS secretary Tom Ridgeannounced the terror alert. "There's continued discussion," he told reporters, "these are from credible sources—about near-term attacks that could either rival or exceed what we experienced on September 11." The *New York Times* reported that intelligence sources warned "about some unspecified but spectacular attack."

The financial markets trembled. By Tuesday the panic had ratcheted up as the Associated Press reported threats to "power plants, dams and even oil facilities in Alaska." The feds forced the cancellation of dozens of French, British and Mexican commercial "flights of interest" and pushed foreign governments to put armed air marshals on certain flights. Air Franceflight 68 was canceled, as was Air Franceflight 70. By Christmas the headline in the *Los Angeles Times* was "Six Flights Canceled as Signs of Terror Plot Point to L.A." Journalists speculated over the basis for these terror alerts. "Credible sources," Ridge said. "Intelligence chatter," said CNN.

But there were no real intercepts, no new informants, no increase in chatter. And the suspicious package turned out to contain a stuffed snowman. This was, instead, the beginning of a bizarre scam. Behind that terror alert, and a string of contracts and intrigue that continues to this date, there is one unlikely character.

The man's name is Dennis Montgomery, a self-proclaimed scientist who said he could predict terrorist attacks. Operating with a small software development company, he apparently convinced the Bush White House, the CIA, the Air Force and other agencies that Al Jazeera—the Qatari-owned TV network—was unwittingly transmitting target data to Al Qaeda sleepers.

An unusual team arrived in Reno, Nevada in 2003 from the Central Intelligence Agency. They drove up Trademark Drive, well south of the casinos, past new desert warehouses. Then they turned into an almost empty parking lot, where a sign read "eTreppid Technologies." It was an attractively designed building of stone tile and mirrored windows that had once been a sprinklerhead factory.

ETreppid Technologies was a four-year-old firm trying to find its way. Some of its employees had been hired to design video games. One game under construction was *Roadhouse*, based on the 1989 movie in which Patrick Swayze plays a bouncer in a dive bar. Other programmers worked on streaming video for security cameras.

p. 44

**" He drove a $70,000 Porsche Cayenne GTS, and his home was near the gambling
tables at the Agua Caliente Casino, where he lost $422,000 in one day. "**

When the liaison team stepped into eTreppid's office, the CIA man in charge introduced himself as
Sid but didn't give his last name. He was tall and in his 50s, with a well-ironed shirt, a paunch and a
mildly robotic politeness. "We called him Sid Vicious," one eTreppid technician explained, "because
he was anything but."

Sid's team set up on the first floor in an unused office and had special cipher locks installed. Workers
carted in a heavy-duty paper shredder that could transform classified documents to dust in seconds.
They set up impenetrable safes with combination locks protected by privacy screens so bystanders
couldn't steal the code.

The CIA team was there to work with Dennis Montgomery, at the time eTreppid's chief technology
officer and part owner. Then 50 years old, with a full head of gray hair, the street-smart
Montgomerystood at about five feet eight inches. Other eTreppid workers, hearing the buzz about the
spooks in town, peered through their blinds and watched as Montgomeryworked at his desk at the
north end of the building. He wore his usual jeans and Tommy Bahama shirt.

He could be seen handing off reams of paper to Sid and the CIA. "They would sit in the room and
review these numbers or whatever the heck Dennis was printing out," one former eTreppid employee,
Sloan Venables, told me. "We called them Sid's guys, and no one knew what the hell they did."

Montgomery called the work he was doing noise filtering. He was churning out reams of data he
called output. It consisted of latitudes and longitudes and flight numbers. After it went to Sid, it went
to Washington, D.C.Then it found its way to the CIA's seventh floor, to Director George Tenet.
Eventually it ended up in the White House. Montgomery's output was to have an extraordinary effect.
Ridge's announcement, the canceled flights and the holiday disruptions were all the results of
Montgomery's mysterious doings.

He is an unusual man. In court papers filed in Los Angeles, a former lawyer for Montgomerycalls the
software designer a "habitual liar engaged in fraud." Last June Montgomerywas charged in Las Vegas
with bouncing nine checks (totaling $1 million) in September 2008 and was arrested on a felony
warrant in Rancho Mirage, California. That million is only a portion of what he lost to five casinos in
Nevadaand California in just one year. That's according to his federal bankruptcy filing, where he
reported personal debts of $12 million. The FBI has investigated him, and some of his own co-
workers say he staged phony demonstrations of military technology for the U.S. government.

