DOWNS DECL - EXHIBIT F

# Dennis L. Montgomery

From Wikipedia, the free encyclopedia

**Dennis Lee Montgomery** (born 1953) is an American software designer and former medical technician credited with "bamboozling" federal officials into purchasing computer programs he claimed would decode secret Al Qaeda messages hidden in Al Jazeera broadcasts and identify terrorists based on predator drone videos.[1] A 2010 Playboy Magazine investigation called Montgomery, "The man who conned the Pentagon" winning millions in federal contracts for his terrorist exposing intelligence software.[2] The software was later exposed as an elaborate "hoax" and Montgomery's own lawyer Michael J. Flynn called him a "con artist" and "habitual liar engaged in fraud".[3]

| Dennis L. Montgomery | |
|---|---|
| **Born** | July 9, 1953 |
| | Mena, Arkansas, U.S. |
| **Residence** | Yarrow Point, Washington,U.S. |
| **Nationality** | American |
| **Occupation** | Software designer |
| **Spouse(s)** | Brenda Kathleen Tate (m. 1974) |
| **Children** | Brian Thomas Montgomery, b. 1976 |
| | Steven Lee Montgomery, b.1979 |
| | Kathleen Ann Burgyan, b.1981 |

# Contents

- 1 Education and career
  - 1.1 Patents and software copyrights
  - 1.2 3Net Systems
  - 1.3 eTreppid Technologies, LLC
  - 1.4 BLXware partnership
  - 1.5 Offshore Limited D
- 2 Terrorist software hoax
- 3 Nevada governor bribery scandal
- 4 Personal life
- 5 References
- 6 External links

# Education and career

Dennis Montgomery is a former medical technician originally from Mena, Arkansas. Montgomery attended Grossmont Community College where he received an Associate's degree in medical technology in 1973. He worked as a biomedical technician for San Diego area hospitals from 1973 to 1990 before becoming a computer software consultant. Montgomery was then employed at 3Net Systems, a financially struggling Sacramento-based medical software company[4] until 1996. In 1998 he co-founded eTreppid Technologies with partner Warren Trepp to develop video compression and noise filtering software for the gaming and casino industries.[5] Montgomery and Trepp evolved their offerings for military applications and in 2004 won a no-bid contract with the Department of Defense. Following a dispute over software ownership Montgomery was fired from eTreppid

in 2006 and formed a new venture with billionaire backers Edra and Tim Blixseth called OpSpring which was later renamed Blxware where he had the title of Chief Scientist.[6] Blxware was dissolved as part of the Blixseth's 2009 divorce and bankruptcy.[7]

## Patents and software copyrights

Dennis Montgomery has applied for 11 and has been granted five patents for software and systems ranging from programs designed to gather data from casino gaming tables to his now infamous claimed terrorist message decoding system. All of his granted patents were assigned to eTreppid Technologies and later purchased by BLXware which went bankrupt in 2009. In addition, Montgomery has 13 U.S. copyrights filed for source code for work he performed at Barrett Laboratories and for ComputerMate, Inc. (3Net). Montgomery's remaining unassigned intellectual property patent applications (valued by Montgomery at $10 million)[8] were listed as assets against liabilities in his personal Chapter 7 bankruptcy in 2012. These patents and patent applications include:

- Optical encoding of audio data (http://www.google.com/patents/US7142778), patent granted 2006 (assigned to eTreppid)
- System and method for managing memory in a surveillance system (http://www.google.com/patents/US7058771), patent granted 2006 (assigned to eTreppid)
- Method and apparatus for streaming data (http://www.google.com/patents/US7050583), patent granted 2006 (assigned to eTreppid)
- Method and apparatus for detecting and reacting to occurrence of an event (http://www.google.com/patents/US7006666), patent granted 2006 (assigned to eTreppid)
- Method and apparatus for storing digital video content (http://www.google.com/patents/US6978047), patent granted 2005 (assigned to eTreppid)
- Data gathering for games of chance (http://www.google.com/patents/US20030096643), patent application 2001
- System and method for generating alert conditions (http://www.google.com/patents/US20030095687), patent application 2001
- Method and apparatus for storing digital video content (http://www.google.com/patents/US20060098880), patent application 2005
- Method and system for size adaptation and storage minimization source noise (http://www.google.com/patents/US20030095180), patent application 2001
- Method and apparatus for encoding information using multiple passes (http://www.google.com/patents/US20020101932), patent application 2000
- Method and apparatus for determining patterns within adjacent blocks of data (http://www.google.com/patents/US20030081685), patent application 2001
- Copyrighted source code: for IBM personal computers: CORTEX software. V3536D631 2006-03-27 (Assigned to Barrett Laboratories, Inc.)

p. 56

- Copyrighted source code: Computermate source code for Hewlett Packard model 87, blood gas analysis & 6 other titles. V3536D581 2006-03-27 (Assigned to ComputerMate, Inc. (3Net))
- Copyrighted source code: MIND 1.0 ANATOMIC PATHOLOGY laboratory software for personal computers with source code. TX0002095009 / 1987-06-05 (Assigned to Barrett Laboratories, Inc.)
- Copyrighted source code: MIND 4.0 clinical software for IBM personal computers with source code. TX0002000234 / 1987-01-20 (Assigned to Barrett Laboratories, Inc.)
- Copyrighted source code: Computermate source code for Hewlett Packard model 85, blood gas analysis. TXu000098727 / 1982-06-03 (Assigned to Computermate, Inc. (3Net))
- Copyrighted source code: Computermate source code for Hewlett Packard model 85, blood gas quality control. TXu000098728 / 1982-06-03 (Assigned to Computermate, Inc. (3Net))
- Copryrighted source code: Computermate source code for Hewlett Packard model 87 blood gas analysis. TXu000098018 / 1982-05-28 (Assigned to Computermate, Inc. (3Net))
- Copyrighted source code: Computermate source code for Hewlett Packard model 87, blood gas quality control TXu000098731 / 1982-05-27 (Assigned to Computermate, Inc. (3Net))
- Copyrighted source code: MIND 1.0 microbiology laboratory software for personal computers with source code. TX0002083750 / 1987-06-04 (Assigned to Barrett Laboratories, Inc.)
- Copyrighted source code: MIND 3.0 clinical laboratory manual for IBM personal computer. TX0002034758 / 1987-01-15 (assigned to Barrett Laboratories, Inc.)
- Copyrighted source code: CORTEX source code for IBM personal computers. TX0001983147 / 1987-01-16 (assigned to Barrett Laboratories, Inc.)

## 3Net Systems

While a corporate officer at 3Net Solutions Dennis Montgomery was successfully sued for sexual harassment[9] and for which his company was found financially responsible.[10] This case was cited as precedent setting in California as mentioned in the article: Key Changes in Employment Law by Margaret J. Grover.[11]

During his tenure at 3Net Systems Dennis Montgomery served as a marketing consultant and then as vice president responsible for product delivery of FAILSAFE, a software product upon which the company based a $5 million stock offering.[12] The Securities and Exchange Commission later determined the FAILSAFE related offering claims were materially false and misleading to shareholders and issued a formal cease and desist order sanctioning the company for failing to disclose materially relevant inflated revenues claims.[13] While at 3Net Montgomery also wrote and filed copyright protections for software source code with 3Net affiliated company ComputerMate, Inc.

## eTreppid Technologies, LLC

Montgomery became a partner to former Michael Milken junk bond trader Warren G. Trepp and investor Wayne Prim to develop and sell audio, video and data compression software under the banner eTreppid Technologies in 1998. As executive vice president and chief technology officer Montgomery led the company's efforts to promote software to government agencies associated with tracking terrorist activities. In 2004 eTreppid was awarded a $30 million no-bid contract with United States Special Operations Command and was

p. 57

ranked the 16th largest defense contractor that year, according to Aerospace Daily.[14] However, by 2006 the company and Montgomery faced federal investigations for fraud.[15] That same year Montgomery was found liable for sexual harassment in a suit brought by a former employee. Montgomery claims he was then "forced out" of eTreppid. He subsequently filed a civil suit[16] against the company asserting his ownership of the terrorist tracking software.[17] The court ruled that Montgomery was required to produce his terror tracking software code via discovery to eTreppid to determine ownership.[18] However, before turning over the code, Montgomery entered into a settlement agreement where his new employers Edra and Tim Blixseth agreed to pay eTreppid an undisclosed amount (later revealed in court documents to be $75 million) to relinquish all rights to the software to their newly formed partnership with Montgomery called BLXware.[19]

## BLXware partnership

After his firing from eTreppid, Montgomery joined with Edra and Tim Blixseth to bring his alleged terrorist tracking software to other U.S. and foreign government clients. With the Blixseths and former presidential candidate Jack Kemp he helped formed OpSpring LLC later renamed BLXware. Via BLXware, Montgomery pursued selling his terror tracking software to the U.S. and Israel governments leveraging political connections of the Blixseth partnership.[20] BLXware's owners Edra and Tim Blixseth divorced in 2008 and BLXware became part of Edra Blixseth's sole property. She filed for personal bankruptcy in 2009 which resulted in a Chapter 7 dissolution of all her assets including BLXware and its associated software and intellectual property. [21]

## Offshore Limited D

During the Chapter 7 bankruptcy and dissolution of BLXware in 2009, Dennis Montgomery transferred various internet and software assets to a holding entity called Offshore Limited D and set up companies called Pacific Coast Innovations and Demaratech LLC computer software services with his son-in-law and former BLXware special projects coordinator Istvan Burgyan.[22][23] Under these entities he has begun to offer software related services for tracking submarines, mining data and medical device software via such brands as Harpoon™ submarine detection,[24] GeoVations geophysical data mining,[25] and LumaSkinz optical cloaking and camouflage technology.[26] OffShore Limited D also lost a domain dispute case for hosting several attack websites for which allegations of trademark violations[27] were raised and defended unsuccessfully by lawyers for Timothy Blixseth.[28]