Montgomery has no formal scientific education, but over the past six years he seems to have
convinced top people in the national security establishment that he had developed secret tools to save
the world from terror and had decoded Al Qaeda transmissions. But the communications Montgomery
said he was decrypting apparently didn't exist.

**" He claimed he provided Cheney's office with new output data on terror that would
validate his work. He said the data, which had been encrypted in Al Jazeera, were the
keys        that allowed investigators to crack the liquid-bomb plot in London. "**

Since 1996 the Al Jazeera news network had been operating in the nation of Qatar, a U.S. ally in the
war on terror. Montgomery claimed he had found something sinister disguised in Al Jazeera's
broadcast signal that had nothing to do with what was being said on the air: Hidden in the signal were
secret bar codes that told terrorists the terms of their next mission, laying out the latitudes and

p. 45

longitudes of targets, sometimes even flight numbers and dates. And he was the only man who had the technology to decrypt this code.

As strange as his technology appeared to be, it was nevertheless an attractive concept. Montgomery was as persuasive as some within the intelligence community were receptive. Al Jazeera was an inspired target since its pan-Arabic mission had been viewed with suspicion by those who saw an anti-American bias in the network's coverage. In 2004 Secretary of Defense Donald Rumsfeld accused Al Jazeera of "vicious, inaccurate and inexcusable" reporting. Will Stebbins, Al Jazeera's Washingtonbureau chief, told *The Washington Post*, "There was clearly an attempt to delegitimize Al Jazeera that came during a period of a lot of national hysteria and paranoia about the Arabic world." ("It is unfortunate," an Al Jazeera spokesperson told Playboy when asked for comment, "that a select few people continue to drag up these completely false conspiracy theories about Al Jazeera, which were generated by the previous U.S.administration.") Over the years Montgomery's intelligence found its way to the CIA, the Department of Homeland Security, Special Forces Command, the Navy, the Air Force, the Senate Intelligence Committee and even to Vice President Dick Cheney's office.

Back in 2003, just before the terror alert caused by Montgomery's technology, eTreppid held a Christmas party in a ballroom at the Atlantis Casino in Reno. Employees gathered at round tables to dine and drink. Even a CIA man showed up, a lanky fellow wearing a button-down shirt with an oxford collar. By the end of the night, employees noticed Montgomeryand eTreppid chief executive Warren Trepp talking closely. A photo snapped by an employee shows Montgomery with his jacket off and a Christmas ribbon wrapped around his head like a turban with a rose tucked into it. He was hugging Trepp, who sobbed into his shoulder. The festivities were a rare break for Montgomery, who had been busy churning out terrorist target coordinates for the CIA.On Sunday, January 4, 2004 a British Airways flight out of Heathrow was delayed for hours for security reasons, and FBI agents demanded that hotels in Vegas turn over their guest lists. It was also the day a top CIA official flew to the eTreppid office in Reno. There, on eTreppid letterhead, the CIA official promised the company's name would not be revealed and that the government would not "unilaterally use or otherwise take" Montgomery's Al Jazeera technology.

Back in Washington, few insiders in government knew where the intelligence was coming from. Aside from Tenet and a select few, no one was told about eTreppid's Al Jazeera finds. Even veteran intelligence operatives within the CIA could only wonder. "These guys were trying to hide it like it was some little treasure," one former counterterrorist official told me.

> **" Director of National Intelligence John Negroponte weighed in. What secrets—what embarrassments—could be exposed if Montgomery and Trepp were to depose intelligence and military officials? "**

The reason the whole thing worked was because Montgomery's CIA contact was with the agency's Directorate of Science and Technology. That's the whiz-bang branch of the intelligence service, where employees make and break codes, design disguises and figure out the latest gadgets. S&T was eventually ordered by CIA brass to reveal its source to small groups from other parts of the agency. And when some experienced officers heard about it, they couldn't believe it. One former counterterrorism official remembers the briefing: "They found encoded location data for previous and future threat locations on these Al Jazeera tapes," he says. "It got so emotional. We were fucking livid. I was told to shut up. I was saying, 'This is crazy. This is embarrassing.' They claimed they were breaking the code, getting latitude and longitude, and Al Qaeda operatives were decoding it. They were coming up with airports and everything, and we were just saying, 'You know, this is

p. 46

horseshit!' " Another former officer, who has decades of experience, says, "We were told that, like magic, these guys were able to exploit this Al Jazeera stuff and come up with bar codes, and these bar codes translated to numbers and letters that gave them target locations. I thought it was total bullshit."