# Terrorist software hoax

According to the New York Times, Dennis Montgomery and his associates received more than $20 million in U.S. government contracts for software they claimed would help stop terrorist attacks on the United States. National Public Radio reported, "For several months starting in the fall of 2003, Montgomery's analysis led directly to national code orange security alerts and cancelled flights. The only problem: he was making it all up."[29]

Dennis Montgomery originally worked for Warren Trepp, a former top junk bond trader for Michael Milken, at eTreppid Technologies and later partnered with Yellowstone Club founders Edra and Tim Blixseth under the banner Blxware to solicit government contracts for his spy software. The Blixseth's were friends with former U.S. Representative and presidential candidate Jack Kemp who became a minority partner in the venture with

p. 58

Montgomery. According to the *New York Times*, Mr. Kemp used his friendship with Vice President Dick Cheney to set up a meeting in 2006 at which Mr. Kemp, Mr. Montgomery and Ms. Blixseth met with a top Vice President Cheney adviser, Samantha Ravich, to talk about expanding the government's use of the software.[30]

Montgomery's software claims were reportedly responsible for a false terror alert which grounded international flights and caused Department of Homeland Security Secretary Tom Ridge to raise the government's security level.[31] In February 2006, the FBI and U.S. Air Force office of Special Investigations opened an economic espionage and theft of intellectual property investigation into Montgomery and Blxware.[32]

## Nevada governor bribery scandal

During the run-up to the 2006 gubernatorial election, Dennis Montgomery accused gubernatorial candidate Jim Gibbons of accepting bribes while serving as a Member of Congress to help Montgomery's company eTreppid Technologies secure military contracts for his terrorist software. In court papers associated with a lawsuit between Montgomery and former business partner Warren Trepp, Montgomery accused Gibbons of accepting casino chips and $100,000 in cash from Trepp during a Caribbean cruise. Montgomery based his claims on Trepps' personal e-mails he says he accessed while working at eTreppid Technologies.[33] Gibbons lawyers claimed they had evidence Montgomery fabricated the emails [34] and presented computer expert evidence in trial that challenged the authenticity of Montgomery's alleged evidence.[35] An 18 month FBI investigation resulted in no charges and Gibbons being "cleared" of all charges by the Department of Justice. Similar reviews by the Nevada State Ethics Commission and U.S. House Ethics Committee also cleared Gibbons. The New York Times reported that Montgomery's employers at Blxware paid a $20 million settlement[36] to Warren Trepp as "compensation for certain allegations" made by Montgomery in the news media linked to the Gibbons bribery claims.[37]

## Personal life

A 2003 U.S. Air Force investigation report revealed Montgomery suffered from gambling problems for which he borrowed $1.3 million from his then company eTreppid Technologies to pay back casino debts. In 2009 Montgomery was arrested on criminal charges in Nevada for passing $1 million in bad checks to Las Vegas casinos.[38] Montgomery was represented in various lawsuits by attorney Michael Flynn until Flynn claimed he learned Montgomery's software was a "sham"[39] and who later sued and won a $628,000 judgment against Montgomery for failing to pay his legal fees.[40][41] Montgomery subsequently filed for Chapter 7 bankruptcy in California in 2009 listing his debts to Flynn, Harrah's Casino ($540,000), Caesars Casinos ($990,000) and other creditors totaling debts of more than $12,000,000.[42][43] In 2013 his former attorney Michael Flynn purchased all of Montgomery's bankruptcy-related debts, encumbrances, real estate and other assets. Montgomery is now a witness on behalf of Flynn representing Tim Blixseth against Credit Suisse and others in Blixseth's bankruptcy. [44]

Prior to his bankruptcy filing Montgomery maintained multi-million dollar residences with his wife in Rancho Mirage, California, Reno, Nevada and Yarrow Point, Washington. In addition to the Nevada criminal complaint for passing bad checks, Montgomery had a federal criminal investigation into his software dealings delayed following an alleged unconstitutional search of his home by the FBI which Montgomery's attorney Michael Flynn claimed resulted in the firing of the head of the FBI Reno Office and an assistant U.S. Attorney in charge of the case. Federal officials denied the allegations and the case remains open pending resolution of related civil suits between Montgomery and his former employer eTreppid.[45]

p. 59

# References

1. ^ Hiding Details of Dubious Deal, U.S. Invokes National Security (http://www.nytimes.com/2011/02/20/us/politics/20data.html?_r=0), by Eric Lichtblau and James Risen, New York Times, February 19, 2012.
2. ^ The Man Who Conned the Pentagon (http://members.i.playboy.com/Playboy-Magazine/Jan-2010-Issue/70), by Aram Roston, Playboy Magazine, January 2010.(subscription required)
3. ^ Software fraudster fooled CIA into terror alert (http://www.theregister.co.uk/2009/12/24/cia_montgomery/), by Christopher Williams, The Register (UK), December 24, 2009.
4. ^ Forget software -- 3Net's importing Russian computer `nerdskis' (http://www.bizjournals.com/sacramento/stories/1997/06/16/story4.html?page=all), by Mark Larson, Sacramento Business Journal, June 15, 1997.
5. ^ Yellowstone Club Divorcee Entangled in Terrorist Software Suits (http://www.bloomberg.com/apps/news?pid=newsarchive&sid=aehZLi13aTPI), Bloomberg, August 29, 2008.
6. ^ TRUE BELIEVERS: Nevada company's troubles entangle Gibbons, federal government (http://www.lvrj.com/news/47141377.html), by David Kihara, Las Vegas Review-Journal, June 7, 2009.
7. ^ Yellowstone Club Chronicles: The Edra Blixeth Bankruptcy (http://www.newwest.net/city/article/yellowstone_club_chronicles_edra_blixseth_bankruptcy/C396/L396/), by Jonathan Weber, New West, June 11, 2009.
8. ^ Chapter 7 Trustees Motion for Order: Approving sale agreement with Michael Flynn, US Bankruptcy Court Los Angeles Division, Case No. 2:10-bk-18510-bb, December 6, 2012.
9. ^ FBI Probes Nevada Governor (Montgomery admits sexual harassment charges) (http://www.msnbc.msn.com/id/18613647/ns/nbcnightlynews-nbc_news_investigates/t/fbi-probes-nevada-governor-corruption/), NBC Nightly News, May 11, 2007.
10. ^ Page v. Superior Court (3Net Systems, Inc.) (http://law.justia.com/cases/california/caapp4th/31/1206.html), U.S. Justia, January 26, 1995.
11. ^ Key Changes in Employment Law (http://www.sfaa.org/0602grover.html), by Margaret J. Grover, SFAA Magazine, February 2006.
12. ^ ALTERNATIVE TECHNOLOGY RESOURCES, INC. (FORMERLY KNOWN AS 3NET SYSTEMS, INC.) (http://google.brand.edgar-online.com/EFX_dll/EDGARpro.dll?FetchFilingHTML1?ID=1318821&SessionID=IVUwFSsb1grCM47), Form SB-2, Securities Exchange Commission, December 18, 1996.
13. ^ ORDER INSTITUTING CEASE-AND-DESIST PROCEEDING IN THE MATTER OF 3NET SYSTEMS (http://www.sec.gov/litigation/admin/337344.txt), Release No. 7344, Securities and Exchange Commission, September 30, 1996.
14. ^ Who is Warren Trepp (http://awstories.blogspot.com/2007/02/who-is-warren-trepp.html), Nevada Today, February 2008.
15. ^ Software fraudster 'fooled CIA' into terror alert (http://www.theregister.co.uk/2009/12/24/cia_montgomery/), by Christopher William, The Register (UK), December 24, 2009.
16. ^ Montgomery v. eTreppid (http://www.leagle.com/xmlResult.aspx?xmldoc=20081723548FSupp2d1175_11646.xml), Leagle.com, April 2008.

17. ^ eTreppid Life and Times (http://awstories.blogspot.com/2007/03/etreppid-life-and-times.html), by Sherri Cruz, Nevada Today, March 9, 2007.

18. ^ CyberLaw: Text and Cases (http://books.google.com/books?id=qALxVkUZh_8C&lpg=PA39&ots=tMkUNBeR5O&dq=%22dennis%20montgomery%22%20etreppid&pg=PA39#v=onepage&q=%22dennis%20montgomery%22%20etreppid&f=false), by Gerald R. Ferrera, et al, Centage Learning, January 1, 2011.

19. ^ eTreppid Technologies Reaches Settlement with Blxware LLC Chief Scientist in Software Litigation (http://www.businesswire.com/news/home/20080923005324/en/eTreppid-Technologies-Reaches-Settlement-Blxware-LLC-Chief), Business Wire, September 23, 2008.

20. ^ Nevada company's troubles entangle Gibbons, federal government (http://www.lvrj.com/news/47141377.html), by David Kihara, Las Vegas Review Journal, April 9, 2012.

21. ^ Yellowstone Club Chronicles: The Edra Blixseth Bankruptcy (http://www.newwest.net/city/article/yellowstone_club_chronicles_edra_blixseth_bankruptcy/C396/L396/), by Jonathan Weber, New West, June 11, 2009.

22. ^ Pacific Coast Innovations, LLC registration #201002810243 (http://kepler.sos.ca.gov/), California Secretary of State, Business Entity Registration, January 1, 2010.

23. ^ Pacific Coast Innovations: About Us (http://pcinx.com/index-aboutus.html)

24. ^ Harpoon Submarine Detection website (http://submarinedetection.com/) a Pacific Coast Innovations Company, registered to Offshore Limited D.