The federal government was acting on the Al Jazeera claims without even understanding how Montgomery found his coordinates. "I said, 'Give us the algorithms that allowed you to come up with this stuff.' They wouldn't even do that," says the first officer. "And I was screaming, 'You gave these people fucking money?'"

Despite such skepticism, the information found its way to the top of the U.S.government. Frances Townsend, a Homeland Security advisor to President George W. Bush, chaired daily meetings to address the crisis. She now admits that the bar codes sounded far-fetched. And, she says, even though it all proved to be false, they had no choice but to pursue the claim. "It didn't seem beyond the realm of possibility," she says. "We were relying on technical people to tell us whether or not it was feasible. I don't regret having acted on it." The feds, after all, had a responsibility to look into the technology. "There were lots of meetings going on during the time of this threat," says Townsend. "What were we going to do and how would we screen people? If we weren't comfortable we wouldn't let a flight take off." Eventually, though Montgomery continued to crank out his figures, cooler heads prevailed. The threat was ultimately deemed "not credible," as Townsend puts it.

A former CIA official went through the scenario with me and explained why sanity finally won out. First, Montgomerynever explained how he was finding and interpreting the bar codes. How could one scientist find the codes when no one else could? More implausibly, the scheme required Al Jazeera's complicity. At the very least, a technician at the network would have to inject the codes into video broadcasts, and every terrorist operative would need some sort of decoding device. What would be the advantage of this method of transmission?

A branch of the French intelligence services helped convince the Americans that the bar codes were fake. The CIA and the French commissioned a technology company to locate or re-create codes in the Al Jazeera transmission. They found definitively that what Montgomeryclaimed was there was not. Quietly, as far as the CIA was concerned, the case was closed. The agency turned the matter over to the counterintelligence side to see where it had gone wrong.

Born in Mena, Arkansas, Dennis Montgomery graduated in 1971 from GrossmontCollege near San Diego with a two-year associate's degree in medical technology. He worked a few years as a hospital medical technician. And then, it appears, he shifted gears. He says he designed technology to analyze blood gas and became a consultant to some of the biggest companies in America. He maintains he invented and secured copyrights for various technologies related to "pattern recognition," "anomaly detection" and "data compression." Montgomeryhad attained some success with his media-compression software.

By the late 1990s Montgomery was in Reno, where he had a meeting at the El dorado Hotel Casino downtown with a financier named Warren Trepp. Trepp had been head trader at Drexel Burnham Lambert in the 1980s, when it was led by junk-bond fraudster Michael Milken. During that time Trepp was a big spender, riding around in his white Rolls-Royce Corniche. He sat at Milken's right hand and eventually earned $25 million a year. In a 1997 SEC decision, an administrative law judge described Trepp's "violations" as "egregious, recurring and intentional." But the case against Trepp was dismissed, and by the time he met Montgomery, he was legally in the clear.

## p. 47

Case 2:13-cv-00360-RAJ   Document 59-1   Filed 11/24/14   Page 44 of 49

**" Venables says the entire backup for the multimillion-dollar eTreppid operation consisted of three CDs and two hard drives. Venables looked at the disks and drives and turned back to Trepp. "'In seven years, that's all? Three CDs and two hard drives?' I said, 'Don't you think that's weird?' "**

Montgomery convinced Trepp he had invented a remarkable technology. He could compress data, he said, a whole movie to just a fraction of the space it took up on a drive. He impressed his patron with his demonstration, using software to highlight images from the 1939 film *Gunga Din*. It was enough for them to launch their operation. Montgomery contributed his technological breakthrough, and Trepp invested $1.3 million to start. Montgomery soon hired Sloan Venables, a video-game designer, as one of his first employees. Venables had helped design the *Ted Nugent Wild Hunting Adventure* video game. From the beginning, Venables realized things were odd and doubted Montgomery knew much about software programming. One day at a Chinese restaurant at the same Eldorado Hotel Casino, Montgomery told him about the time he'd been abducted by a UFO. "He told me about his encounter with aliens," Venables says. "He went to his uncle's or grandfather's or great uncle's barn in the middle of the night, and a spaceship descended on him. They wanted him to go with them, and he was abducted. Then he came back with extra knowledge." Venables started laughing at the story, he says.