25. ^ Geovations, Inc. (http://geovations.org/) website registered to Offshore Limited D.

26. ^ LumaSkinz optical cloaking technology website (http://cloakit.net/), registered to Offshore Limited D.

27. ^ Atigeo vs. Dennis Mongtomery, et al (http://www.rfcexpress.com/lawsuits/trademark-lawsuits/california-central-district-court/552309/atigeo-llc-et-al-v-offshore-limited-d-et-al/summary/), US Federal District Court, Case Number 5:13-cv-01243-CAS-DTB, Filed July 15, 2013.

28. ^ Yellowstone Mountain Club LLC v. Offshore Limited D and PCI (http://www.wipo.int/amc/en/domains/search/text.jsp?case=D2013-0097), Administrative Panel Decision, WIPO, April 12, 2013.

29. ^ The man who conned the Pentagon (http://www.npr.org/templates/story/story.php?storyId=121667905), by Guy Raz, All Things Considered, National Public Radio, December 19, 2009.

30. ^ 'Terrorist-catcher' deals land government in hot seat (http://o.seattletimes.nwsource.com/html/nationworld/2014280616_contractor20.html), *Seattle Times*, February 19, 2011

31. ^ Programmer conned CIA, Pentagon into buying bogus anti-terror code (http://www.wired.com/threatlevel/2009/12/montgomery-2/), *Wired Magazine*, December 28, 2009.

32. ^ Nevada company's troubles (http://www.lvrj.com/news/47141377.html), *Las Vegas Review Journal*, June 7, 2009

33. ^ FBI probes Nevada governor for corruption (http://www.msnbc.msn.com/id/18613647/ns/nbcnightlynews-nbc_news_investigates/t/fbi-probes-nevada-governor-corruption/#.UNIOJm80WSo), by Lisa Myers & Jim Popkin, NBC News, May 11, 2007.

34. ^ NBC Investigates Jim Gibbons, an exclusive interview with Dennis Montgomery (https://www.youtube.com/watch?v=Zjux5im6RRs) on YouTube, NBC News, May 11, 2007.

35. ^ Nevada governor cleared in corruption probe, may sue (http://usatoday30.usatoday.com/news/nation/2008-11-03-nevada-governor_N.htm), by AP, USA Today, November 3, 2008.

p. 61

36. ^ Case 3:09-mc-00019 Document 1, Filed 01/09/09, United States District Court of Nevada.
37. ^ Governor of Nevada Is Cleared in an Inquiry on Gifts (http://www.nytimes.com/2008/11/03/us/03nevada.html), by Randal Archibold, New York Times, November 2, 2008.
38. ^ Man who accused Gibbons of taking bribes arrested on bad check allegations (http://www.lvrj.com/news/breaking_news/51438472.html), by David Kihara, Las Vegas Review-Journal, July 22, 2009.
39. ^ Yellowstone Club Divorcee Entangled in Terrorist Software Suits (http://www.bloomberg.com/apps/news?pid=newsarchive&sid=aehZLi13aTPI&refer=news), By Anthony Effinger, Bloomberg, August 29, 2008.
40. ^ The Shadow of State Secrets (http://scholarship.law.georgetown.edu/cgi/viewcontent.cgi?article=1291&context=facpub), Laura K. Donahue, University of Pennsylvania Law Review, Vol. 159:77, 2010.
41. ^ Case 2:12-mc-00019-MCE-CKD, Document 4 (http://www.pacer.gov), U.S. District Court Nevada, Filed 04/12/2012.
42. ^ Case 6:09-bk-24322-BB, Doc 9 (http://dockets.justia.com/docket/california/cacdce/2:2012cv01031/523605/), Filed 07/13/09, United States Bankruptcy Court, Central District of California.
43. ^ US regretting dubious deal with computer programmer (http://www.boston.com/news/nation/articles/2011/02/20/us_regretting_dubious_deal_with_computer_programmer/), By Eric Lichtblau, The Boston Globe, February 20, 2011.
44. ^ Court: Montana can pursue resort founder Tim Blixseth into bankruptcy (http://www.oregonlive.com/pacific-northwest-news/index.ssf/2012/12/court_montana_can_pursue_resor.html), Associated Press, December 18, 2012.
45. ^ Judge says FBI raid in eTreppid case went too far (http://www.rgj.com/article/20070320/NEWS07/703200344/Judge-says-FBI-raid-eTreppid-case-went-too-far), by Martha Bellisle, Reno Gazette Journal, March 20, 2007.

## External links

- Agency France Press: Swindler duped CIA over Al-Qaeda decoding scam (http://www.google.com/hostednews/afp/article/ALeqM5hlYRd6FVf_FvslqUlWb78RD0kk-w)
- The Guardian: The Nevada gambler, al-Qaida, the CIA and the mother of all cons (http://www.guardian.co.uk/world/2009/dec/23/dennis-montgomery-cia-al-jazeera)
- Harpers Magazine: State Stupidities; State Secrets (http://harpers.org/blog/2011/02/state-stupidities-state-secrets/)

Retrieved from "http://en.wikipedia.org/w/index.php?title=Dennis_L._Montgomery&oldid=628746609"

Categories:  1953 births | Living people | People from Rancho Mirage, California | American fraudsters | Confidence tricksters | Hacking (computer security)

- This page was last modified on 8 October 2014 at 04:43.
- Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. By using this site, you agree to the Terms of Use and Privacy Policy. Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.

p. 62

Case 2:13-cv-00360-RAJ   Document 59-2   Filed 11/24/14   Page 10 of 37

p. 63

DOWNS DECL - EXHIBIT G

**The New York Times** Reprints

This copy is for your personal, noncommercial use only. You can order presentation-ready copies for distribution to your colleagues, clients or customers here or use the "Reprints" tool that appears next to any article. Visit www.nytreprints.com for samples and additional information. Order a reprint of this article now.



February 19, 2011

# Hiding Details of Dubious Deal, U.S. Invokes National Security

By ERIC LICHTBLAU and JAMES RISEN

WASHINGTON — For eight years, government officials turned to Dennis Montgomery, a California computer programmer, for eye-popping technology that he said could catch terrorists. Now, federal officials want nothing to do with him and are going to extraordinary lengths to ensure that his dealings with Washington stay secret.

The Justice Department, which in the last few months has gotten protective orders from two federal judges keeping details of the technology out of court, says it is guarding state secrets that would threaten national security if disclosed. But others involved in the case say that what the government is trying to avoid is public embarrassment over evidence that Mr. Montgomery bamboozled federal officials.

A onetime biomedical technician with a penchant for gambling, Mr. Montgomery is at the center of a tale that features terrorism scares, secret White House briefings, backing from prominent Republicans, backdoor deal-making and fantastic-sounding computer technology.

Interviews with more than two dozen current and former officials and business associates and a review of documents show that Mr. Montgomery and his associates received more than $20 million in government contracts by claiming that software he had developed could help stop Al Qaeda's next attack on the United States. But the technology appears to have been a hoax, and a series of government agencies, including the Central Intelligence Agency and the Air Force, repeatedly missed the warning signs, the records and interviews show.

Mr. Montgomery's former lawyer, Michael Flynn — who now describes Mr. Montgomery as a "con man" — says he believes that the administration has been shutting off scrutiny of Mr. Montgomery's business for fear of revealing that the government has been duped.

"The Justice Department is trying to cover this up," Mr. Flynn said. "If this unravels, all of the evidence, all of the phony terror alerts and all the embarrassment comes up publicly, too. The government knew this technology was bogus, but these guys got paid millions for it."

Justice Department officials declined to discuss the government's dealings with Mr. Montgomery, 57, who is in bankruptcy and living outside Palm Springs, Calif. Mr. Montgomery is about to go on trial in Las Vegas on unrelated charges of trying to pass $1.8 million in bad checks at casinos, but he has not been charged with wrongdoing in the federal contracts, nor has the government tried to get back any of the money it paid. He and his current lawyer declined to comment.

The software he patented — which he claimed, among other things, could find terrorist plots hidden in broadcasts of the Arab network Al Jazeera; identify terrorists from Predator drone videos; and detect noise from hostile submarines — prompted an international false alarm that led President George W. Bush to order airliners to turn around over the Atlantic Ocean in 2003.

The software led to dead ends in connection with a 2006 terrorism plot in Britain. And they were used by counterterrorism officials to respond to a bogus Somali terrorism plot on the day of President Obama's inauguration, according to previously undisclosed documents.

**'It Wasn't Real'**

"Dennis would always say, 'My technology is real, and it's worth a fortune,' " recounted Steve Crisman, a filmmaker who oversaw business operations for Mr. Montgomery and a partner until a few years ago. "In the end, I'm convinced it wasn't real."

Government officials, with billions of dollars in new counterterrorism financing after Sept. 11, eagerly embraced the promise of new tools against militants.

C.I.A. officials, though, came to believe that Mr. Montgomery's technology was fake in 2003, but their conclusions apparently were not relayed to the military's Special Operations Command, which had contracted with his firm. In 2006, F.B.I. investigators were told by co

-workers of Mr. Montgomery that he had repeatedly doctored test results at presentations for government officials. But Mr. Montgomery still landed more business.

In 2009, the Air Force approved a $3 million deal for his technology, even though a contracting officer acknowledged that other agencies were skeptical about the software, according to e-mails obtained by The New York Times.

Hints of fraud by Mr. Montgomery, previously raised by Bloomberg Markets and Playboy, provide a cautionary tale about the pitfalls of government contracting. A Pentagon study in January found that it had paid $285 billion in three years to more than 120 contractors accused of fraud or wrongdoing.