Montgomery was prone to temper tantrums, according to Venables. Once he hurled a steak at a waitress. As volatile as he was at times, Venables says, he was at other times warm and confiding. When Venables threatened to quit after Montgomery threw a can of grape soda at him, Montgomery took Venables's dying mother to dinner. Every Friday he would take all his employees skeet and trapshooting at a desert range.

Venables brought in a childhood friend to work at eTreppid. Jim Bauder, who was in his 20s, was soon working on the video games eTreppid was trying to design. Bauder and Venables say Montgomery ran the place, and they saw little of Trepp but were aware of his background. They also say they saw Milken at eTreppid. "I saw him come in once, and he had this entourage of five or six people with him," says Bauder. "They came walking down the hallway, and he looked at me and smiled, introduced himself and then went on down the hall."

ETreppid landed its first big contract from General Electric in 2002 for use of its video compression technology in gaming surveillance. The company eventually got a contract with the Air Force dealing with aspects of video shot by unmanned Predator drones. Montgomery claimed his software could automatically recognize weapons and faces. In 2004 the U.S. Special Operations Command gave eTreppid a $30 million no-bid contract for "compression" and "automatic target recognition." Venables and Bauder acknowledge they can't be certain that no "anomaly detection" or "pattern recognition" software existed, but they doubt it did. In fact, eTreppid workers later told the FBI they thought Montgomery had developed little if any original software.

Montgomery and eTreppid did, over time, receive five patents for various inventions and theoretical methods related to video and data. These included a "method and apparatus for storing digital video content provided from a plurality of cameras" and a "method and apparatus for detecting and reacting to occurrence of an event." But Montgomery said these patents had nothing to do with his government work, and they never seemed to lead to business or profit.

FBI reports indicate Montgomery rigged tests to make government officials think his software could detect weapons in video streams. Apparently it was all part of Montgomery's claim to have developed "automatic target recognition" software. Imagine how useful it would be if a computer could pick out

AK-47s in enemy hands. That's how eTreppid got at least one contract. One former employee told agents he helped fake as many as 40 demonstrations.

**" Venables and Bauder say Montgomery had his own way of classifying items at the company. "He had rolls of 'classified' stickers," Bauder says, "and he would just put them on random garbage. "**

Bauder says he helped once, unwittingly. He told his story to the FBI, and he told it to me. In his demonstrations Montgomeryoften used a plastic toy bazooka that he said a computer could recognize as a weapon. He would do the demonstration in scrubland behind eTreppid's offices. "Some military guys were walking around the office," says Bauder. Montgomery suddenly came to him, he says, "and takes me back to his office. He closes the door and closes the blinds and was like, 'Need you to do something for me. Don't worry; we are just doing a demo. It's all good.' " Bauder was concerned about the secrecy. "I was like, 'But what's with the doors and blinds?' " Montgomerylooked up at Bauder and told him it was okay. They would communicate via an open cell phone line. He told Bauder to listen to the phone. "'When you hear the tone, I want you to hit the space bar on the keyboard.'" Bauder, in other words, would be secretly communicating with Montgomerywhile the military guys watched the supposed software demo on another computer.

Montgomery ran off to do his demonstration outside. Bauder watched the computer screen, seeing what the camera saw. Montgomery held the toy bazooka in one hand while his other hand was hidden. When Bauder heard the tone, he says, "I hit the space bar. A little square encircled his image through the camera on the screen. He was running around with the fake plastic bazooka." Bauder figured Montgomery had rigged the computer screen so it seemed as if the square was tracking the bazooka. In reality, the square was brought up on the screen when Bauder hit the space bar.

ETreppid needed security clearances to get classified contracts. In 2004 Venables was selected as the firm's facilities security officer. He flew to Baltimorefor Department of Defense training. It was an arduous process, with the Defense Security Service probing everyone's background.

Montgomery received an "interim secret" clearance in May 2003, according to records later released in a federal case. In February 2004 he got a top-secret clearance from the Defense Industrial Security Clearance Office. At eTreppid, Montgomeryappears to have taken a curious approach to secrecy. Venables and Bauder say Montgomeryhad his own way of classifying items at the company. "He had rolls of 'classified' stickers," Bauder says, "and he would just put them on random garbage."

The CIA was an eTreppid customer, as was SOCOM and the Air Force. Soon the Navy started coming by. Montgomery said he had another "filter" to identify underwater submarines by scanning a giant satellite photo of the ocean. Although Montgomery claimed he was using his software, Bauder and Venables say he appeared to be doing it by eye.