"We've seen so many folks with a really great idea, who truly believe their technology is a breakthrough, but it turns out not to be," said Gen. Victor E. Renuart Jr. of the Air Force, who retired last year as the commander of the military's Northern Command. Mr. Montgomery described himself a few years ago in a sworn court statement as a patriotic scientist who gave the government his software "to stop terrorist attacks and save American lives." His alliance with the government, at least, would prove a boon to a small company, eTreppid Technologies, that he helped found in 1998.

He and his partner — a Nevada investor, Warren Trepp, who had been a top trader for the junk-bond king Michael Milken — hoped to colorize movies by using a technology Mr. Montgomery claimed he had invented that identified patterns and isolated images. Hollywood had little interest, but in 2002, the company found other customers.

With the help of Representative Jim Gibbons, a Republican who would become Nevada's governor and was a longtime friend of Mr. Trepp's, the company won the attention of intelligence officials in Washington. It did so with a remarkable claim: Mr. Montgomery had found coded messages hidden in broadcasts by Al Jazeera, and his technology could decipher them to identify specific threats.

The software so excited C.I.A. officials that, for a few months at least, it was considered "the most important, most sensitive" intelligence tool the agency had, according to a former agency official, who like several others would speak only on the condition of anonymity because the technology was classified. ETreppid was soon awarded almost $10 million in contracts with the military's Special Operations Command and the Air Force, which were interested in software that Mr. Montgomery promised could identify human and other targets from videos on Predator drones.

In December 2003, Mr. Montgomery reported alarming news: hidden in the crawl bars broadcast by Al Jazeera, someone had planted information about specific American-bound flights from Britain, France and Mexico that were hijacking targets.

C.I.A. officials rushed the information to Mr. Bush, who ordered those flights to be turned around or grounded before they could enter American airspace.

"The intelligence people were telling us this was real and credible, and we had to do something to act on it," recalled Asa Hutchinson, who oversaw federal aviation safety at the time. Senior administration officials even talked about shooting down planes identified as targets because they feared that supposed hijackers would use the planes to attack the United States, according to a former senior intelligence official who was at a meeting where the idea was discussed. The official later called the idea of firing on the planes "crazy."

French officials, upset that their planes were being grounded, commissioned a secret study concluding that the technology was a fabrication. Presented with the findings soon after the 2003 episode, Bush administration officials began to suspect that "we got played," a former counterterrorism official said.

The C.I.A. never did an assessment to determine how a ruse had turned into a full-blown international incident, officials said, nor was anyone held accountable. In fact, agency officials who oversaw the technology directorate — including Donald Kerr, who helped persuade George J. Tenet, then the director of central intelligence, that the software was credible — were promoted, former officials said. "Nobody was blamed," a former C.I.A. official said. "They acted like it never happened."

After a bitter falling out between Mr. Montgomery and Mr. Trepp in 2006 led to a series of lawsuits, the F.B.I. and the Air Force sent investigators to eTreppid to look into accusations that Mr. Montgomery had stolen digital data from the company's systems. In interviews, several employees claimed that Mr. Montgomery had manipulated tests in demonstrations with military officials to make it appear that his video recognition software had worked, according to government memorandums. The investigation collapsed, though, when a judge ruled that the F.B.I. had conducted an improper search of his home.

**Software and Secrets**

The litigation worried intelligence officials. The Bush administration declared that some classified details about the use of Mr. Montgomery's software were a "state secret" that could cause grave harm if disclosed in court. In 2008, the government spent three days "scrubbing" the home computers of Mr. Montgomery's lawyer of all references to the technology. And this past fall, federal judges in Montana and Nevada who are overseeing several of the lawsuits issued protective orders shielding certain classified material.

The secrecy was so great that at a deposition Mr. Montgomery gave in November, two government officials showed up to monitor the questioning but refused to give their full names or the agencies they worked for.

Years of legal wrangling did not deter Mr. Montgomery from passing supposed intelligence to the government, according to intelligence officials, including an assertion in 2006 that his software was able to identify some of the men suspected of trying to plant liquid bombs on planes in Britain — a claim immediately disputed by United States intelligence officials. And he soon found a new backer: Edra Blixseth, a onetime billionaire who with her former husband had run the Yellowstone Club in Montana.

Hoping to win more government money, Ms. Blixseth turned to some influential friends, like Jack Kemp, the former New York congressman and Republican vice-presidential nominee, and Conrad Burns, then a Republican senator from Montana. They became minority stakeholders in the venture, called Blxware.

**New Pitches**

In an interview, Mr. Burns recalled how impressed he was by a video presentation that Mr. Montgomery gave to a cable company. "He talked a hell of a game," the former senator said.

Mr. Kemp, meanwhile, used his friendship with Vice President Dick Cheney to set up a meeting in 2006 at which Mr. Kemp, Mr. Montgomery and Ms. Blixseth met with a top Cheney adviser, Samantha Ravich, to talk about expanding the government's use of the Blxware software, officials said. She was noncommittal.

Mr. Flynn, who was still Mr. Montgomery's lawyer, sent an angry letter to Mr. Cheney in May 2007. He accused the White House of abandoning a tool shown to "save lives." (After a falling out with Mr. Montgomery, Mr. Flynn represents another party in one of the lawsuits.)

But Mr. Montgomery's company still had an ally at the Air Force, which in late 2008 began negotiating a $3 million contract with Blxware.

In e-mails to Mr. Montgomery and other company officials, an Air Force contracting officer, Joseph Liberatore, described himself as one of the "believers," despite skepticism from the C.I.A. and problems with the no-bid contract.

If other agencies examined the deal, he said in a December 2008 e-mail, "we are all toast."

"Honestly I do not care about being fired," Mr. Liberatore wrote, but he said he did care about "moving the effort forward — we are too close." (The Air Force declined to make Mr. Liberatore available for comment.)

The day after Mr. Obama's inauguration, Mr. Liberatore wrote that government officials were thanking Mr. Montgomery's company for its support. The Air Force appears to have used his technology to try to identify the Somalis it believed were plotting to disrupt the inauguration, but within days, intelligence officials publicly stated that the threat had never existed. In May 2009, the Air Force canceled the company's contract because it had failed to meet its expectations.

Mr. Montgomery is not saying much these days. At his deposition in November, when he was asked if his software was a "complete fraud," he answered, "I'm going to assert my right under the Fifth Amendment."

*Barclay Walsh contributed research.*

p. 67

DOWNS DECL - EXHIBIT H

*The Honorable Richard A. Jones*

1

2

3

4

5

6

7

8

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10   MICHAEL J. FLYNN; and DENNIS LEE
MONTGOMERY and BRENDA KATHLEEN
MONTGOMERY, husband and wife,

Case No. 2:13-cv-00360-RAJ

11          Plaintiffs,

**PLAINTIFFS' FRCP 26(a)(1)
INITIAL DISCLOSURES**

12       v.

13   NV MORTGAGE INC. d/b/a Soma Financial
d/b/a www.mysoma.com;

14

COUNTRYWIDE FINANCIAL
15   CORPORATION;

16   COUNTRYWIDE HOME LOANS, INC.;

COUNTRYWIDE BANK, FSB;

17

BANK OF AMERICA, N.A., successor to the
18   COUNTRYWIDE DEFENDANTS;

19   BAC HOME LOANS SERVICING, LP,
successor to the COUNTRYWIDE

20   DEFENDANTS;

21   BANK OF AMERICA CORPORATION,
successor to the COUNTRYWIDE

22   DEFENDANTS; and

DOES 1-50,

23
          Defendants.

24

25       Pursuant to FRCP 26(a)(1), Plaintiffs hereby make the following Initial Disclosures:

26   //

27   //

28   //

PLAINTIFFS' FRCP 26(a)(1) INITIAL DISCLOSURES
(Case No. 2:13-cv-00360-RAJ) – Page 1

p. 69

# I. INDIVIDUALS WITH DISCOVERABLE INFORMATION

1. **Dennis Montgomery**
   c/o Paul E. Brain, Brain Law Firm PLLC
   1119 Pacific Avenue, Suite 1200, Tacoma, WA 98402
   Tel: 253-327-1019

Mr. Montgomery has information regarding the representations made to him by the lending institutions, and the toll this situation has taken on him financially, medically, mentally and emotionally.

2. **Brenda Montgomery**
   c/o Paul E. Brain, Brain Law Firm PLLC
   1119 Pacific Avenue, Suite 1200, Tacoma, WA 98402
   Tel: 253-327-1019

Mrs. Montgomery has information regarding the representations made to her by the lending institutions, and the toll this situation has taken on her financially, medically, mentally and emotionally.

3. **Michael Flynn**
   c/o Paul E. Brain, Brain Law Firm PLLC
   1119 Pacific Avenue, Suite 1200, Tacoma, WA 98402
   Tel: 253-327-1019

Mr. Flynn has information regarding the overall schemes of Bank of America and Countrywide to violate state and federal law regarding lending statutes and regulations as applied to the Montgomerys' loan.

4. **Amy DeDoyard, Managing Broker**
   Windermere Real Estate – Yarrow Bay
   3933 Lake Washington Boulevard NE, Suite 100
   Kirkland, WA 98033
   Tel: 425-822-5100

Ms. DeDoyard was the Montgomerys' real estate agent for their purchase of the subject property located at 3812 94th Avenue NE, Yarrow Point, King County, Washington (the "Subject Property"). As such, Ms. DeDoyard would have information regarding the purchase.

5. **Ric Mangialardi**
   Windermere Real Estate/East, Inc.
   11100 Main Street, Suite 200
   Bellevue, WA 98004
   Tel: 425-455-9800

Mr. Mangialardi was the seller's real estate agent for the Subject Property. As such, Mr. Mangialardi would have information regarding the sale of the Subject Property.