The pattern recognition, anomaly detection and compression work were nice, but it was the Al Jazeera stuff—the "noise filtering"—that had cash potential. Even though the CIA had abandoned Montgomeryin 2004 after determining the bar codes didn't exist, he and eTreppid continued to try to sell it.

Trepp later told a judge in a federal lawsuit that he'd asked the government for $100 million. Montgomery has also cited that figure in sworn declarations—though he also claimed Trepp wanted $500 million for the "decoding technology." He would tell his lawyers and investors that the money was "appropriated" as part of the "black budget." ETreppid did have powerful friends and lobbyists

**p. 49**

on Capitol Hill. It had strong connections on the House Permanent Select Committee on Intelligence. The local congressional representative, Republican Jim Gibbons—soon to be governor of Nevada—was on the committee. But by late 2005 things were falling apart between Montgomery and Trepp. There were indications Montgomerywas losing big at the blackjack tables. According to an FBI investigation, he borrowed $275,000 from Trepp "to pay down casino and other debts." Trepp told FBI agents he'd made him sign a note that he'd pay it back—Trepp had loaned him more than $1.3 million over the years.

One eTreppid employee told the FBI that she notified Trepp about the faked bazooka tests. Evidently Trepp hadn't known. She informed Trepp she didn't think Montgomery had written "any significant software" for the company. Trepp heard from others that Montgomerydidn't have the technical skills he claimed to have. For his part, Montgomerywas grumbling. Trepp had not adequately shared the tens of millions in government funds he had made. "Warrenis screwing me out of the money," Montgomerysaid to Venables. In January 2006 Montgomeryleft eTreppid. He asked Bauder to help load his big Chevy twin-cab truck on a Saturday. When he left, according to eTreppid, the company's software had been deleted and the source code wiped out. Even the surveillance videotapes were blank. If eTreppid was a store, its inventory was gone. It couldn't do government contracts, video games or compression.

Trepp believed he had backup. After all, Montgomeryhad assured him he'd give him daily backups of his material. So Trepp went to his outside safe where he kept whatever Montgomeryhad given him. He gave the material to his security officer, Sloan Venables. Venables says the entire backup for the multimillion-dollar eTreppid operation consisted of three CDs and two hard drives. Venables looked at the disks and drives and turned back to Trepp. "'In seven years, that's all? Three CDs and two hard drives?' I said, 'Don't you think that's weird?'"

Venables ran the supposed backup files through his computer. "There was nothing on them," he says. "There were a couple of zip files, and the hard drives had some source codes for an interface." It wasn't anything that could run as a program

Trepp called the FBI. Not only was the company software gone and its tapes erased, but, he told them, classified tapes were missing. In January 2006 the U.S.government suspended Montgomery's security clearance. (Montgomery, however, later stated he was unaware his clearance had been suspended.)

Montgomery's phone rang on February 16. The voice on the other end was someone he trusted: Paul Haraldsen, an agent of the Air Force Office of Special Investigations. For years Haraldsen had reassured him the government was still interested in the Al Jazeera intercepts. "Hey, Dennis—Paul, how are you?" What Montgomerydidn't know was that Haraldsen was working with the FBI on the investigation and was recording the call. Montgomeryrailed against Trepp and bragged about his bizarre intelligence work. "I did something very good for this country," he said. Montgomery boasted that even if the CIA didn't believe in him, the work he did was "100 percent accurate—more accurate than people will ever know." (The agency's name is blacked out in the court transcript, but it is clear what he means.) Haraldsen apparently tried to lure him in. Money might be available, he said. "You know, we had money loaded in a pipeline," Haraldsen said to Montgomery. He could go back to his bosses in Washingtonand let them know whether to spend it or not.

"Paul," Montgomery said, "why does it have to stop because [Trepp] is a prick?" The government money could flow even if it went to him rather than to eTreppid. Haraldsen tried to egg him on with promises he'd tell Washingtonto buy more of the Al Jazeera information. "Where do I go from here?"

Haraldsen asked. "What do I tell the people back in D.C.? Do I tell them to forget about the money and put it away?" "Absolutely not," Montgomery said.

Montgomery and Trepp were soon in a no-holds-barred federal lawsuit. Each sued the other. Trepp obviously believed Montgomery's technology was real because he pursued the lawsuit with a vengeance. Montgomery, on the other hand, accused Trepp of trying to steal his inventions. Montgomery claimed he needed to bring the U.S. intelligence establishment into the case. He went so far as to name the Department of Defense as a defendant.