BRAIN LAW FIRM PLLC
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON 98402
TEL: 253-327-1019 / FAX: 253-327-1021

6.    **Jason Abboud, President**
      Orca Financial Partners
      5400 Carillon Point
      Kirkland, WA 98033
      Tel: 425-827-6070

Mr. Abboud consulted with the Montgomerys regarding financing their purchase of the Subject Property. As such, Mr. Abboud would have information regarding the Montgomerys' qualifications for a loan.

7.    **Washington Appraisal Reviews, Inc.**
      1840 130th Avenue NE, Suite 11
      Bellevue, WA 98005
      Tel: 425-861-7374

Washington Appraisal Reviews Inc. prepared an appraisal for the Montgomerys' purchase of the Subject Property.

8.    **Jim Merritt**
      WIN Home Inspection
      14150 NE 20th Street, Suite 97
      Bellevue, WA 98007
      Tel: 425-868-1408

Mr. Merritt conducted to pre-purchase inspection of the Subject Property.

9.    **American Home Laboratories, Inc.**
      1400 112th Avenue SE, Suite 100
      Bellevue, WA 98004
      Tel: 800-224-1527

American Home Laboratories Inc. conducted mold testing of the Subject Property.

10.   **Brian Moynihan**
      Bank of America
      North Tryon Street
      Charlotte, NC 28256
      Tel: 980-335-3561

Mr. Moynihan is the Chief Executive Officer of Bank of America. As such, Mr. Moyihan is expected to provide evidence at the Board of Director level involving the securitization policies of the Bank of America in the "bundling" of mortgages from 2005 to the present. More specifically, Mr. Moynihan is expected to provide evidence involving the concealment of the "buy back potential" of securitized, defaulted mortgages such as the Montgomery mortgage, including evidence of "fraudulent conduct" and a "culpable state of mind" in connection with certifying Bank of America's financials while knowing that Bank of America was in fact concealing the likelihood of having to buy back defaulted mortgages such as the Montgomery mortgage. Mr. Moynihan is expected to provide evidence relating to a May 13, 2010 letter sent under his name to the Financial Crisis Inquiry Commission regarding Bank of America's

PLAINTIFFS' FRCP 26(a)(1) INITIAL DISCLOSURES
(Case No. 2:13-cv-00360-RAJ) – Page 3

BRAIN LAW FIRM PLLC
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON 98402
TEL: 253-327-1019 / FAX: 253-327-1021

p. 71

securitization practices and loan modification policies. Mr. Moynihan is expected to provide evidence relating Bank of America's $25 billion Consent Judgment and the internal policies of Bank of America to avoid compliance with the requirements of the Consent Judgment in order to avoid millions of dollars in losses and required payments under the Consent Judgment. The anticipated evidence from Mr. Moynihan will be based in part on evidence from Bank of America "whistleblowers" responsible for processing loan modifications and payments under the Consent Judgment and related federal programs such as the Home Affordable Modification Program. Mr. Moynihan is currently a defendant in the case of *Pennsylvania Public School Retirement System v. Bank of America*, United States District Court, Southern District of New York, Case No. 11-00733.

 11. **Kenneth Lewis**
      *Current address and telephone number unknown*

Mr. Lewis is the former Chief Executive Officer of Bank of America. *See* No. 10 above.

 12. **Joe Price**
      *Current address and telephone number unknown*

Mr. Price is the former Chief Financial Officer of Bank of America. *See* No. 10 above.

 13. **Charles Noski**
      *Current address and telephone number unknown*

Mr. Noski is the former Chief Financial Officer of Bank of America. *See* No. 10 above.

 14. **Neil Cotty**
      *Current address and telephone number unknown*

Mr. Cotty is the former Chief Accounting Officer of Bank of America. *See* No. 10 above.

 15. **Doug Campbell**
      *Current address and telephone number unknown*

Mr. Campbell is the former Senior Vice President of Bank of America. As such, Mr. Campbell is expected to provide evidence involving bid rigging in municipal reinvestment and municipal interest hedging, as it relates to an overall pattern of fraudulent conduct within Bank of America.

 16. **Angelo Mozilo**
      *Current address and telephone number unknown*

Mr. Mozilo is the former Chief Executive Officer of Countrywidel. As such, Mr. Mozilo is expected to provide evidence that he effectively created a massive Ponzi scheme in connection with his nationwide policy to take over the securitized mortgage lending market with fraudulent lending policies such as the "Hustle," as evidenced by documents, emails and testimony from multiple Countrywide and Bank of America "whistleblowers" identified herein.

PLAINTIFFS' FRCP 26(a)(1) INITIAL DISCLOSURES
(Case No. 2:13-cv-00360-RAJ) – Page 4

BRAIN LAW FIRM PLLC
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON 98402
TEL: 253-327-1019 / FAX: 253-327-1021

p. 72

17. **Edward O'Donnell**
*Current address and telephone number unknown*

Mr. O'Donnell is the former Executive Vice President for Countrywide, and a "whistleblower" under the United States False Claims Act. As such, Mr. O'Donnell is expected to provide evidence of an automated loan processing and underwriting strategy, internally referred to as "The Hustle," which systematically, pursuant to internal policy, removed specific quality control procedures in the loan underwriting and appraisal procedures required by state and federal law, and sound lending practices, resulting in the default of tens of thousands of securitized home loans, including the Montgomery loan. Countrywide engaged in this fraudulent "Hustle" in order to receive hundreds of millions of dollars from the United States government in connection with federally-regulated loans.

18. **Kyle Lagow**
*Current address and telephone number unknown*

Mr. Lagow is a former Appraiser for Countrywide and a "whistleblower" under the United States False Claims Act. As such, Mr. Lagow is expected to provide evidence "that the game was rigged when you brought people into it" referencing the internal policies underlying the mortgage lending and appraisal "game" of fraud at Countrywide. Mr. Lagow will provide evidence that the "rigged game" was the loan origination, lending and appraisal process that the Montgomerys were brought into including "robo signing," non-compliance with state and federal appraisal laws, non-compliance with loan review and analysis procedures qualifying the borrower, and intentional circumvention of loan origination safeguards.

19. **Gregory Mackler**
*Current address and telephone number unknown*

Mr. Mackler is a former executive with Urban Lending Solutions, a company with which Bank of America contracted its "HAMP" work, and a "whistleblower" under the United States False Claims Act. As such, Mr. Mackler is expected to provide evidence that Bank of America intentionally and, pursuant to an orchestrated internal scheme, entered into the $25 billion Consent Judgment with the fraudulent intent to prevent homeowners such as the Montgomerys from receiving appropriate loan modifications, including modifications under the Home Affordable Modification Program ("HAMP"), a federal program, in order to avoid millions of dollars in losses and required payments under the Consent Judgment. Mr. Mackler's evidence will support the fraudulent intent of Mr. Moynihan and Bank of America to conceal its "buy back losses" involving defaulted mortgages such as the Montgomery mortgage, and to effectively "make money" on program incentives by committing fraud on homeowners such as the Montgomerys.

20. **Lynn Szymiak**
*Current address and telephone number unknown*

Ms. Szymiak is a "whistleblower" who received $18 million as part of her "robo signing" investigation under the United States False Claims Act. As such, Ms. Szymiak is expected to provide evidence relating to the facts and factors in her investigation and her cooperation with federal authorities that resulted in the $25 billion Consent Judgment that Bank of America is

PLAINTIFFS' FRCP 26(a)(1) INITIAL DISCLOSURES
(Case No. 2:13-cv-00360-RAJ) – Page 5

BRAIN LAW FIRM PLLC
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON 98402
TEL: 253-327-1019 / FAX: 253-327-1021

p. 73

now violating, and which was violated in the Montgomery loan modification and foreclosure process.

21.  **Anonymous Bank of America Employee**
     *Current address and telephone number unknown*

Anonymous, is a current Bank of America employee and "whistleblower," is expected to provide evidence that Bank of America is currently flagrantly violating the Consent Judgment including the "dual tracking" and "single point of contact" requirements in the Consent Judgment involving mortgage modification and settlements with homeowners under the Consent Judgment; and that in cases such as the Montgomerys, **after** the Montgomerys proposed and offered to settle their claims for assignment of the Note and Bank of America's position, Bank of America is specifically violating the Consent Judgment by failing to provide a settlement and mortgage modification under multiple federal programs applicable to the Montgomerys, including the HAMP modification process that takes into account the Montgomery bankruptcy, their mortgage defaults, the loss of their home, the suspension of the foreclosure process during bankruptcy after violating the "dual tracking requirements, and the failure to comply with monetary settlement procedures in violation of the Consent Judgment, including the failure to settle their case by assignment of the Note.  This whistleblower is expected to support the evidence of Mr. Mackler that Bank of America intentionally engaged in current business practices designed to prevent eligible homeowners such as the Montgomerys from becoming eligible or staying eligible for permanent and dispositive modifications under HAMP and related federal programs and the Consent Judgment.  The whistleblower is expected to provide evidence that in cases such as the Montgomerys, Bank of America is currently pursuing a policy in connection with the Consent Judgment" of "cheat now and pay not punitive enough fines later."   The whistleblower will testify that Bank of America is intentionally not complying with the Consent Judgment in cases such as the Montgomerys and that it entered into the Consent Judgment knowing that the monitoring process for compliance could and would be circumvented.

22.  **Jackie Ramos**
     *Current address and telephone number unknown*

Ms. Ramos is an employee in Bank of America's Customer Assistance Department in Kennesaw, Georgia.   As such, Ms. Ramos is expected to provide evidence that Bank of America's lending collection policies, in her cases involving defaulted credit card loans, was part of a larger scheme of fraudulent banking practices at the Bank of America in connection with general policies involving dealings with customers.