Eventually Director of National Intelligence John Negroponte weighed in. What secrets—what embarrassments—could be exposed if Montgomery and Trepp were to depose intelligence and military officials? Negroponte issued a declaration that warned of "serious, and in some cases exceptionally grave, damage to the national security of the United States." He invoked the state secrets privilege. The judge in the case issued a protective order; the secrets of eTreppid's government business would remain untold.

Trepp had deep pockets and a collection of associates who could bankroll him, but Montgomery had a new patron, someone with tremendous financial resources and connections in Washington, D.C. Her name was Edra Blixseth, wife of billionaire developer Tim Blixseth. The Blixseths had made their reputations as founders of the exclusive Yellowstone Club in Montana, a resort for the fabulously wealthy. Membership cost a quarter of a million dollars, but once there, vacationers like Bill Gates or Dan Quayle could enjoy "private powder" in the company of other elites.

The Blixseths lived in a $200 million estate called Porcupine Creek in Rancho Mirage, California. It had a private golf course and a 30,000-square-foot mansion set among manicured gardens. This is where Montgomery pursued the next stage of his career as a software programmer.

**" Trepp heard from others that Montgomery didn't have the technical skills he claimed to have. For his part, Montgomery was grumbling. Trepp had not adequately shared the tens of millions in government funds he had made. "**

A document in Superior Court in California—now unsealed—reveals how Montgomery explained his inventions and intelligence work for the U.S. government to Blixseth, her lawyers and her partners. He would pull out his laptop, demonstrate his software and brag how he was "decoding Al Jazeera broadcasts and using it for other 'top secret' programs." He found a new lawyer for his case against Trepp. He told him he had been "intercepting Al Qaeda 'target coordinates' for proposed terrorist attacks sent to its field operatives via digital Al Jazeera satellite TV network transmissions." Montgomery also told his lawyer the Department of Defense "paid approximately $30 million in contracts and appropriated another $100 million in their 'black budget.'"

In July 2006 Montgomery and Blixseth pitched their technology to an aide to Vice President Cheney. "I met for several hours with Samantha Ravich, deputy assistant to the vice president in charge of national security," Montgomery asserted in a sworn statement. His word may be suspect, but there is corroborating evidence. Ravich listened to Montgomery and Blixseth, but she was—even in Montgomery's recollection—unimpressed by his claims.

Still, Montgomery hailed his meeting as a victory. He claimed he provided Cheney's office with new output data on terror that would validate his work. He said the data, which had been encrypted in Al Jazeera, were the keys that allowed investigators to crack the liquid-bomb plot in London. On August

p. 51

9, 2006 British police rounded up two dozen suspects and announced they'd halted a plan to bomb several transcontinental flights at once. Montgomery swore his warning was "used in the disruption of that threat." In another declaration he said he "provided the output from [his] decoding programs, without compensation, to our government in order to stop terrorist attacks and save American lives."

Montgomery was now making $100,000 a month as a software programmer. He worked for companies with different names, but they all received funding from Edra Blixseth. Montgomery had a home in a serene gated community in Rancho Mirage not far from Blixseth's estate. He drove a $70,000 Porsche Cayenne GTS, and his home was near the gambling tables at the Agua Caliente Casino, where he lost $422,000 in one day.

Blxware, the company through which Blixseth was doing business, had lofty connections. With the aid of Nevada senator Harry Reid's office, Montgomery's technology found its way to the Senate Intelligence Committee staff. This is no routine achievement: The committee staff, operating in a special office of the Dirksen Senate building, constitutes an elite sector in Washington. Normal lobbyists cannot walk in to see staffers because their offices are protected, with special access and guards. When intel staffers talk, the intelligence community listens because they hold the reins—they control oversight.

Montgomery claimed he was reading secret messages about three Americans who had been grabbed in the Sunni triangle. Signals were coming out "related to the recent hostage-taking of our three soldiers," Montgomery told the staffers. He warned them that something was up. The staffers didn't know what to make of it.

In 2007 things were looking up for Montgomery. He finally got some interest, this time from an agency he couldn't name in public. Reading between the lines, one can presume it was the National Security Agency. But then Montgomery had a strange reaction. He had just "purged" the software, he said, and it would take time to redo it. He wanted $4 million from the U.S. government to get started.