23.  **Bank of America Customer Service Representatives**
     *Current addresses unknown*
     Tel: 800-669-6607

The Montgomerys have spoken to the following Bank of America Customer Service Representatives regarding their loan:  3/5/12 "Mary"; 6/7/12 "Michael"; 9/15/12 "Rene"; and 2/14/13 "Celespine".  These representatives would have knowledge regarding their discussions with the Montgomerys regarding the Montgomerys' loan with Bank of America.

PLAINTIFFS' FRCP 26(a)(1) INITIAL DISCLOSURES
(Case No. 2:13-cv-00360-RAJ) – Page 6

BRAIN LAW FIRM PLLC
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON 98402
TEL: 253-327-1019 / FAX: 253-327-1021

p. 74

24.     **Jonathan David Amos**
         *Current address and telephone number unknown*

Mr. Amos was the President and Chief Executive Officer of NV Mortgage Inc, d/b/a Soma Financial in Henderson, Nevada.  As such, Mr. Amos is expected to provide evidence relating to the revocation of his mortgage banking license; and relating to the loan origination policies of Soma, sanctioned and encouraged by Countrywide, including his dealings with executives at Countrywide, and his dealings with Neel and Arjun Dhingra, Soma loan executives, in connection with the Montgomery mortgage; and the failure of Soma to comply with FIRREA, USPAP, and numerous federal regulations relating to the Montgomery mortgage as part of a pattern of fraudulent conduct in the loan origination, loan application and appraisal process.

25.     **Arjun Dhingra**
         *Current address and telephone number unknown*

Mr. Dhingra was an executive at Soma Financial in Reno, Nevada.  As such, Mr. Dhingra is expected to provide evidence of the internal policies of Soma and Countrywide in connection with violations of state and federal laws and regulations in the loan process into which the Montgomerys were unwittingly sucked into in their loan process.

26.     **Neel Dhingra**
         *Current address and telephone number unknown*

Mr. Dhingra was an executive at Soma Financial in Reno, Nevada.  As such, Mr. Dhingra is expected to provide evidence of the internal policies of Soma and Countrywide in connection with violations of state and federal laws and regulations in the loan process into which the Montgomerys were unwittingly sucked into in their loan process.

27.     **Istvan Burgyan**
         3812 94th Avenue NE
         Yarrow Point, WA  98004
         Tel: 775-830-7676

Mr. Burgyan was an independent loan contractor at Soma.  As such, Mr. Burgyan is expected to provide evidence as a "whistleblower" in connection with his work at Soma including, but not limited, to the policies of Soma to uniformly violate state and federal lending regulations as part of a pattern of intentional, fraudulent conduct in the loan origination process leading to the securitization of mortgages including the Montgomery mortgage.

28.     **Abhineet Chowdhary, MD**
         Overlake Hospital Medical Center, Neurosurgery
         1515 116th Avenue NE
         Bellevue, WA  98004
         Tel: 425-635-6300

Dr. Chowdhary is a neurosurgeon and has information regarding Mr. Montgomery's medical conditions.

PLAINTIFFS' FRCP 26(a)(1) INITIAL DISCLOSURES
(Case No. 2:13-cv-00360-RAJ) – Page 7

BRAIN LAW FIRM PLLC
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON  98402
TEL: 253-327-1019 / FAX: 253-327-1021

p. 75

29. **Farhad Limonadi, MD, FAANA**
Desert Spine and Neurosurgical Institute
72780 Country Club Drive, Suite A104
Rancho Mirage, CA 92270
Tel: 760-837-8020

Dr. Limonadi is a neurosurgeon and has information regarding Mr. Montgomery's medical conditions.

30. **Bishoy Labib, MD**
39000 Bob Hope Drive, Suite K305
Rancho Mirage, CA 92270
Tel: 760-779-1177

Dr. Labib is a neurosurgeon and has information regarding Mr. Montgomery's medical conditions.

31. **Daniel Lopez, MD**
77564 Country Club Drive, Suite 340B
Palm Springs, CA 92211
Tel: 760-200-2477

Dr. Lopez is a doctor in general practice and has information regarding Mr. Montgomery's medical conditions.

32. **Malinda Zampera**
State Farm Insurance & Financial Services
10808 Ne Second Place
Bellevue, WA 98004
Tel: 425-453-1800

Ms. Zampera is an insurance agent and is familiar with insurance coverage for the Subject Property and Mr. Montgomery's life insurance.

## II. DOCUMENT CATEGORIES

Mr. Montgomery is in the process of locating and assembling documentation in his possession relating to the acquisition and ownership of the Subject Property and the dealings with the lender and lender representatives. However, Mr. Montgomery's medical condition has seriously complicated this process. Plaintiffs will make available documentation provided by Mr. Montgomery as it becomes available. Notwithstanding, below is a summary of document categories that Plaintiffs believe are relevant to this action, copies of which are not in Plaintiffs' possession.

1. Documents regarding the Montgomerys' purchase of the Subject Property and communications between the Montgomerys and Defendants in the possession of the Montgomerys.

PLAINTIFFS' FRCP 26(a)(1) INITIAL DISCLOSURES
(Case No. 2:13-cv-00360-RAJ) – Page 8

BRAIN LAW FIRM PLLC
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON 98402
TEL: 253-327-1019 / FAX: 253-327-1021

p. 76

2.    Pleadings from the Montgomery bankruptcy, Case No. 2:10-18510-BB, United States Bankruptcy Court for the Central District of California.

3.    Correspondence, email communications, loan and security documents between the parties

4.    Countrywide/Bank of America loan origination, servicing and securitizing documents including, but not limited to, the following:

    a.    Correspondence, email communications, documents, memoranda, notes, including all underwriting document, loan applications, loan creation criteria, risk analysis, including documents detailing prospective borrower's assets, liabilities, income, employment history, borrower's credit worthiness, and the value of the Subject Property and its potential title defects.

    b.    Documents relied upon by Countrywide Home Loans Inc. and Countrywide Financial to originate home loans to consumer borrowers, including all internal memorandums, notes and communication relating to the Countrywide Loan Expert Underwriting System.

    c.    Quality Control meeting notes, reviews and results of Countrywide Corporate quality control audits for all divisions.

    d.    Documents used by Countrywide Home Loans Servicing LP to service the loans, including documents evidencing collection and payments by borrowers.

    e.    Documents used by Countrywide to package mortgage loans into pools in order to issue Certificates or Notes.

    f.    Certificate or Notes evidencing the debt securities.

    g.    Prospectuses and Supplemental prospectuses in connection with any securitization.

    h.    Documents and written communications between MBIA and Countrywide pertaining to "credit enhancement" programs, including risk profiles of residential mortgages.

    i.    Countrywide's corporate polices to expand to second-lien loans, including home equity lines of credit, improve "flow through" rates.

    j.    Countrywide's underwriting standards and guidelines for primary and second-lien loans.

    k.    Documents, transcripts, notes from conference callas or communication from Countrywide offices to investors pertaining to Countrywide's policy of "sound lending" to investors instead of increasing market share.

BRAIN LAW FIRM PLLC
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON 98402
TEL: 253-327-1019 / FAX: 253-327-1021

l.   Documents detailing representation made to MBIA as well as others to procure financial guaranty insurance for 15 securitizations that were issued between 2004 and 2007, including (1) underwriting guidelines, policies and procedures and industry standards; (2) loan tapes; (3) shadow ratings; and (4) appraisals of residential properties by Countrywide affiliates.

m.   Documents related to the Countrywide's loan program called or identified as the "Hustle" or "High Speed Swim Lane."

n.   Documents related to Reps and Warranty models.

o.   Internal memoranda, correspondence, email communications and documents related to elimination of underwriting review of income loans and/or "dirty prime" loans.

p.   Mortgage selling and servicing contracts made by and between Countrywide and Fannie Mae.

q.   Mortgage selling and servicing contracts made by and between Countrywide and Freddie Mac.

r.   Countrywide's Loan Program Guides.

s.   FSL employees communications regarding Countrywide's quality control reports.

t.   Countrywide's Technical Manuals.

u.   Form 10-k Investor Summary lists.

v.   Fanny Mae internal correspondence and email communications concerning Countrywide's risk.

w.   Freedie Mac internal correspondence and email communications concerning Countrywide's risk.

x.   Memorandum, documents, correspondence and email communications from Andrew Gissinger.

y.   Countrywide polices about stated income loans.

z.   Emails from Countryside employees pertaining to HSSL & "Swim Lanes."

aa.   Program "Dirty Prime High-Speed Swim Lane" Model.

bb.   September 2007 email communications regarding Swim Lanes and Expanded Approval Loan Program/Models.

BRAIN LAW FIRM PLLC
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON 98402
TEL: 253-327-1019 / FAX: 253-327-1021

cc.  Internal memoranda pertaining to change in compensation structure for loan specialists and funders.

dd.  Internal email communications from employees warning FSL management about risky loans.

ee.  Email communications from Michael Thomas regarding the conflict between Countrywide's HSSL program and federal regulators.

ff.  Email communications referencing "Fast & Easy" loan product.

gg.  2008 Report from Countrywide's Enterprise Risk Management unit.

hh.  Any self-reports from Countrywide to Fannie Mae regarding defect rates.

ii.  Loan/presentation materials prepared and/or used by Countrywide in management meetings.

jj.  Reports detailing the number of times originating ran loans through CLUES.

kk.  Post-default quality review studies performed by Countrywide.

ll.  Countrywide's loan repurchase program, including documents evidencing how faulty appraisals caused the loan to default.

mm.  Memoranda, including June 15, 2007 memorandum to former Fannie Mae Chief Executive Officer, discussing Countrywide's refusal to repurchase loans.

nn.  Documents pertaining to the Red Oak Merger that merged Countrywide Financial Corporation with Bank of America Corporation subsidiary Red Oak Corporation.

oo.  Documents pertaining to a series of sales of Countrywide Financial and Bank of America's subsidiary NB Holdings Corporation.

pp.  Documents pertaining to November 7, 2008 Stock Purchase Agreement where Bank of America purchased Countrywide Financial's 100% equity ownership of Effinity.

qq.  Documents pertaining to Countrywide Bank and CHLS into Bank of America.

rr.  Public statements made by senior Bank of America officials, including the Chief Executive Officer that Bank of America has assumed Countrywide's liabilities.