The FBI investigation of Montgomery went nowhere. First, his new lawyer challenged the FBI searches, and the judge found in his favor. Then Montgomery went on the offensive, accusing his accuser. He went public with allegations that Trepp had committed bribery by paying off Nevada congressman Jim Gibbons. NBC News did an exclusive interview with Montgomery at Blixseth's house. He was dressed in a suit and tie and said he saw the bribe take place. He claimed Trepp had given Gibbons "casino chips and cash" worth about $100,000. Montgomery backed this up with e-mails he said he'd taken off the eTreppid server. Trepp and Gibbons found themselves under a grand jury's scrutiny. They, not Montgomery, were targeted. But Montgomery's allegations fell apart after a forensic expert for eTreppid alleged in court papers that one crucial e-mail had been doctored. The Department of Justice later dropped the case, and Gibbons was cleared.

By 2008 things seemed to have resolved themselves in the epic litigation between Montgomery and his old moneyman Warren Trepp. There was a glitch at first: Montgomery was supposed to produce a key CD with the breakthrough software he claimed he'd invented, the very heart of this case. But he couldn't find the disk, he said, and he claimed he couldn't re-create the lost and precious secret. He lashed out at the FBI in a court document. It was the agents who had ruined everything anyway, he said. The FBI had "damaged and in some cases destroyed" his property.

That backfired, but the parties all seemed to come to a temporary agreement. By the fall, Montgomery settled his long-standing suit with Warren Trepp. Terms weren't released at the time, but Trepp let

p. 52

Montgomery and his new financier, Edra Blixseth, keep the "software." Court records indicate Montgomery and Blixseth would now owe $26.5 million to Trepp.

One can only assume it hit Montgomeryhard: Four days after the settlement he spent his day at CaesarsPalace on the Las Vegas Strip. He was a blackjack player by preference, according to all accounts, and so he presumably sat at the high roller's blackjack tables on September 27. He was, in the parlance of the gambling hall, a "whale." He took out his checkbook and tore out check after check, making them out to Caesars Palace Hotel and Casino, and buying cash and chips. The first check was for $10,000, then $100,000 and on and on. That's blackjack for you. In fact, Montgomerybought a cool million dollars' worth from the casino that day. Caesars won't comment on individual players, but prosecutors say Montgomery's checks later bounced. (In October 2009 Montgomerycame up with $250,000 in restitution, which kept him from being prosecuted.)

But Montgomery and the U.S.government were apparently still working together. The CIA had discredited the embarrassing Al Jazeera technology, but it was all still secret, still classified. Few people even in the government knew about the old scandal. Montgomery and his patron somehow found a new federal buyer willing to hand over taxpayer funds. In this case it was $3 million for "research, development, test and evaluation." It was written in the dense language of federal procurement law and revived all the terms Montgomeryhad bandied about. The contract was so heavily redacted that even the name of the Air Force office is blacked out. I read through a version of the document, and at the end I found the nondisclosure agreement. "This agreement is entered into between the United States Air Force and Dennis Montgomery." He signed it January 29, 2009.

Montgomery did not cooperate with this story, but I managed to reach the Air Force program manager, Joseph Liberatore. "How do I want to say this?" he said. "We were testing some of the software. We were just looking at it to see if there was anything there. If there is anything there we wanted to make sure there was due diligence and it was looked at by the U.S. government."

I asked the Air Force how this could have happened. The chief of the Air Force press desk, Andrew Bourland, said Blxware represented its software as "innovative and transformational." But the results of the evaluation were "inconclusive" and discussions were over. The first taxpayer transfer to Edra Blixseth's company was a $2 million payment on February 5, 2009. That same month, Blxware paid Dennis Montgomery $600,000.

In June, four months after collecting all that money, Montgomery and his wife declared personal bankruptcy. One of his assets, he claimed, was the $10 million value of his "copyrights"—all that software. His bankruptcy lawyer tells me the technology Montgomeryclaimed to have invented is an asset in the bankruptcy proceedings. "It'll be between the government authorities and Dennis," he says.

So in the end, was there ever any software designed by Montgomery? Sloan Venables and Jim Bauder say they doubt it. They shrug and laugh. "I never saw it," says Venables. But if it's all bogus, why is it still classified? And if Montgomery's claims have any truth, why can't anyone else find what he found? Did that $100 million appropriation ever exist? And who will Dennis Montgomery reach out to with his next scheme?

p. 53