PLAINTIFFS' FRCP 26(a)(1) INITIAL DISCLOSURES
(Case No. 2:13-cv-00360-RAJ) – Page 11

BRAIN LAW FIRM PLLC
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON 98402
TEL: 253-327-1019 / FAX: 253-327-1021

p. 79

5.     Countrywide/Bank of America regulation compliance documents including, but not limited to, the following:

    a.    Documents necessary and required to comply with the United States banking laws and United States Stimulus/Rescue efforts as detailed in Complaint allegation nos. 4.10 through 4.23.

    b.    Documents necessary and required to engage in business with Frannie Mae and Freddie Mac.

    c.    Documents complying with the Inter-Agency Statement of Policy on the Allowance for Loan and Lease Losses ("ALLL").

    d.    Countrywide procedures pertaining to ALLL.

    e.    Reports and disclosures required by ALLL that were made to the Office of the Comptroller of the Currency, the Federal Reserve System, the Federal Deposit Insurance Corporation, the National Credit Union Administration, and the Office of Thrift Supervision.

6.     Correspondence, email communications, memoranda and underwriting documents referenced in the Complaint in *U.S. v. Countrywide*, Case No. 1:12-cv-01422, United States District Court for the Southern District of New York.

7.     Correspondence, email communications, memoranda and underwriting documents referenced in the Complaint in *Syncora Guarantee Inc. v. Countrywide Home Loans Inc.*, New York State Supreme Court, New York County, Case No. 650042/2009.

8.     Documents produced in discovery in *U.S. v. Bank of America*, Case No. 1:12-cv-00361, United States District Court for the District of Columbia.

## III. COMPUTATION OF DAMAGES

Until Plaintiff Dennis Montgomery has undergone surgery, it is unknown whether he is going to be facing any long term disability, and, if so, what his potential income loss and long term medical expenses will be. However, any calculation of damages would include special damages as well as compensatory damages for these items. Second, the claims include multiple claims for exemplary damages which awards are discretionary and incapable of determination at this time. The remedies available to Plaintiffs include rescission, and no election of remedies has as yet been made. If such an election is made, Plaintiffs damages would be calculated by determining the total amount of expenditure made by Plaintiffs arising from acquiring and owning the Subject Property. Plaintiff Dennis Montgomery's current medical condition and impending surgery have not allowed counsel to make such a calculation.

BRAIN LAW FIRM PLLC
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON 98402
TEL: 253-327-1019 / FAX: 253-327-1021

1

## IV. INSURANCE COVERAGE

2    No claims have been asserted against Plaintiffs.  Regardless, Plaintiffs do not have any
3 insurance agreement under which an insurance business may be liable to satisfy all or part of a
possible judgment in the action or to indemnify or reimburse for payments made to satisfy the
4 judgment.

5    DATED this 15th day of May, 2013.

6                                            BRAIN LAW FIRM PLLC

7

8                                            By:
9                                                Paul R. Brain, WSBA #13438

10                                           Counsel for Plaintiffs

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BRAIN LAW FIRM PLLC
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON 98402
TEL: 253-327-1019 / FAX: 253-327-1021

# CERTIFICATE OF SERVICE

I hereby certify that I am a citizen of the United States of America and a resident of the State of Washington, am over the age of twenty-one years, am not a party to this action, and am competent to be a witness herein.

Pursuant to Fed. R. Civ. P. 5(b) and RCW 9A.72.085, I hereby certify that on the 15th day of May, 2013, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following

***Counsel for Defendants Bank of America N.A. as successor by merger to Countrywide Bank FSB and BAC Home Loans Servicing LP; Countrywide Home Loans Inc.; and Bank of America Corporation for itself and as successor by merger to Countrywide Financial Corporation***

Jody M. McCormick (jmm@witherspoonkelley.com, katel@witherspoonkelley.com)
Steven J. Dixson (sjd@witherspoonkelley.com, aliciaa@witherspoonkelley.com)

and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants:

[none]

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

DATED this 15th day of May, 2013, at Tacoma, Washington.

Paul E. Brain, WSBA #13438
Brain Law Firm PLLC
1119 Pacific Avenue, Suite 1200
Tacoma, WA 98402
Tel: 253-327-1019 / Fax: 253-327-1021
Email: pbrain@paulbrainlaw.com

PLAINTIFFS' FRCP 26(a)(1) INITIAL DISCLOSURES
(Case No. 2:13-cv-00360-RAJ) – Page 14

BRAIN LAW FIRM PLLC
1119 PACIFIC AVENUE, SUITE 1200
TACOMA, WASHINGTON 98402
TEL: 253-327-1019 / FAX: 253-327-1021

p. 82

DOWNS DECL - EXHIBIT I

Obayashi Corp. v. Chartis Specialty Ins. Co., No. C11-962 TSZ., 2012 BL 204670 (W.D. Wash. Aug. 03, 2012), Court Opinion

Pagination
\*   BL

United States District Court, W.D. Washington

OBAYASHI CORPORATION, Plaintiff, v. CHARTIS SPECIALTY INSURANCE COMPANY, Defendant.

C11-962 TSZ.
August 3, 2012.

ORDER

Thomas S. Zilly, District Judge

THIS MATTER comes before the Court on Plaintiff's Motion for Sanctions, docket no. 35. The Court has reviewed the motion, opposition, and reply, and all pleadings relating to the motion, and now enters the following Order.

I. Background

Plaintiff filed this action on June 9, 2011, docket no. 1, seeking a declaratory judgment relating to insurance coverage under a Primary Commercial General Liability Insurance Policy and an Excess Liability Policy (the "AISLIC Policies") issued by defendant Chartis Specialty Insurance Company ("Chartis") to Central Puget Sound Regional Transit Authority ("Sound Transit") and the Obayashi Corporation ("Obayashi"), a general contractor. Obayashi was hired to excavate tunnels through Beacon Hill in Seattle to accommodate the light rail system and to construct the Beacon Hill Station. The complaint also alleges breach of contract, bad faith, and violation of both the Washington Consumer Protection Act and the Washington Insurance Fair Conduct Act. On September 27, 2011, defendant filed its answer to the complaint, docket no. 11, including 50 separate affirmative defenses. On April 5, 2012, defendant filed its First Amended Answer, docket no. 28, withdrawing affirmative defenses 19 and 27 and renumbering all the remaining affirmative defenses. There are now 48 affirmative defenses pleaded by defendant. The 48 affirmative defenses can be categorized as (1) affirmative defenses relating to damages or causation, or that are merely boilerplate affirmative defenses, (2) coverage-related affirmative defenses, and (3) legal challenges to the complaint.

On February 8, 2012, plaintiff Obayashi filed notice for a Rule 30(b)(6) deposition of defendant's corporate designee on various topics. Topic 14 stated that Obayashi would seek testimony regarding "all facts and the identity of witnesses supporting the assertion of affirmative defenses stated in Chartis's responsive pleadings." See docket no. 20-4 at 80. A dispute arose over the location of the deposition, the amount of time for taking the deposition, and whether defendant would produce a 30(b)(6) witness relating to Topic 14. The defendant took the position that no witness would be produced regarding Topic 14. In substance, defendant argued that it was impermissible to ask the witness about facts supporting the affirmative defenses and that this information should be obtained through written interrogatories. See Crisera Decl., docket no. 30, Ex. B (letter dated April 18, 2012). As a result, on April 19, 2012, plaintiff filed its Motion to Compel, docket no. 30, which asked the Court to compel discovery by deposition of the factual bases for Chartis Specialty's affirmative defenses. On March 2, 2012, defendant filed its opposition, docket no. 31, and argued that the motion to compel a FRCP Rule **[\*2]** 30(b)(6) designee to answer deposition questions, regarding facts supporting affirmative defenses, should be denied "because such questions are impermissible legal conclusions." See opposition, docket no. 31, at 5. Defendant also contended in the alternative, that plaintiff's initial disclosures were incomplete and defendant's 30(b)(6) witness would "not yet have sufficient information ... to allow the Fed.R.Civ.P. 30(b)(6) designee to testify as to facts supporting particular affirmative defenses." Opposition, docket no. 31 at 7.

On May 8, 2012, the Court entered a Minute Order, docket no. 34, providing, in part, that "the motion to allow inquiry

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Obayashi Corp. v. Chartis Specialty Ins. Co., No. C11-962 TSZ., 2012 BL 204670 (W.D. Wash. Aug. 03, 2012), Court Opinion

into the factual basis for defendant's affirmative defenses is granted." Thereafter, on May 10, 2012, the defendant's 30(b)(6) witness, Ms. Pappalardo, was produced and testified in Boston about Topics 1-13 of the Notice, but Chartis refused during the deposition to allow the witness to answer questions about the factual basis for Chartis's affirmative defense:

[COUNSEL FOR CHARTIS]: I told you that she was not going to be testifying on Category 14.... I'm going to instruct her not to answer....

See Tr. at 223:20-25, Ex. A to Harper Decl.

## II. Analysis

Chartis purposefully violated this Court's May 8, 2012, Order, docket no. 34, based on the arguments already rejected by the Court in issuing said Order. Fed.R.Civ.P. 37(b)(2) authorizes courts to sanction a party who "fails to obey an order to provide or permit discovery" and allows sanctions including striking defenses in whole or in part. Fed.R.Civ.P. 37(b)(2)(iii). In the Ninth Circuit, dismissal, striking pleadings, default judgment, and similar dispositive sanctions are appropriate only in "extreme circumstances" and where the violation is "due to willfulness, bad faith, or fault of the party." Fair Housing of Marin v. Combs, 285 F.3d 899, 905 (9th Cir. 2002). In contrast, monetary sanctions are required unless the failure to obey "was substantially justified or other circumstances make an award of expenses unjust." Fed.R.Civ.P. 37(b)(2)(C).

In this case, defendant answered the complaint on September 27, 2011, and originally raised 50 affirmative defenses. This pleading, subject to Rule 11, necessarily included defendant's certification, "after an inquiry reasonable under the circumstances" that the defenses were warranted, and that any factual contention had "evidentiary support." See Fed.R.Civ.P. 11(b)(3).

Any factual basis for the coverage-related defenses were or should have been generally known to Chartis at the time it filed its Answer. Insurance companies are in the business of analyzing the facts surrounding a claim and providing the insured with the basis for any policy dispute. Chartis cannot be heard to argue it was burdensome to require the 30(b)(6) witness to answer questions relating to the factual basis for its numerous coverage-related affirmative defenses. Chartis had sufficient time and an affirmative duty to prepare its witness to testify about all topics in the notice for deposition. See U.S. Equal Emp't Opportunity Comm'n v. Caesars Entm't, Inc., 237 F.R.D. 428, 435 (D. Nev. 2006).

Defendant argues this Court's Order of May 8 did not state testimony **[*3]** regarding Topic 14 had to be provided on May 10. Opposition, docket no. 37 at 5. The very substance of the motion to compel and the Court's Order related to whether or not plaintiff could inquire about the factual basis of defendant's affirmative defenses that had been raised in defendant's answer filed more than 7 months before the deposition and 3 months after the first notice of deposition. The Court's Order granted the motion and allowed the inquiry. Defendant chose to intentionally prevent the authorized discovery at the May 10, 2012, deposition.[fn1]

This case is now set for trial on April 8, 2013. The discovery deadline is November 13, 2012. The Court must determine whether sanctions are appropriate. The Court has considered striking each of the affirmative defenses pleaded by defendant. The Court concludes, however, that less drastic sanctions are appropriate in this case. The public interest favoring disposition of cases on the merits and the availability of less drastic sanctions counsel in favor of monetary sanctions. See Hyde & Drath v. Baker, 24 F.3d 1162, 1167 (9th Cir. 1994).

Therefore IT IS ORDERED as follows:

(1) Chartis and its attorneys are deemed in contempt of this Court's Order of May 8, 2012, docket no. 34. The Court will impose monetary sanctions against defendant Chartis Specialty Insurance Company and its counsel, Herold & Sager, as set forth in paragraphs 2 and 4, which shall be payable to plaintiff.

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Obayashi Corp. v. Chartis Specialty Ins. Co., No. C11-962 TSZ., 2012 BL 204670 (W.D. Wash. Aug. 03, 2012), Court Opinion

(2) Defendant shall produce a Rule 30(b)(6) witness for a video deposition within 30 days of this Order for purposes of allowing plaintiff to examine the witness relating to the factual basis for all affirmative defenses. The deposition will take place in Seattle unless the witness is unable to travel to Seattle for health reasons. In the event the witness tendered by defendant is unable to travel to Seattle, the Court will assess against defendant the costs of travel to Boston for plaintiff's counsel, including airfare, car rental or other transit, lodging, and meal expenses. The Court also orders that defendant pay reasonable attorney's fees in connection with any travel time and all reasonable attorney's fees incurred in the taking of the deposition. The deposition may take up to 10 hours, but not more than 7 hours per day.

(3) The Court advises defendant that the Court will dismiss all affirmative defenses unless a Rule 30(b)(6) deposition is taken without interruption, except for objections as to privilege or work product, within the next 30 days. Defendant's counsel is cautioned not to make objections or statements such as "outside the scope," "vague and ambiguous," "argumentative," "lacks foundation," "or assumes facts not in evidence," and not to instruct the witness not to answer.

(4) Pursuant to Rule 37(b)(2)(C), the Court awards reasonable expenses, including attorney's fees, in connection with plaintiff's filing of the motion for sanctions in this case, in an amount to be determined by the Court. Plaintiff may file its application for attorney's fees and costs within 30 days after concluding the Rule 30(b)(6) deposition required herein, or within **[*4]** 30 days of this Order, whichever occurs later, and shall note such application for the third Friday after filing. Any response and any reply shall be filed in accordance with Local Rule CR 7(d).

[fn1] The parties had previously disputed the location of the deposition and the Court allowed defendant to produce the witness in Boston because of health-based travel restrictions of the witness. Plaintiff's counsel traveled to Boston and was willing to remain in Boston to continue the deposition pursuant to the Court's Minute Order limiting time on the first day to 7 hours.

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

DOWNS DECL - EXHIBIT J

Business : Finance : Financial Reform Watch

# Treasury Dept. anti-foreclosure program "abysmal," says watchdog

By David Heath  email  5:28 pm, January 27, 2011 Updated: 12:19 pm, May 19, 2014

Desperate homeowners beware: Getting help from the federal government to lower your monthly mortgage bill may actually force you into foreclosure.

Comment
E-mail
Print

That warning comes from Neil Barofsky, the government watchdog monitoring the Treasury Department's loan modification program. The problem, he says, is that borrowers struggling to pay the mortgage are first put into a trial version of the Home Affordable Modification Program (HAMP) that often only makes their situation worse.

"This program has hurt people," said Barofsky, the inspector general of the Troubled Asset Relief Program which bailed out the banks and was also supposed to help homeowners facing foreclosure. "It's heartbreaking."

The trial program cuts the monthly mortgage bill temporarily while a borrower's application for a permanent loan modification is processed. But most borrowers are rejected for the permanent program.

While 1.4 million have gone through the trial, only 550,000 have had their modifications made permanent. The other 900,000 borrowers suddenly got whopping bills to repay the trial reduction in their mortgage payment, often for thousands of dollars.

Barofsky said the Treasury Department even allows loan companies retroactively to charge late fees for each month of the trial.

### Little Incentive for Loan Servicers

While borrowers are caught in a terrible bind, loan servicers profit from the borrower's misery, because they take all their fees off the top of a foreclosure. So there's not much incentive for them to get borrowers into a permanent modification, Barofsky told the Center for Public Integrity in an interview earlier this week.

In testimony before the House Oversight and Government Reform Committee yesterday, Barofsky called the program's performance "abysmal."

Tim Massad, the Treasury official who oversees the program, defended its performance, calling it a success because it had helped a half-million borrowers.

Treasury had initially expected more than 3 million borrowers to get permanent modifications but the latest projections are for no more than 800,000 borrowers to get help. In the last three years, 8 million American homeowners were served with foreclosure notices.



"Go tell a Republican," Rep. Frank says to complaints that Congress has failed to curb foreclosures

By Julie Vorman July 1, 2011

"People are losing their homes," said Rep. Edolphus Towns, a Democrat from New York. "I wish you could just come and spend just one day in my office and listen to people who are coming in and the stories they are telling."

**Applicants Don't Meet Criteria**

Massad agreed that the performance of loan servicers has been "abysmal" but he said part of the reason so many borrowers are turned down is because they don't meet the program's eligibility requirements. In fact, only 1.5 million borrowers who applied meet the criteria, Massad told lawmakers.

"We don't help people who have million-dollar mansions," Massad said. "We don't help people who have vacation homes."

Barofsky, however, scoffed at the notion that the problem was too many million-dollar mansions, and blamed the Treasury Department's reluctance to penalize loan servicers for forcing people into foreclosure. But Massad said the only penalty Treasury can impose is to withhold funds.

The Treasury Department has also been criticized for failing to disclose more specific loan-level data from mortgage servicers about which borrowers obtain HAMP modifications. The Dodd-Frank financial reform law requires loan servicers to disclose how they arrived at the decision to deny a loan modification.

And Fannie Mae, the loan financing giant, has also been accused of bungling its stewardship of the HAMP_program by mismanaging and wasting taxpayer funds, according to whistleblower allegations reported by the Center in August.

Meanwhile, Treasury has so far spent only $1 billion of the $50 billion allocated for helping homeowners.

**More stories about**

Finance, Personal finance, Business and Finance, Economy of the United States, Mortgage, Subprime mortgage crisis, Troubled Asset Relief Program, Mortgage modification, Mortgage servicer, Financial services, Banking in the United States, United States housing bubble, Home Affordable Modification Program, Neil Barofsky, Department of the Treasury



Add a comment...

Comment using...

Facebook social plugin

**Get our email newsletter**

Sign up for the Center for Public Integrity's *Watchdog* email and get the news you want from the Center when you want it.

Email address     Subscribe     More options ▼

p. 89

## Support investigative journalism
Make a tax-deductible donation to the Center today

**Click here to donate online**    **Other ways to give**

## What we cover

Politics

National Security

Business

Environment

Juvenile Justice

Accountability

Health

Inside Publici

## About the Center

About The Center for Public Integrity

Our Organization

Our Funders

Our People

Our Work

About the International Consortium of
Investigative Journalists

Privacy Policy and Terms of Use

Contact

## Follow us

Twitter

Facebook

LinkedIn

Google+

RSS

Copyright 2014 The Center for Public Integrity

Supported by:

p. 90